## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MID-ATLANTIC EQUITY CONSORTIUM, INC.**
5272 River Road, Suite 340,
Bethesda, MD 20816;

**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE**
4805 Mt. Hope Drive
Baltimore, MD 21215;

**NAACP TENNESSEE STATE CONFERENCE**
27 Brentshire Square, Suite A
Jackson, TN 38305;

and

**SOMERVILLE-FAYETTE NAACP**
3505 Warren Road
Oakland, TN 38060

     *Plaintiffs*,

       v.

**UNITED STATES DEPARTMENT OF EDUCATION**,
400 Maryland Avenue, SW
Washington, D.C. 20202

and

**LINDA MCMAHON**, *in her official capacity as Secretary of the U.S. Department of Education*,
400 Maryland Avenue, SW
Washington, D.C. 20202

     *Defendants*.

Civil Action No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Mid-Atlantic Equity Consortium, Inc. ("MAEC") and the National Association for the Advancement of Colored People ("NAACP"), by and through their undersigned counsel, bring this action against Defendants and, in support, state the following:

## PRELIMINARY STATEMENT

1.     On February 13, 2025, the Defendant United States Department of Education ("ED" or the "Department**"**) terminated the Equity Assistance Center ("EAC") grant awarded to Plaintiff MAEC, and the entire EAC program, abruptly, arbitrarily, and in violation of required procedures and Plaintiffs' constitutional rights on the basis that the grant award ("the EAC grant") promotes equity. The EAC grant funds Plaintiff MAEC's Center for Education Equity ("CEE"), through which it provides critical technical assistance to school districts seeking to comply with, or prevent violations of, Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, and other federal civil rights laws.

2.     Plaintiff MAEC is one of four grantees awarded by the Department's EAC Program, which was established to fund desegregation and anti-discrimination assistance in public schools.[1] On the same day and using the same boilerplate language Defendants used to terminate Plaintiff MAEC's grant, the Department terminated EAC grants awarded to the three other grantees. These terminations effectively ended the EAC Program, a program authorized by Congress under Title IV of the Civil Rights Act.  Since 1964, Congress has appropriated millions of dollars for the EAC Program to provide financial assistance grant awards.

3.     As a result of the termination of the EAC program, the members of Plaintiff NAACP who attend or are employed by public schools were deprived of the benefits of the

---

[1] *See Training and Advisory Services – Equity Assistance Centers: Home*, U.S. Dep't of Educ., https://web.archive.org/web/20250421210554/https://www.ed.gov/grants-and-programs/grants-birth-grade-12/training-and-advisory-services--equity-assistance-centers (last reviewed Feb. 28, 2025).

technical assistance and support provided to their school districts by the EAC grantees. The Department's elimination of the EAC grantees' desegregation and anti-discrimination services has inflicted outsized harm on Black students, parents, teachers, and school administrators who are members of Plaintiff NAACP. Black students experience higher rates of school-based discrimination and are subject to harsher and more frequent school discipline than their peers, harms which the EAC Program and the grantees' services were addressing prior to Defendants' termination of the EAC Program and related grants.

4.    Through this lawsuit, Plaintiff MAEC and Plaintiff NAACP seek to enjoin and set aside Defendants' unconstitutional, arbitrary, and lawless termination of the EAC Program and the related EAC grants.

5.    As the Department describes on its website, the EACs design technical assistance and training services to support school desegregation, including by working with schools "in the areas of harassment, bullying, and prejudice reduction."[2]

6.    Consistent with this objective, Plaintiff MAEC has been awarded EAC grants for more than three decades.

7.    During the current five-year award period, Plaintiff MAEC has responded to requests for assistance to help seventeen school districts in New York reduce racially discriminatory discipline practices, three schools in Maine to decrease the racial academic opportunity gap for students in Math and English Language Arts, and countless other local and state educational agencies to improve their compliance with Title IV, Title VI, Title IX, and other applicable civil rights laws. Plaintiff MAEC's work has benefited over one hundred state and local educational agencies and hundreds of thousands of students.

---

[2] *Id.*

8.    Despite the measurable benefits of Plaintiff MAEC's work and the work of the other EAC grantees, and contrary to the Department's longstanding priorities to support desegregation and federal nondiscrimination laws, Defendants terminated MAEC's EAC grant and the grants of each of the EAC grantees on the basis that their activities "promote or take part in diversity, equity, and inclusion ("DEI") initiatives." This termination comes on the heels of President Donald Trump's recent executive orders targeting "diversity, equity, and inclusion," including an executive order to end all "equity-related" grants and programs.

9.    The form letter that the Department used to terminate Plaintiff's EAC grant ("the Termination Letter") provides no definition of diversity, equity, and inclusion, nor information on the types of diversity, equity, and inclusion programs that are permissible or impermissible. The Termination Letter also fails to reference Plaintiff MAEC's performance and offers no identification or description of MAEC programs or activities that constitute apparently disfavored diversity, equity, and inclusion, nor of any MAEC programs that are inconsistent with Department priorities or otherwise run afoul of the EAC Program or applicable laws. The same is true of the form letter used to terminate the other three EAC grants. The Termination Letter denies Plaintiff MAEC its statutory and regulatory right to due process prior to termination of the grant, and it provides no opportunity for meaningful appeal or recourse.

10.    By abruptly and arbitrarily terminating the EAC grants, Defendants have inflicted immediate and irreparable harm on Plaintiff MAEC and the school districts, municipalities, local educational agencies ("LEAs"), students, and families, including the members of Plaintiffs NAACP, Tennessee NAACP, and Fayette NAACP ("NAACP members"), it serves. The termination has forced Plaintiff MAEC, the other EAC grantees, and their partner LEAs to shutter or halt ongoing technical assistance projects in multiple school districts that were seeking to

prevent and remedy race and sex discrimination in student achievement, discipline, and academic placement—programs that benefited the families, students, teachers, and others who are NAACP members.

11.    Without the assistance of the EAC grantees, these school districts lack the resources to continue these projects, which are necessary to ensure compliance with federal law and to support the well-being of students, families, and teachers, including NAACP members. One Superintendent noted that their district "lacks the resources and skills needed to complete the effort" Plaintiff MAEC was due to conduct and that, without those resources, "[t]he academic achievement and educational outcome discrepancies historically seen within our school district . . . will continue to persist." Appeal of Grant Award Termination Grant Award S004D220002 (Mar. 12, 2025) at 19, herein and attached as Exhibit 1.

12.    The termination of the EAC grant program on the basis that EAC grants and grantees promotes diversity, equity, and inclusion initiatives violates Plaintiff MAEC's First Amendment right to free speech, Plaintiff MAEC's Fifth Amendment Right to due process, the separation of powers enshrined in the Constitution, and the statutes governing the procedures required for termination of such grants. The termination also violates Plaintiff NAACP's right to receive information and Fifth Amendment right to be free of vague prohibitions that infringe upon that right.

13.    The termination is also a final agency action that exceeds Defendants' authority and contradicts the text of Title VI, Title IX, Part D of the General Education Provisions Act ("GEPA"), and other constitutional rights, civil rights laws, and regulations and longstanding precedent interpreting them, and that is not based on reasoned analysis or consideration of

applicable reliance interests. Accordingly, it violates the rights of Plaintiffs MAEC and NAACP under the Administrative Procedure Act.

## PARTIES

14.    Plaintiff the Mid-Atlantic Equity Consortium, Inc. ("MAEC"), is a nonprofit 501(c)(3) organization. Under the EAC grant, Plaintiff MAEC provided free or low-cost technical assistance, planning, and training requested by school districts, municipalities, and states to help them prevent and remediate discrimination, segregation, and the special educational problems occasioned by desegregation.

15.    Plaintiff NAACP was founded in 1909 and has more than 2,200 local branches, 371 college chapters, forty-nine Youth Councils, and twenty-three high school chapters across the country, including Plaintiff Tennessee State Conference of the NAACP ("Tennessee NAACP") and NAACP Fayette-Somerville Branch ("Fayette NAACP") and their members. The NAACP's principal objectives are to ensure the political, educational, social, and economic equality of all citizens; to eliminate racial prejudice; to remove all barriers of racial discrimination through democratic processes; to seek enactment and enforcement of federal, state, and local laws securing civil rights; and to inform the public of the continued adverse effects of racial discrimination. The NAACP's members include educators and families in every state, including Black students who attend PK-12 schools throughout the country and Black educators who teach in PK-12 schools throughout the country. NAACP members' equal access to their education depends in part upon the development and application of practices that prevent and redress discrimination in classrooms and on campuses, including through the technical assistance services made available by the EAC Program. NAACP members have benefited and continue to benefit from the provision of services by the EAC program and its grantees, and the elimination of the EAC program and related grants

has denied, and will continue to deny, NAACP members access to and the benefits of trainings, information, and other technical services that reduce racial and other forms of discrimination in schools.

16.    Plaintiff Tennessee NAACP is the state conference of the NAACP and shares its missions and goals. Members of the Tennessee NAACP are also members of the national NAACP. The Fayette NAACP is a local unit of Plaintiff NAACP and Plaintiff Tennessee NAACP and shares their missions and goals. Members of the Fayette NAACP are also members of Plaintiff NAACP and Plaintiff Tennessee NAACP. Plaintiffs Tennessee NAACP and Fayette NAACP have members who are Black children, parents, and educators across the state who benefit from the EAC Program and the services and information provided to their membership by the EAC grantees.

17.    Defendant United States Department of Education (the "Department") is a federal agency within the executive branch of the United States government headquartered in Washington, D.C. The Department administers and oversees thousands of education-related grants, including the EAC grant, the Equity Assistance Centers Program, and other discretionary grants to remedy and prevent discrimination in educational services.

18.    Defendant Linda M. McMahon is the Secretary of Education and the Department's highest-ranking official. Defendant McMahon is charged with the supervision and management of all decisions and actions of that Department, including its decision to terminate the EAC grant for Plaintiff MAEC. She is sued in her official capacity.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. § 702.

20.     Venue is proper in this District under 28 U.S.C. § 1391(e) because each Defendant is an agency of the United States or an officer or employee of the United States, sued in their official capacities, and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

21.     The Court is authorized to award the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201-02 (Declaratory Judgment Act).

## FACTUAL BACKGROUND

### I. CONGRESS CREATED THE EQUITY ASSISTANCE CENTER PROGRAM TO FUND DESEGREGATION TECHNICAL ASSISTANCE AND TRAINING.

22.     The Equity Assistance Center Program (the "EAC Program") is "one of [the Department's] longest-standing investments in technical assistance" and "ensuring that all students have equitable access to learning opportunities."[3]

23.     The EAC Program promotes nondiscrimination in education by funding Equity Assistance Centers to provide desegregation assistance to public schools, school districts, municipalities, and states. *See* 34 C.F.R. pt. 270.

24.     Authorized pursuant to Title IV of the Civil Rights Act of 1964, Congress created the EAC Program in 1964 as a vehicle to "render technical assistance . . . in the preparation, adoption, and implementation of plans for the desegregation of public schools," 42 U.S.C. § 2000c–2, and to "arrange, through grants or contracts, . . . institutes for special training designed to improve the ability of teachers, supervisors, counselors and other elementary or secondary school personal to deal effectively with special educational problems occasioned by desegregation," 42 U.S.C. § 2000c–3.

---

[3] *Training and Advisory Services – Equity Assistance Centers: Home*, U.S. Dep't of Educ., *supra* note 1.

25.     As recently as 2022, the Department awarded  5-year EAC grants to nonprofits to "operate regional equity assistance centers to provide technical assistance and training, at the request of school districts and other responsible governmental agencies, on issues related to equity in education to ensure that all children, regardless of race, gender, national origin, or religion, have equal access to a quality education and the opportunity to develop high academic proficiency in reading, math and other core subject areas."[4]

26.     The EACs "offer technical assistance to school districts . . . who seek to resolve civil rights conflicts" and "more recently [have] provide[d] resources and training in the areas of hate crimes, racial prejudice, and bullying."[5]

27.     According to the Department, the Equity Assistance Centers "play[] a vital role in ensuring that all students have equitable access to learning opportunities, regardless of their . . . race, sex, national origin, or religion."[6]

28.     The EAC Program establishes a competitive process for public agencies and private nonprofits to apply for grant awards to provide desegregation assistance for school districts and LEAs in a given region. 34 C.F.R. §§ 270.1–270.5, 270.7. An entity receiving funds through the EAC Program is called an Equity Assistance Center. *Id*. § 270.1.

29.     Federal regulations governing the EAC Program define desegregation as "the assignment of students to public schools and within those schools without regard" to their race, sex, national origin, or religion, "including providing students with a full opportunity for participation in all educational programs regardless of their" race, sex, national origin, or religion. *Id*. § 270.7.

---

[4] *Id*.
[5] *Id*.
[6] *Training and Advisory Services – Equity Assistance Centers: Home*, U.S. Dep't of Educ., *supra* note 1.

30.     Since 2016, the Department has divided the United States and territories into four regions and has awarded EAC grants to four grantees, each of which serves a region.

31.     In 2022, the Department awarded the EAC grants to four grantees: MAEC to serve Region I, which covers Connecticut, Delaware, Kentucky, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Puerto Rico, Rhode Island, Vermont, West Virginia, and the Virgin Islands; the Southern Education Foundation to serve Region II, which covers Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, Texas, Virginia, and the District of Columbia; the Midwest and Plains Equity Assistance Center to serve Region III, which covers Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, Oklahoma, South Dakota, and Wisconsin; and the Western Educational Equity Assistance Center to serve Region IV, which covers Alaska, Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, Wyoming, American Samoa, the Commonwealth of the Northern Mariana Islands, and Guam.[7]

32.     All EACs must provide desegregation assistance in the areas of race, sex, national origin, and religion desegregation. *Id.* §§ 270.4(b), 270.7.

33.     Desegregation assistance "may include, among other activities, (1) Dissemination of information regarding effective methods of coping with special educational problems occasioned by desegregation; (2) Assistance and advice in coping with these problems; and (3) Training designed to improve the ability of teachers, supervisors, counselors, parents, community

---

[7] *Training and Advisory Services – Equity Assistance Centers: Contacts,*
https://web.archive.org/web/20250506230015/https://www.ed.gov/grants-and-programs/grants-birth-grade-12/training-and-advisory-services--equity-assistance-centers#contacts (last reviewed Feb. 28, 2025) (select a state/area in each color from the map).

members, community organizations, and other elementary or secondary school personnel to deal effectively with special educational problems occasioned by desegregation." *Id*. § 270.4(c).

34.    An EAC may provide these services only when requested to do so by a school board or other LEA in its assigned region. *Id*. § 270.3.

35.    The Department awarded the EAC grant to Plaintiff MAEC and the other grantees in 2022 pursuant to the Department's authority under 42 U.S.C. § 2000c-2, which authorizes the Secretary of Education to render technical assistance to further desegregation of public schools, and the Department's General Administrative Regulations, including 34 C.F.R. Parts 75, 77, 79, 81, 82, 84, 86, 97–99 and 2 C.F.R. Parts 180, 485, 3474.

## II.    PURSUANT TO ITS EAC GRANT, PLAINTIFF MAEC AND THE OTHER GRANTEES OFFERED NEEDED TECHNICAL ASSISTANCE TO THOUSANDS OF DISTRICTS NATIONWIDE.

36.    Plaintiff MAEC has been a part of the EAC Program since MAEC was founded in 1992.

37.    Since 2016, Plaintiff MAEC has provided technical assistance through its Center for Education Equity. With the EAC grant, Plaintiff MAEC provided desegregation assistance services to schools and LEAs in Region 1.

38.    Dozens of districts in these states remain subject to school desegregation orders, and many of these districts continue to struggle to comply with Federal Civil Rights Law. For example, as of February 2022, Region I had 177 open Title VI investigations at elementary and secondary schools, ranging from racial harassment to denial of benefits to discipline. Of these, nearly as many cases (47.5%) were opened in the past two years as were opened in the prior 12-year period (52.5%). Five states (New York, Maine, Pennsylvania, New Jersey, and Maryland) rank in the top 20 states with the largest number of hate incidents against Asian American students

between March 2020 and December 2021.[8] And, per a 2014 study, over 60 districts in Region I were under federal school desegregation orders, including 17 districts in Connecticut, 16 districts in New York, nine each in New Jersey and Pennsylvania, eight in Delaware, five in Maryland, and two each in New Hampshire and Maine.[9]

39.    Plaintiff MAEC was competitively selected for its most recent five-year EAC grant under the Program in 2022, Award No. S004D220002, Project 84.004D. The EAC grant, by its terms, awarded Plaintiff MAEC annual funding through September 30, 2027.

40.    The grant obligates both the Department and Plaintiff MAEC "to the requirements that apply to the grant." 34 C.F.R. § 75.236.

41.    Under the terms of the EAC grant, Plaintiff MAEC was scheduled to receive a total of $8,214,498 in annual disbursements to provide technical assistance and training to state educational agencies, school districts, and other entities in Region I from October 1, 2022, to September 30, 2027.

42.    Plaintiff MAEC received its most recent Grant Award Notification ("GAN") on August 22, 2024. The GAN provided $1,686,452 to Plaintiff MAEC from October 1, 2024, through September 30, 2025.

43.    For more than 30 years (with the exception of 2009-2011, when Plaintiff MAEC did not receive the EAC grant), Plaintiff MAEC has complied with the terms of its EAC grant to provide technical assistance and training to schools and municipalities.

---

[8] MAEC-CEE, Mid Atlantic Equity Consortium Application - S004D22002 4 (Oct. 2022), https://web.archive.org/web/20250421211134/https://www.ed.gov/sites/ed/files/2022/10/Region_I_Project_Narrative-MAEC.pdf
[9] Yue Qiu & Nikole Hannah-Jones, *A National Survey of School Desegregation Orders*, ProPublica (Dec. 23, 2014), https://web.archive.org/web/20250405220525/https://projects.propublica.org/graphics/desegregation-orders.

44.     Specifically, Plaintiff MAEC delivers technical assistance services designed to build the capacity of schools and other state and local educational agencies to effectively prevent and respond to discrimination, segregation, and the special educational problems occasioned by desegregation, including by improving and sustaining educational agencies' desegregation and by increasing equitable education opportunities for all students regardless of race, sex, religion, and national origin.[10]

45.     Plaintiff MAEC's work also helps schools and other entities ensure they are complying with Title IV and Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, and other federal civil rights laws.

46.     Plaintiff MAEC's technical assistance to school districts and other eligible entities consists of a wide range of services to address issues arising in schools, classrooms, and communities in the course of efforts to desegregate on the basis of race, national origin, sex, or religion. This may include trainings, webinars, targeted interventions, and strategic planning, and otherwise assisting schools in fostering positive and safe learning environments that meet all students' needs and that are free from bullying and harassment related to race, color, national origin, sex, or religion.

47.     Plaintiff MAEC's EAC initiates its work with states, districts, schools, and community-based organizations within Region I at the request of school boards and other responsible governmental agencies. Referrals also come as a result of investigations conducted by the Office for Civil Rights ("OCR") and the Department of Justice.

48.     Plaintiff MAEC's resources, training, and individualized, intensive technical assistance have impacted 4,440 school districts and 19,125,434 students.

---

[10] *Who We Are*, Ctr. for Educ. Equity, https://cee-maec.org/who-we-are/(last visited Apr. 22, 2025).

49.     In Fiscal Year 2024 alone, Plaintiff MAEC served 109 state and local educational agencies, including schools and other entities.

50.     During that same Fiscal Year, Plaintiff MAEC engaged in thirty projects to address discrimination and segregation on the basis of race and national origin, three projects to address discrimination and segregation on the basis of sex, and one project to reduce discrimination and segregation on the basis of religion.

51.     For example, Plaintiff MAEC recently worked with school districts in New York and Maine to address racial discrimination in school discipline and academic programs. Plaintiff MAEC worked with seventeen school districts in New York to improve their school discipline practices. As a result of Plaintiff MAEC's assistance, these schools saw decreases in the racially disproportionate use of school discipline, and the New York State Education Department requested that Plaintiff MAEC provide trainings to prevent discrimination in school discipline trainings throughout the state. Similarly, with Plaintiff MAEC's assistance, three schools in Portland, Maine decreased the racial academic opportunity gap in Math and English Language Arts by up to ten percent.

52.     Before the Department terminated Plaintiff's MAEC grant, Plaintiff MAEC was scheduled to help six school districts with similar projects, including five districts in Massachusetts and one in Pennsylvania.

53.     In addition to its work under the EAC grant, Plaintiff MAEC provides other services to states, localities, and school districts across the Northeast and Mid-Atlantic regions, Kentucky, Puerto Rico, and the Virgin Islands that similarly advise equal educational opportunity and access.

54.    For example, Plaintiff MAEC operates two statewide family engagement centers: one for Pennsylvania and Maryland and one in Maine.

55.    Plaintiff MAEC also previously served as the Maryland Parental Information and Resource Center from 2011-2016.

56.    The Department was aware of all of Plaintiff MAEC's projects described herein through meetings and reports. The Department determined whether to issue each continuation GAN and reviewed and approved MAEC's annual reports, compliance with Government Performance and Results (GPRA) measures, and initiated yearly client surveys, which are also provided to Congress for budget appropriations.

57.    The other EAC grantees have similarly impacted millions of students and hundreds of districts across the country. The Western Educational Equity Assistance Center has served a region comprising over 12.4 million public school students, the Midwest and Plains Equity Assistance Center has served a region of over 11 million students, and the Southern Education Foundation has served a region comprising of 17 million students (including 11 million students of color and  over a million students who attend school in a district with an active desegregation order).[11] The Midwest and Plains Equity Assistance Center has, in the past ten years, served over 186 local education agencies and all thirteen state education agencies in its region.[12]

### III. PLAINTIFF NAACP RELIES ON SERVICES PROVIDED BY PLAINTIFF MAEC AND THE OTHER EAC GRANTEES TO PREVENT VIOLATIONS OF CIVIL RIGHTS LAWS.

---

[11] *See* WestEd, *Western Educational Equity Assistance Center Proposal* (PR/Award # S004D220004) 4 (May 2022), https://web.archive.org/web/20250506235042/https://www.ed.gov/sites/ed/files/2022/10/Region_IV_Project_Narrative-WestEd.pdf; Kathleen King Thorius & Seena M. Skelton, Midwest & Plains Equity Assistance Ctr.: Region III EAC, *Civil Rights Training and Advisory Services Equity Assistance Centers Program* 22 (Jan. 2021) ["S004D220003 Application"], https://web.archive.org/web/20250506235006/https://www.ed.gov/sites/ed/files/2022/10/Region_III_Project_Narrative-Indiana-University.pdf.

[12] *See* S004D220003 Application, *supra* note 11, at 1.

58.     Plaintiff NAACP has over 97,664 members. NAACP membership includes Black educators in nearly every state, 7,803 active college members in 371 college chapters in 43 states, 295 active high school members in 23 high school chapters in 23 states, and 12,611 active Youth Council members in 567 Youth Council chapters in 49 states. In addition, members in each state chapter have school-aged children who attend PK-12 schools.

59.     Plaintiff NAACP has members across the country who attend K-12 public schools that benefit from, and in many instances, rely on, technical assistance and support provided by EAC grantees. For example, NAACP members and their children attend schools in Fayette County Public Schools ("FCPS") in Tennessee, a school district that requested and received technical assistance and other EAC support from the southern region EAC grantee, Southern Education Foundation ("SEF"). FCPS is currently subject to a federal court's school desegregation order, which requires FCPS to contract with the EAC grantee for services. In connection with FCPS' efforts to eliminate the vestiges of discrimination against Black students and educators, including NAACP members, SEF provided teacher recruitment, hiring, and retention training to FCPS and technical assistance designed to create a more supportive environment for Black teachers and prepare all teachers to teach Black students in an engaging and effective way.

60.     For example, SEF provided tailored instructional practices and strategies to FCPS, consulting on district goals and challenges to maximize FCPS' ability to "grow their own" culturally responsive teachers, including NAACP educator members. SEF also offered FCPS a variety of professional development resources, including workshops, consultation services, and resources on retaining teachers and fostering a supportive environment for all teachers, including Fayette NAACP educator members, and students, including Fayette NAACP student members.

61.    Black students, including the children of NAACP members and student members of NAACP Youth Councils, experience higher rates of school-based discrimination than their peers. Services provided by the EACs, including Plaintiff MAEC, to address school-based discrimination directly benefit NAACP members and other Black students in state and local educational agencies served by the EACs.

62.    Black students are, for example, at greater risk of experiencing racial discrimination than their peers. As a result, they must expend cognitive energy processing discrimination and are less able to spend that energy on learning and development.[13]

63.    Indeed, more than a fifth of Black post-secondary students frequently or occasionally feel discriminated against.[14] 61% of those students have considered dropping out of school as a result.[15] During Fiscal Year 2024, 19% (4,307) of the nearly 23,000 complaints that ED's Office for Civil Rights received alleged discrimination on the basis of race, color, or national origin.[16]

64.    Racially discriminatory acts, including school-based discrimination, are "detrimental to students' motivation, engagement, development, learning, performance, and psychological well-being."[17]

---

[13] Sellers et al., *Racial Identity Matters: The Relationship between Racial Discrimination and Psychological Functioning in African American Adolescents*, 16 J. Rsch. Adolescence 187, 188 (2006), https://doi.org/10.1111/j.1532-7795.2006.00128.x; Dr. Gillian Scott-Ward, *Moving Past Racist Grooming Standards Terrorizing our Children*, Medium (Jan. 10, 2019), https://medium.com/@gillianscottward/moving-past-racist-grooming-standards-terrorizing-our-children-40df73b9ecb3.
[14] Camille Lloyd & Courtney Brown, *One in Five Black Students Report Discrimination Experiences*, Gallup (Feb. 9, 2023), https://news.gallup.com/poll/469292/one-five-black-students-report-discrimination-experiences.aspx.
[15] *Id.*
[16] Off. for C.R., U.S. Dep't of Educ., *2024 Fiscal Year Annual Report* 8 (2024), https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf.
[17] DeLeon L. Gray et al., *Black and Belonging at School: A Case for Interpersonal, Instructional, and Institutional Opportunity Structures*, 53 Educ. Psych. 97, 102 (2018), https://doi.org/10.1080/00461520.2017.1421466.

65.    Defendants have also recognized that students of color, particularly Black students including NAACP members, are subject to harsher and more frequent school discipline.[18] Studies show that the racially discriminatory administration of discipline adversely affects students' academic performance, attendance, and behavior; may contribute to lower enrollment in higher education; and may push students into the criminal justice system.[19]

66.    Schools often fail to appropriately respond to school-based discrimination and its impacts on NAACP members and other students. But technical assistance, including the provision of training and revisions to policies, can help K-12 schools better respond to school-based discrimination and can ensure equal educational opportunities for NAACP members and other Black students and Black educators.

67.    For example, Plaintiff MAEC created a technical assistance tool, *A Data Inquiry Guide for Identifying and Addressing Equity Gaps,* to provide services to schools to increase academic achievement and close racial opportunity gaps. Using the *Inquiry Guide*, Plaintiff MAEC was able to reduce the racial opportunity gaps across a cohort of three public schools in Maine,

---

[18] Joint "Dear Colleague" Letter from the U.S. Dep't of Educ. & U.S. Dep't of Just. (Jan. 8, 2014), https://web.archive.org/web/20250409163856/https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-201401-title-vi.pdf; Nora Gordon, *Disproportionality in Student Discipline: Connecting Policy to Research*, Brookings Inst. (Jan. 18, 2018), https://www.brookings.edu/articles/disproportionality-in-student-discipline-connecting-policy-to-research/; *see, e.g.*, Kirsten Weir, *Inequality at School: What's Behind the Racial Disparity in Our Education System?*, 47 Am. Psych. Ass'n. 42 (2016), https://www.apa.org/monitor/2016/11/cover-inequality-school; *see* Erin Hinrichs, *Minnesota Educators Weigh in on Student Discipline Debate Unfolding in D.C.*, MinnPost (Dec. 5, 2017), https://www.minnpost.com/education/2017/12/minnesota-educators-weigh-student-discipline-debate-unfolding-dc/ [https://perma.cc/S25S-SM54].

[19] *E.g.*, Alicia R. Jackson, *Inherently Unequal: The Effect of Structural Racism and Bias on K-12 School Discipline*, 88 Brook. L. Rev. 459, 495 (2023), https://brooklynworks.brooklaw.edu/blr/vol88/iss2/2; Am. Psych. Ass'n Zero Tolerance Task Force, *Are Zero Tolerance Policies Effective in the Schools?*, 63 Am. Psych. 852, 852 (2008), https://www.apa.org/pubs/reports/zero-tolerance.pdf [https://perma.cc/6SSP-7RCT]; Amity L. Noltemeyer et al., *Relationship Between School Suspension and Student Outcomes: A Meta-Analysis*, 44 Sch. Psych. Rev. 224–40 (2015), https://edsource.org/wpcontent/uploads/2018/09/Noltemeyer_Ward_2015_Meta-Analysis.pdf; Emily Peterson, *Racial Inequality in Public School Discipline for Black Students in the United States*, Ballard Brief (Sept. 2021), https://ballardbrief.byu.edu/issue-briefs/racial-inequality-in-public-school-discipline-for-black-students-in-the-united-states; *School to Prison Pipeline*, Wis. Coal. Against Sexual Assault, Inc., https://www.wcasa.org/resources/areas-of-interest/topics/school-to-prison-pipeline/ (last visited May 6, 2025).

achieving decreases in the racial opportunity gap as high as 10.6% in Math and 10.1% in English Language Arts.

68.     Similarly, changes to school discipline policies and programs, including those facilitated by EAC technical assistance, equalize education for all students and mitigate harms to Black students. For example, research shows that Black students are less likely to be excluded and more likely to benefit from their educational environment when their schools adopt restorative justice practices, begin regularly analyzing and responding to racial disparities in discipline, and take other steps to reduce racial discrimination in discipline.[20]

69.     In another example of how the targeted support and technical services provided by EAC grantees yielded tangible and transformative results for students, including NAACP student members, SEF played a vital role in assisting a district with a comprehensive revision of its discipline policies and framework designed to eliminate unfair disciplinary practices and reduce excessive suspensions. As a direct result of this targeted consulting, the district experienced a dramatic reduction in disciplinary hearings, dropping from 35 per year to just 3.[21]

70.     Educators, including NAACP members, regularly receive and rely on technical assistance from Plaintiff MAEC and other EACs to implement these changes, properly respond to school-based discrimination, and otherwise facilitate equal education access for all students.

71.     Educators, including NAACP members, benefit from the ability to openly discuss and learn from trainings and instructional materials that address problems occasioned by desegregation and promote equity and equal educational access, including materials and programs

---

[20] Anne Gregory & Katherine Evans, *The Starts and Stumbles of Restorative Justice in Education: Where Do We Go from Here?*, Nat'l Educ. Pol'y Ctr. 3 (2020), https://nepc.colorado.edu/sites/default/files/publications/Revised%20PB%20Gregory 0.pdf [https://perma.cc/C6LEQBS6] (discussing, among other benefits, that schools that adopt these practices saw a drop in suspension rates).
[21] Motion at Ex. 1, p. 5, *S. Educ. Found. v. U.S. Dep't of Educ.*, No. 1:25-cv-01079-PLF (D.D.C. Apr. 23, 2025), ECF No. 11-4.

provided by Plaintiff MAEC and the other EACs. The ability to openly discuss and learn from these ideas creates a more supportive environment for educators, including Plaintiff NAACP members and other Black educators, and helps those educators create a more supportive learning environment for students.

## IV. PRESIDENT TRUMP TARGETS PROGRAMS THAT HE ASSERTS PROMOTE DIVERSITY, EQUITY, AND INCLUSION.

72.     In the opening days of the new administration, President Donald Trump issued a series of executive orders broadly seeking to end all efforts to advance initiatives that he identifies as relating to diversity, equity, inclusion, and accessibility.

73.     The new administration's broad efforts to end all purported diversity, equity, inclusion, and accessibility initiatives extended to the Department's grants.

74.     On Inauguration Day, January 20, 2025, President Trump issued Executive Order No. 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing." 90 Fed. Reg. 8339 (Jan. 29, 2025).

75.     Executive Order No. 14151 asserts that diversity, equity, inclusion, and accessibility programs are "illegal and immoral discrimination programs." *Id*. To impose the Administration's viewpoint, the Order requires each federal agency head to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts" within 60 days. *Id.*

76.     The next day, on January 21, 2025, President Trump issued Executive Order No. 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," 90 Fed. Reg. 8633 (Jan. 31, 2025).

77.     As expressed in its title, this executive order characterizes diversity, equity, and inclusion efforts as contrary to the Administration's preferred viewpoint, "merit-based opportunity."

78.     Executive Order No. 14173 requires the Director of Office of Management and Budget ("OMB"), with the assistance of the Attorney General, to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." *Id.* at 8634.

79.     Executive Order No. 14173 also instructs federal agencies to include in every contract or grant award terms requiring each contractual counterparty or grant recipient "to certify that it does not operate any programs promoting diversity, equity, and inclusion that violate any applicable Federal anti-discrimination laws." *Id.*

80.     Executive Orders Nos. 14151 and 14173 ("the Executive Orders") demonstrate the Administration's intent to target and censor speech, programs, and activities that Defendants view as promoting diversity, equity, and inclusion. However, these Executive Orders provide no definitions of their key terms, such as "diversity," "equity, and "inclusion," and no method or information to identify "illegal DEI" or which grants are "equity-related."

81.     The Executive Orders provide no guidance concerning the manner in which a grant, policy, program, statement, action, activity, or contract will be deemed an unlawful diversity, equity, or inclusion initiative, as "promoting DEI," as "illegal DEI," or as "illegal discrimination or preferences."

82.     Consistent with these Executive Orders, Defendants have targeted "equity-related grants" for termination on the basis that they promote diversity, equity, and inclusion, including Plaintiff MAEC's use of its EAC grant to conduct long-running desegregation and technical assistance programs in schools throughout Region I.

83.    As explained below, Defendants have relied on the arbitrary and vague terms used in the Executive Orders to terminate the federal grants of those grantees, like Plaintiff MAEC, that Defendants perceive as engaging in speech, training, advocacy, or mission-driven services that Defendants disfavor.

## V. THE DEPARTMENT TERMINATES THE EAC GRANTS, INCLUDING PLAINTIFF MAEC'S GRANT.

84.    On February 5, 2025, the Department Acting Secretary of Education issued an internal directive requiring Department personnel to review "issued grants" to "ensur[e] that Department grants do not fund discriminatory practices" that are "contrary to law or to the Department's policy objectives." Pls' Mem. Supp. TRO, Ex. 20 (Directive on Department Grant Priorities), *California v. Dep't of Educ.*, No. 1:25-cv-10548-MJJ, 2025 WL 1099496 (D. Mass. Mar. 6, 2025), ECF No. 8-20. The directive expressly extends to "practices . . .  in the form of [diversity, equity, and inclusion]." App. To Application to Vacate Order at 12a (App.), *U.S. Dep't of Educ. v. California*, No. 24A910 (Mar. 26, 2025).

85.    The internal directive does not define key terms such as "diversity, equity, and inclusion," nor does it explain how the Department will determine that a grantee is engaged in "diversity, equity, and inclusion" practices. *Id*.

86.    Eight days later, on February 13, 2025, the Department sent Plaintiff MAEC a boilerplate Termination Letter announcing the immediate termination of the EAC grant for Plaintiff MAEC, Federal Award No. S004D22002, and the immediate "suspension" of Plaintiff MAEC's access to its EAC grant funds. Exhibit 1 at 14.

87.    On the same day, the Department sent each of the other three EAC grant recipients and over a hundred other program grantees boilerplate letters announcing the termination of their grant awards. The letters were identical to the Termination Letter received by Plaintiff MAEC,

save for differences in the addressees, termination dates, and grant-award numbers. None of the letters included findings specific to individual recipients' actual conduct.

88.    The Termination Letter sets forth the Department's justification for the grant termination in a single paragraph, which states as follows:

> The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. § 200.340(a)(4); see also 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. [grant award number] in its entirety effective [date of letter].

Exhibit 1 at 14.

89.    The Termination Letter further states that "[i]t is a priority of the Department to eliminate discrimination in all forms of education throughout the United States," and that "this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic." *See id*.

90.    This purported "priority" upon which Defendants base their termination of the EAC Program and Plaintiff MAEC's EAC grant was not lawfully adopted and cannot be lawfully imposed on Plaintiff MAEC mid-budget year. *See infra* Section IX.

91.    The Termination Letter characterizes Plaintiff MAEC's EAC grant as "promot[ing] or tak[ing] part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of

prioritizing merit, fairness, and excellence in education . . . ; or that otherwise fail to serve the best interests of the United States." *See* Exhibit 1 at 14.

92.    The Termination Letter does not define the words "diversity," "equity," or "inclusion."

93.    The Termination Letter does not define the phrases "diversity, equity, and inclusion initiatives" or "[i]llegal DEI policies and practices."

94.    On the same day that Plaintiff MAEC and the other EAC grantees received the Termination Letter, the Department also sent Plaintiff MAEC an updated GAN listing the budget period as October 1, 2024, through February 13, 2025, and stating that the grant was terminated because it was deemed "inconsistent with, and no longer effectuates, Department priorities." *See id.*

95.    On the same day that Plaintiff MAEC and the other EAC grantees received the Termination Letter and the updated GAN, the Department issued a press release (the "February 13 Press Release") announcing that it had cancelled over $350 million in contracts and grants, including $33 million in grants to MAEC and the other three EACs.[22]

96.    The February 13 Press Release suggests that the grant termination was effectuated pursuant to Executive Order 14151, requiring the Department to terminate "equity-related" grants or contracts. The press release states that Plaintiff and other Equity Assistance Centers "support divisive training in DEI, Critical Race Theory, and gender identity for state and local education agencies as well as school boards."

---

[22] Press Release, U.S. Dep't of Educ., U.S. Department of Education Cancels Additional $350 Million in Woke Spending: Contracts and grants terminated at several Regional Educational Laboratories and Equity Assistance Centers (Feb. 13, 2025), https://web.archive.org/web/20250422213426/https://www.ed.gov/about/news/press-release/us-department-of-education-cancels-additional-350-million-woke-spending.

97.    The February 13 Press Release provides no basis or explanation for its assertion that Plaintiff MAEC or any other Equity Assistance Centers "support divisive training in DEI, Critical Race Theory, and gender identity for state and local education agencies as well as school boards."

98.    Nor does the February 13 Press Release define "divisive training," "DEI," "Critical Race Theory," and "gender identity."

99.    The Termination Letter does not describe how Plaintiff MAEC or any of the programs and initiatives that Plaintiff MAEC operates are contrary to federal law.

100.    The Termination Letter includes a general list of potential grounds for cancellation, but it does not specify any basis for the termination of Plaintiff MAEC's EAC grant. *See* Exhibit 1 at 14.

101.    The Termination Letter provides no factual basis for its conclusion that Plaintiff MAEC had engaged in any of the potential grounds for cancellation.

102.    Similarly, the termination letters issued to the Southern Education Foundation, the Midwest and Plains Equity Assistance Center, and the Western Educational Equity Assistance Center do not describe how those EACs or their activities are contrary to federal law and do not provide a factual or legal basis for the termination of their grants.

103.    Plaintiff MAEC was in the middle of the FY2024 budget period when it received the Termination Letter. The applicable statutes and regulations required the Department to comply with robust due process procedures as a condition precedent for terminating a grant award in the mid-budget period, including an investigation, notice of finding, remediation, and administrative law adjudication. In the Termination Letter, the Department cited some of these authorities for the termination. However, it did not comply with the required due process procedures.

104.    The Termination Letter briefly mentions an appeal process and imposes a thirty-day timeline to challenge the termination. *See id.* at 15.

105.    The Termination Letter does not describe any procedures for the Department to process appeals, objections, or challenges, and it deviates from required statutory and regulatory termination procedures. *See infra* Sections VIII, IX.

106.    The Termination Letter does not state whether any interim relief is possible or available.

107.    The Termination Letter does not set forth a deadline by which the Department is obligated to make a determination regarding an appeal.

108.    Prior to the Termination Letter, the Department did not send Plaintiff MAEC any pretermination notice or provide Plaintiff MAEC any opportunity to be heard.

109.    Prior to the Termination Letter, the Department did not offer Plaintiff MAEC an opportunity to cure any alleged noncompliance.

110.    Defendants did not consider the reliance interests of Plaintiff MAEC and the school districts Plaintiff MAEC serves before terminating the EAC grant. For example, the grant termination forced Plaintiff MAEC to terminate the technical assistance and training projects requested by six school districts. The grant termination also forced Plaintiff MAEC to lay off four staff members, lose another, and reduce the workload and compensation of remaining staff.

111.    Similarly, as a result of the Termination Letters, the other EAC grantees immediately ceased their EAC operations. The Midwest and Plains Equity Assistance Center immediately shuttered all operations and no longer employs any staff.

112.    On March 12, 2025, Plaintiff MAEC submitted a timely appeal to the Acting Assistant Secretary for the Office of Elementary and Secondary Education, objecting to the Termination Letter. *See generally* Exhibit 1.

113.    As of the date of filing of this Complaint, the Department has not responded to Plaintiff MAEC's agency appeal.

114.    The Southern Education Foundation similarly submitted a timely appeal. As of the date of filing of this Complaint, the Department has not responded to that appeal.

## VI. THE DEPARTMENT'S TERMINATION OF PLAINTIFF MAEC'S GRANT RELIES ON IMPROPERLY PROMULGATED DEPARTMENTAL PRIORITIES.

115.    The Termination Letter does not define or describe the "priorities" to which it refers and upon which it bases its termination of Plaintiff MAEC's grant, including how those priorities were adopted.

116.    With limited exceptions not applicable here, the Department is required to establish its agency priorities, including those governing grant programs, through notice-and-comment rulemaking. 34 C.F.R. § 75.105(b)(2); 20 U.S.C. § 1232(d); *see also Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, -- F. Supp. 3d --, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025).

117.    The Department's Priorities must be published in the Federal Register, and the published Priorities must be used to define the more specific priorities for an award competition unless certain exceptions, not relevant here, apply. 34 C.F.R. § 75.105(b)(2). Defendants must publish these priorities in the Notice Inviting Applications for the grant in the Federal Register. 34 C.F.R. § 75.105(b)(l).

118.    The Department has published, after notice-and-comment rulemaking, several different sets of priorities that apply to Plaintiff MAEC's grant. Pursuant to the required notice-

and-comment rulemaking process, the Department published its Notice of Final Priority and Requirement for EACs in the Federal Register on July 18, 2016.

119.   The Department's July 18, 2016 final priority requires a successful grant applicant to have "a track record of success or demonstrated expertise in developing or providing technical assistance to increase socioeconomic diversity in schools or school districts as a means to further desegregation by race, sex, national origin, and religion." 81 Fed. Reg. 46,817–19 (to be codified at 34 C.F.R. ch. II).

120.   Following notice-and-comment rulemaking, the Department priorities for all of its discretionary grant programs were published on March 9, 2020, Administrative Priorities for Discretionary Grant Programs, 85 Fed. Reg. 13,640–42, and were supplemented on December 10, 2021, 86 Fed. Reg. 70,612–40 (to be codified at 34 C.F.R. pt. 75). Among other things, the supplemental priorities include "promoting equity in student access to educational resources and opportunities," "supporting a diverse educator workforce," and "meeting student social, emotional, and academic needs," including by "addressing disparities in school discipline policy." 86 Fed. Reg. 70,636–38.

121.   On February 15, 2022, following notice-and-comment rulemaking, the Department published a Notice Inviting Applications for the FY2022 EAC competition, inviting applicants to apply for the grant funds. 87 Fed. Reg. 8564, 8564–70.

122.   In addition to the Departmental priorities cited above, the FY2022 EAC competition also set as a priority: "Promoting Equity Through Diverse Partnerships." *Id.* at 8566.

123.   Since establishing the above-described priorities, the Department has not conducted any notice-and-comment rulemaking to change its priorities for discretionary grantmaking programs.

124.    The above-described published priorities remain the Department's published and lawful priorities.

125.    The EAC Program and the terms of Plaintiff MAEC's EAC grant remain consistent with the Department's published priorities.

126.    The EAC Program and Plaintiff MAEC's conduct as an EAC grantee is consistent with the Department's published priorities.

127.    For example, Plaintiff MAEC planned activities consistent with the priority stated in the 2022 Notice Inviting Applications, which seeks applicants that promote educational equity by partnering with, among others, minority-serving institutions, 87 Fed. Reg. at 8566. MAEC had planned to partner with Capital Community College, a minority-serving institution, to support their dual enrollment programs with K-12 public schools during the 2024-25 grant year; however, this partnership was stopped because Defendants terminated the EAC grant.

128.    Also in furtherance of the Priorities, MAEC partnered with other grantees and contractors to train state and local education agency staff to effectively teach and assess English Learners and supported Burlington School District in tracking and addressing incidents of sex-based harassment and bullying.

129.    In addition, and consistent with the Department's established Priorities, Plaintiff MAEC supports school districts within New York to promote socioeconomic diversity as a way to further desegregation, and has published resources that all school districts can use.

130.    Defendants have no authority to impose a new priority on Plaintiff MAEC in the middle of its budget year.

131.    Defendants have no authority to assert that any "priorities," other than the Department's properly established Priorities, including a desire to terminate equity-related grants and programs, may be used to evaluate prospective grantees.

132.    Defendants have no authority to assert that any "priorities" other than the Department's properly established Priorities, including a desire to terminate equity-related grants and programs, may be used to evaluate the performance of current grantees.

## VII.    PLAINTIFF MAEC AND OTHER EQUITY ASSISTANCE CENTERS' PROVISION OF TECHNICAL ASSISTANCE TO PREVENT AND REMEDY DISCRIMINATION ON THE BASIS OF RACE, NATIONAL ORIGIN, SEX, AND RELIGION COMPLIES WITH APPLICABLE FEDERAL LAWS AND REGULATIONS.

133.    The Department's Termination Letter incorrectly claims that EAC activities, including Plaintiff MAEC's programs, "unlawfully discriminate on the basis of race, color, religion, sex, national origin or another protected characteristic" and "violate either the letter or purpose of Federal civil rights law."

134.    Plaintiff MAEC and other EACs' technical assistance work is consistent with federal civil rights laws, including Title VI, which prohibits discrimination on the basis of race, color, and national origin, 42 U.S.C. § 2000d, and Title IX, which prohibits discrimination on the basis of sex. 20 U.S.C. § 1681.

135.    The EAC grant program and its grantees, like Plaintiff MAEC, provide technical assistance, trainings and toolkits, and targeted interventions to help schools comply with the mandates of Title VI and Title IX. In doing so, the EAC grant program, including Plaintiff MAEC's work, is intended to prevent or reduce instances of discrimination on the basis of race, color, religion, sex, and national origin within Region I.

136.    For example, Plaintiff MAEC provides technical assistance designed to reduce the rates of school-based race and sex discrimination. In recent years, Region I has seen an increase in Title VI investigations in elementary schools, increasing segregation along racial lines, and high rates of sexual harassment. Plaintiff MAEC also provides technical assistance and targeted interventions to reduce racial discrimination in discipline. During the 2018-19 grant year, Plaintiff MAEC provided targeted assistance to New York school districts to reduce racial discrimination in exclusionary discipline. It piloted a toolkit, *Getting Started with Restorative Practices in Schools: A Toolkit for Administrators*, which it subsequently made available to schools throughout Region I to help them comply with Title VI. Because of Plaintiff MAEC's technical assistance, one of the New York school districts reduced their use of suspensions within the first year. Plaintiff MAEC continued assisting New York schools to reduce racial discrimination in exclusionary discipline over multiple grant years.

137.    In addition, Plaintiff MAEC provides technical assistance to prevent and reduce racial discrimination that impacts academic achievement. For example, during the 2018-19 grant year, Plaintiff MAEC created a tool, *A Data Inquiry Guide for Identifying and Addressing Equity Gaps* (hereinafter "*Inquiry Guide*").[23] After Plaintiff MAEC partnered with a Maine school district to pilot the *Inquiry Guide* in three schools, all schools reported a decrease in racial opportunity gaps in English Language Arts and Math. Plaintiff MAEC proposed, and the Department agreed, that Plaintiff MAEC would continue this work and implement the *Inquiry Guide* throughout the school district.

138.    Plaintiff MAEC has also sought to address increases in the race- and sex-based harassment that have resulted in hostile environments in violation of Title VI and IX. As part of

---

[23] *See* Susan Villani et al., *A Data Inquiry Guide: for Exploring Equity Issues and Solutions*, MAEC (Mar. 2021), https://files.eric.ed.gov/fulltext/ED627711.pdf.

30

their 2022 grant application, Plaintiff MAEC proposed, and the Department agreed, that Plaintiff MAEC would provide a wide range of services, including a webinar series on racism and xenophobia to address anti-Asian American discrimination and intensive services to address peer-to-peer sex-based harassment and bullying.

139.    And in November 2024, at the request of an Intermediate Unit, representing several school districts in Pennsylvania, Plaintiff MAEC developed and presented a professional workshop on best practices to support LGBTQIA+ students in school.

140.    Based on these and similar successful projects, the Department has renewed Plaintiff MAEC's EAC grant every year since 2016.

141.    The goals and actions of the EAC grantees, including Plaintiff MAEC, are consistent with the Department's longstanding values, guidance, and past resolution agreements pertaining to Title VI and Title IX. For example, in 2020, during President Trump's first administration, then-Secretary of Education Betsy DeVos told the Department's staff in a memorandum that "[d]iversity and inclusion are the cornerstones of high organizational performance." The Secretary also opined that "embracing diversity and inclusion are key elements for success" for "building strong teams."[24]

142.    The Department has entered into resolution agreements that permitted, and sometimes required, schools to adopt race-neutral measures to address racial discrimination.[25] The Department has required schools to collect and maintain data on racial disparities in discipline, has ordered schools to use that data to identify and remedy racial disparities in the administration of

---

[24] Erica L. Green & Zach Montague, *Trump Cracks Down on Diversity Initiatives Celebrated in His First Term*, N.Y. Times (Feb. 14, 2025), https://www.nytimes.com/2025/02/14/us/politics/trump-diversity-education-department.html.
[25] *E.g.*, Grants/Cibola County Schools Resolution Agreement, OCR Case No. 08-19-1269 (Sept. 17, 2020) https://web.archive.org/web/20250422215233/https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/08191269-b.pdf (to remedy patterns of discrimination against Native American students, district agreed to conduct a self-assessment of racial equity in gifted and talented education).

discipline, and has even used that data itself to assess Title VI compliance and recommend appropriate remedies.[26]

143.     Moreover, the Department has previously issued guidance stating that diversity, equity, and inclusion trainings, training on the impact of racism, cultural competency trainings, and other nondiscrimination trainings "in most circumstances are consistent with Title VI" and have been implemented to redress discrimination.[27]

144.     The Department has also issued guidance directing that schools may need to provide training to students to prevent the recurrence of sexual harassment that creates a hostile environment.[28]

145.     And in response to findings that school districts did not respond appropriately to harassment and discrimination in violation of Title VI and Title IX, the Department has routinely

---

[26] *See, e.g.*, Victor Valley Union High School District Resolution Agreement, OCR Case No. 09-14-5003 (Aug. 15, 2022)), https://web.archive.org/web/20250422220344/https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/investigations/more/09145003-b.pdf; Davis School District, Farmington, UT Agreement/Findings (Oct. 20, 2021) https://web.archive.org/web/20250422221230/https://www.justice.gov/d9/case-documents/attachments/2021/10/21/doj_dsd_settlement_agreement_508.pdf; East Side Union High School District Resolution Agreement, OCR Case No. 09-14-1242 (Dec. 13, 2017), https://web.archive.org/web/20250403234526/https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/09141242-b.pdf; Bushnell-Prairie City Community Unit School District Resolution Agreement, OCR Case No. 05-16-7034 (May 4, 2017) ), https://web.archive.org/web/20250423013538/https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/05167034-b.pdf.

[27] *See* U.S. Dep't of Educ., Off. for C. R., *Ensuring Educational Opportunities for All Students on Equal Terms 70 Years After Brown v. Board of Education* 4 (May 2024), https://web.archive.org/web/20250422230223/https://drive.google.com/file/d/1l671DtgWsgs_zlMyn269k_Gmatvgdx7A/view; *see also* U.S. Dep't of Educ., Off. for C. R., *Fact Sheet: Diversity & Inclusion Activities Under Title VI* 2 (Jan. 2023), https://web.archive.org/web/20250423014506/https://drive.google.com/file/d/1WzUGtPntZa3RlhPp2q69thKhqUctPakF/view.

[28] U.S. Dep't of Educ., Off. for C. R., *Know Your Rights: Title IX Requires Your School to Address Sexual Violence*\* 2 (Apr. 2014, modified Oct. 2020), https://web.archive.org/web/20250423014456/https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/know-rights-201404-title-ix.pdf.

entered into resolution agreements requiring those districts to offer training about harassment on the basis of race and/or sex.[29]

146.    The Department's longstanding interpretation of Title VI and Title IX is consistent with Congress's recognition of the importance of diversity as a means of furthering educational equity and its authorization of programs to foster diversity in public education. For example, Congress has specifically recognized that it is in "the best interest[] of the United States" to "foster meaningful interaction among students of different racial and ethnic backgrounds." 20 U.S.C. §§ 7231(a)(4)(A), (b), b(3) (providing federal funds for the Magnet School Assistance Program's "development, design, and expansion of innovative educational methods and practices that promote diversity").

147.    Plaintiff MAEC and the other EACs' technical assistance work is likewise consistent with the Department's overriding "mission to ensure equal access to education," 20 U.S.C. § 1228a(a), and its requirement that grant recipients take steps "to ensure equitable access to, and equitable participation in, the project or activity to be conducted with such assistance, by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age," *id.* § 1228a(b).

---

[29] *See, e.g.*, Fremont Unified School District Resolution Agreement, OCR Case No. 09-13-5001 (Jan. 12, 2017), https://web.archive.org/web/20250423023136/https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/09135001-b.pdf (requiring mandatory training for all staff on race-based harassment and processing, investigating, and/or resolving complaints of discrimination); Berkeley County Schools, WV Resolution Agreement, OCR Case No. 03-16-1179 (Oct. 11, 2018) 3–4, https://web.archive.org/web/20250423024359/https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/03161179-b.pdf (requiring training for all staff on preventing, recognizing, and appropriately responding to complaints of sex discrimination, including documentation of staff who did not attend the training).

148.    Plaintiff MAEC and the other EACs' technical assistance work is also consistent with the Department's current priorities established through notice-and-comment rulemaking. *See supra* pp. 26–27.

149.    Plaintiff MAEC has come to rely on the Department's longstanding interpretations of Title VI and Title IX.

150.    The Department's statements in the Termination Letter, including its new purported priorities, *see supra* p. 22, contradict decades of the Department's prior guidance, resolution agreements, and past positions.

151.    The Department has provided no explanation of how and why it has changed its position on diversity, equity, inclusion, and accessibility programs, even though many of these programs are authorized by statute and regulation. When promulgating and acting pursuant to a rule with the force of law, the Department must undertake notice and comment and respond to the public's comments and recommendations.

152.    Neither Plaintiff MAEC nor any other grant recipient was given any prior notice of or opportunity to comment on, or adjust its work in response to, the Department's purported new priorities or position.

153.    The Termination Letter improperly enforces the Department's new priorities or position, which failed to follow the required notice and comment processes. 5 U.S.C. § 553 (b), (c); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95–96 (2015).

154.    When changing positions, agencies must "provide a reasoned explanation for the change," "display awareness that [they are] changing position," and consider "serious reliance interests." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (quoting *F.C.C. v.*

*Fox Television Stations, Inc*., 556 US 502, 515 (2009)). The Department failed to undertake this process at all.

155.    The Department's termination of Plaintiff MAEC and the other EACs' grants, effectively terminating the EAC program, is not only inconsistent with Title VI and Title IX, but it also undermines Title VI, Title IX, and other federal civil rights laws by removing resources that support Region I schools' compliance with those laws.

## VIII.   THE DEPARTMENT'S TERMINATION OF PLAINTIFF MAEC'S EAC GRANT VIOLATES TITLE VI, GEPA, AND OTHER REQUIRED TERMINATION PROCEDURES.

156.    The Department's authority to withhold grant funds or terminate grants in the middle of the budget period is governed by Title VI, 42 U.S.C. § 2000d-1, the regulations implementing Title VI, 34 C.F.R. § 100.8, GEPA, 20 U.S.C. §§ 1234–1234i, and OMB's Uniform Guidance, 2 C.F.R. part 200, as adopted by the Department, 2 C.F.R. § 3474.1(a). These statutes and regulations provide the substantive and procedural standards for terminating a grant mid-budget period.

157.    The Termination Letter purports to terminate Plaintiff MAEC's grant based on alleged violations of federal civil rights laws, which presumably include Title VI.

158.    Title VI delineates specific procedures that an agency must follow to "terminat[e] . . . or refus[e] to grant or to continue assistance" based upon alleged violations of Title VI. 42 U.S.C. § 2000d-1.

159.    First, the agency must "advise[] the appropriate person or persons of the failure to comply with the requirement [of Title VI]" and "determine[] that compliance cannot be secured by voluntary means." *Id.*

160.    The agency must provide "an opportunity for a hearing," and there must be "an express finding on the record . . . of a failure to comply with" a requirement of Title VI. *Id.*

161.    The agency must file "a written report of the circumstances and the grounds for" termination with the appropriate House and Senate Committees. *Id.* "No action shall become effective until thirty days have elapsed after the filing of such report." *Id.*

162.    The Department's regulations implementing Title VI reiterate the procedural requirements an agency must follow before terminating a grant. 34 C.F.R. § 100.8(c).

163.    The Title VI regulations make clear that " [n]o action to effect compliance by any other means authorized by law shall be taken until (1) the responsible Department official has determined that compliance cannot be secured by voluntary means, (2) the recipient or other person has been notified of its failure to comply and of the action to be taken to effect compliance, and (3) the expiration of at least 10 days from the mailing of such notice to the recipient or other person." *Id.* § 100.8(d).

164.    The Title VI regulations apply to EAC grants. 34 C.F.R. pt. 100, App. A, pt. 1(18).

165.    Defendants failed to advise Plaintiff MAEC of its alleged noncompliance with Title VI before terminating its EAC grant or make any determination that compliance could not be secured through voluntary means.

166.    Defendants failed to provide Plaintiff MAEC with an opportunity for a hearing.

167.    Defendants failed to secure an express finding on the record that Plaintiff MAEC did not comply with a requirement of Title VI.

168.    Defendants failed to submit a written report to the House or Senate thirty days before freezing Plaintiff MAEC's funds.

169.    In addition to Title VI, GEPA establishes the substantive standard and the procedures that the Department must follow before withholding grant funds or terminating a grant during the budget period.

170.    GEPA applies to EAC grants because they are an "applicable program" for which the Secretary or the Department has administrative responsibility as provided by law. 20 U.S.C. § 1234i; *accord* 34 C.F.R. § 270.6; 34 C.F.R. pt. 81.

171.    GEPA allows the Department to withhold funds from a grantee only if the grantee "is failing to comply substantially with any requirement of law applicable to such funds." 20 U.S.C. § 1234c(a).

172.    Before withholding payments from a grantee, GEPA requires the Department "notify the recipient, in writing, of—(1) the intent to withhold payments; (2) the factual and legal basis for the Secretary's belief that the recipient has failed to comply substantially with a requirement of law; and (3) an opportunity for a hearing to be held on a date at least 30 days after the notification has been sent to the recipient." 20 U.S.C. § 1234d(b).

173.    Administrative Law Judges within the Department "shall conduct" hearings to withhold payments from grantees. *See id.* § 1234(a); *see also* 34 C.F.R. § 81.3(a).

174.    Grantees are entitled to various procedural protections in the hearing, including the opportunity to present oral and documentary evidence and to cross-examine witnesses. *Id.* § 1234(f)(1); 5 U.S.C. § 556(d). The Department has the burden of proof for its termination decision. 5 U.S.C. § 556(d).

175.    The Department's regulations implementing GEPA provide additional procedures governing hearings, including the responsibilities of Administrative Law Judges and what evidence may be considered. *See* 34 C.F.R. §§ 81.1–81.20.

176.    Only after the Department "has given reasonable notice and an opportunity [for the grantee to demonstrate] why future payments . . . should not be suspended" may it suspend funds pending the outcome of the hearing. 20 U.S.C. § 1234d(d).

177.    The OMB Uniform Guidance requires, when an agency initiates a remedy for alleged noncompliance—including termination of the grant—that the agency "comply with any requirements for hearings, appeals, or other administrative proceedings to which the recipient or subrecipient is entitled under any statute or regulation applicable to the action involved." 2 C.F.R. § 200.342.

178.    The OMB Uniform Guidance also provides a procedural backstop to the more specific termination procedures required by Title VI, GEPA, and their implementing regulations.

179.    The OMB Uniform Guidance permits an agency to terminate a grant only after the agency has notified the grantee of its alleged noncompliance with the Constitution, federal law, or terms of the award and given the grantee an opportunity to cure by imposing "specific conditions" on the grantee. 2 C.F.R. § 200.208(d); *see also id.* § 200.339.

180.    The agency may suspend or terminate the grant only if the agency "determines that noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 200.339.

181.    Before terminating a grant, the agency must provide written notice of the termination that includes "the reasons for termination." *Id*. § 200.341(a).

182.    The Department cannot waive the requirements for grant termination imposed by the OMB Guidance or the laws and regulations it incorporates. 34 C.F.R. § 75.900(a).

183.    Instead of following these procedures, the Department terminated the EAC Program and Plaintiff MAEC's grant on the same day that it informed Plaintiff MAEC of its intent to withhold payments.

184.    Instead of following these procedures, the Department terminated the EAC Program and Plaintiff MAEC's grant without stating any factual or legal basis for the Department's claim that Plaintiff MAEC had failed to comply substantially with a requirement of law.

185.    Instead of following these procedures, the Department did not notify Plaintiff MAEC of any opportunity for a hearing.

186.    In February 2025, the Department updated its procedures for appealing a grant termination. The updated procedures do not provide any deadline for the Department to respond to the appeal, nor do they give grantees an opportunity for a hearing on their appeal.

187.    The Department also did not go through notice-and-comment rulemaking before publishing its new appeal procedures, as required by GEPA. 20 U.S.C. §1232(a).

188.    The Department's new appeal procedures therefore contravene GEPA.

## IX. THE DEPARTMENT'S TERMINATION OF THE EAC GRANTS HARMS PLAINTIFF MAEC'S STAFF, THE HUNDREDS OF SCHOOLS, THOUSANDS OF EDUCATORS, AND MILLIONS OF STUDENTS THAT PLAINTIFF MAEC AND THE OTHER EACS SERVE, INCLUDING PLAINTIFF NAACP MEMBERS, AND UNDERMINES THE GOALS OF TITLE VI AND TITLE IX.

189.    As a direct result of Defendants' actions, Plaintiff MAEC has been forced to terminate technical assistance and training for six school districts that sought help to prevent and address special educational problems occasioned by desegregation, including discrimination in achievement, academic placement, discipline, and other policies and practices based on race, sex, national origin, and religion.

190.    Plaintiff MAEC does not have access to alternative funding sources that would allow it to continue providing technical assistance and training to these school districts or to otherwise continue its operations under the EAC grant.

191.    Without the technical assistance and training that Plaintiff MAEC provides at low cost or free of charge, these school districts lack the resources needed to improve student success and eradicate discrimination based on race, sex, national origin, and religion that may violate Title IV, Title VI, Title IX, and other civil rights laws.

192.    For example, a school district in Massachusetts requested intensive technical assistance from Plaintiff MAEC to address discrimination and disparities in school discipline and academic placement. In response to this request, Plaintiff MAEC conducted a comprehensive needs assessment intended to guide its future technical assistance work. However, the Department's termination of Plaintiff MAEC's EAC grant forced Plaintiff MAEC to immediately cease its data analysis, training, delivery of strategies to address disparities, discrimination, and potential violations of federal civil rights laws, and fulfillment of other terms of its memorandum of understanding with the district.

193.    In response to the Department's termination, the Superintendent of this district said, "[i]f the funds are not available to continue this project . . . [t]he academic achievement and educational outcome discrepancies historically seen within our school district . . . will continue to persist." The Superintendent further noted that that district "lacks the resources and skills needed to complete the effort" Plaintiff MAEC was due to conduct in the district.

194.    In addition, the Department's termination of Plaintiff MAEC's EAC grant has forced Plaintiff MAEC to terminate four key personnel with a combined 93 years of experience in technical assistance. The rest of Plaintiff MAEC's team members were forced to reduce their capacities to 80% because of the EAC termination. Plaintiff MAEC was also forced to lay off its Project Director, who had provided technical assistance and training in Region I for eight years

and is critical to Plaintiff MAEC's mission because of his vast experience serving in a variety of leadership roles at the state, district, and school levels of education.

195.    The Department's termination of Plaintiff MAEC's EAC grant has made it more difficult for Plaintiff MAEC to continue its non-EAC work. For example, Plaintiff MAEC is planning to host a convening in May 2025 related to family engagements, but three speakers have dropped out for fear of being targeted because of their association with Plaintiff MAEC.

196.    The termination has also forced Plaintiff MAEC to place fourteen remaining staff on reduced capacity. As a result, those staff members are working only thirty-two hours per week and are receiving a reduced salary commensurate with their reduced hours.

197.    Plaintiff MAEC has been forced to give up its office space as a result of the termination of the EAC grant. This has significantly limited Plaintiff MAEC's ability to continue its operations. Plaintiff MAEC currently does not have a space to hold internal and external meetings and easily access resources necessary to effectively and efficiently operate.

198.    Also, as a result of Defendants' termination of the EAC grants, including Plaintiff MAEC's grant, Plaintiff MAEC and the other EACS are no longer able to provide the targeted technical assistance that would support educators in revising policies and practices to ensure high-quality educational opportunities for *all* students. The Termination Letter directly and immediately harms the school district and students, including NAACP student members, who would otherwise benefit from the services provided by EAC grantees. The Department's decision to abruptly halt the operation of the EAC program imposes a significant obstacle on school districts' ability to serve all students equitably.

199.    Without this technical assistance, school districts served by Plaintiff MAEC and the EACs are unable to address the discrimination and obstacles to equal educational access that

harm students, particularly Black students and NAACP members, and hinder their academic performance and social-emotional well-being. *See supra* Section III.

200.    Similarly, the Termination Letter denies educators, including Plaintiff NAACP members, the ability to continue openly discussing and learning from trainings, instructional materials, and other technical assistance programs that address problems occasioned by desegregation and promote equity and equal educational opportunity. By denying educators access to these programs, Defendants have denied educators the resources and tools to create a more supportive environment for themselves and for students.

## CAUSES OF ACTION

### First Cause of Action
### Fifth Amendment – Due Process, Void for Vagueness
### (All Plaintiffs Against All Defendants)

201.    All preceding paragraphs are incorporated herein by reference.

202.    Under the Due Process Clause of the Fifth Amendment, a governmental enactment is "void for vagueness" if it "fails to provide a person of ordinary intelligence [fair notice of what is] prohibit[ed], or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 707, 732 (2000) (citation omitted); *accord F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

203.    Government enactments that "threaten[] to inhibit the exercise of constitutionally protected rights," including "the right of free speech," are subject to "a more stringent vagueness test." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982); *see also F.C.C.*, 567 U.S. at 253–54. The prohibition against vagueness "applies with particular force in review of laws dealing with speech." *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1395 (D.C. Cir. 1990).

204.    The Termination Letter and the "priorities" referenced therein along with the related Executive Orders, do not provide "a reasonable opportunity to understand what conduct it prohibits" and they "authorize[] or even encourage[] arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732.

205.    The Termination Letter purports to terminate the EAC Program, including Plaintiff MAEC's grant and similar programs, because the EAC Programs constitute diversity, equity, and inclusion programs disfavored by Defendants and the Executive Orders and because such programs and the EAC grant purportedly conflict with the Department's "priorities." But the Executive Orders and the Termination Letter do not provide clear definitions of these terms and priorities. These documents fail to define foundational terms like "[i]llegal DEI policies and practices." *See NAACP v. U.S. Dep't of Educ*., -- F. Supp. 3d --, 2025 WL 1196212, at *6 (D.D.C. Apr. 24, 2025); *Chi. Women in Trades v. Trump*, -- F. Supp. 3d --, No. 25 C 2005, 2025 WL 933871, at *8 (N.D. Ill. Mar. 27, 2025). Nor does the Termination Letter describe which of Plaintiff MAEC's programs purportedly conflict with the Department's undefined priorities.

206.    Without appropriate notice of the conduct, speech, and activities that violate the Defendants' purported "priorities," Plaintiff MAEC cannot meaningfully contest the Department's determination that its programs are in conflict with those priorities.

207.    The Termination Letters' vague and undefined terms and the Department's similarly vague "priorities" lend themselves to subjective interpretation and discriminatory enforcement. Department of Education officials are left to exercise unfettered discretion to determine whether grant recipients engage in conduct or speech that run afoul of these "priorities."

208.    The Termination Letter's vague and undefined justifications have irreparably harmed Plaintiff MAEC.

209.     The ability of NAACP educator members to continue receiving training, instructional materials, and other technical assistance programming is directly affected by the vague prohibitions imposed on the EACs, including Plaintiff MAEC.

210.     Defendants' vague prohibitions infringe upon NAACP members' liberty interest in receiving this protected speech. *NAACP*, 2025 WL 1196212, at *5, *7; *see also Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (finding a right-to-receive injury where a plaintiff challenged a vague statute alleged to have "a direct impact on plaintiffs' right to receive information.")

211.     Accordingly, the Termination Letter is unconstitutionally vague in violation of the Plaintiff MAEC and Plaintiff NAACP's rights under the Fifth Amendment's Due Process Clause.

**Second Cause of Action**
**First Amendment – Viewpoint Discrimination**
**(All Plaintiffs Against All Defendants)**

212.     All preceding paragraphs are incorporated herein by reference.

213.     The First Amendment provides that the government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

214.     Content-based regulations that "target speech based on its communicative content" are presumptively unconstitutional and "justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc*., 570 U.S. 205, 214-15 (2013) ("*AID*"); *Minn. Voters All. v. Mansky*, 585 U.S. 1, 12 (2018).

215.     Viewpoint discrimination, or discrimination against speech because of the opinion or perspective of the speaker, is also presumptively unconstitutional and is the most "egregious form of content discrimination." *Reed*, 576 U.S. at 163, 168–69; *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–89 (1995).

216.    While the government may terminate grantees for poor performance or to improve services offered to the public, federal grantees retain First Amendment rights. *See Board of Cnty. Com'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 674 (1996). Although the government may choose to fund one activity to the exclusion of another, it may not, however, make this decision because it disagrees with a grantee's viewpoint. *See id.* at 677–78.

217.    First, the government may not "leverage funding to regulate speech outside the contours of the program itself." *AID*, 570 U.S. at 214–15.

218.    Second, the government may not terminate a grant "because of the [grantee's] speech on matters of public concern." *Umbehr*, 518 U.S. at 675.

219.    Defendants' termination of the EAC Program and Plaintiff MAEC's grant violates Plaintiff MAEC's First Amendment rights because it impermissibly restricts the exercise of Plaintiff MAEC's constitutionally protected speech and expressive conduct, including speech outside the scope of the grant, based on its content and viewpoint.

220.    Specifically, the Termination Letter and the Executive Orders target "equity-related" grants and state that the Department is targeting grants that fund "*organizations* [that] promote or take part in diversity, equity, and inclusion . . . initiatives," [emphasis added] regardless of whether the grant is funding diversity, equity, and inclusion initiatives and without any definition of diversity, equity and inclusion.

221.    Defendants therefore target speech and expressive conduct that is "equity-related" or that promotes the viewpoint of "diversity, equity, and inclusion." Without defining the speech and expressive activities captured by that broad viewpoint, Defendants terminated MAEC's grant on the basis that MAEC promotes that viewpoint.

222.    The Termination Letter also does not define what activities by MAEC violate Defendants' targeted viewpoint. Plaintiff MAEC promotes and takes part in programs that remedy discrimination and try to prevent future discrimination, including equity audits, landscape analyses, training and technical assistance, webinars, and podcasts, and produces equity-related resources and tools unrelated to the EAC grant. In targeting "diversity, equity, and inclusion," Defendants' Termination Letter targets these efforts and other speech and activities whereby Plaintiff MAEC expresses its viewpoints regarding race and sex discrimination, among other issues, as well as Plaintiff MAEC's view of the Civil Rights Act, the Fourteenth Amendment, and other federal laws.

223.    The Defendants failed to explain in their Termination Letter and cannot demonstrate how Plaintiff MAEC's alleged promotion of "diversity, equity and inclusion" practices render it difficult for Plaintiff MAEC to effectuate the underlying goals of the grant. Nor can Defendants demonstrate that the goals of the grant could only be effectuated by a grantee who shared the Defendant's ideological beliefs about "diversity, equity and inclusion." In fact, as discussed above—*see supra* Section V—MAEC's technical assistance and other work has yielded measurable results for school districts, families, and students in preventing and remedying violations of federal civil rights laws.

224.    Accordingly, the Termination Letter unconstitutionally penalizes Plaintiff MAEC's protected speech on the basis of its content and viewpoint without any compelling interest.

225.    The First Amendment also protects Plaintiff NAACP educator members' right to receive information and ideas. *Martin v. Struthers*, 319 U.S. 141 (1943); *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301 (1965). This right to receive information and ideas gives true effect to the "*recipient's* meaningful exercise of [their] own rights of speech, press, and political freedom."

46

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion).

226.    By impeding Plaintiff MAEC and the other EACs' ability to provide training, instructional materials, and other technical assistance programming on certain topics disfavored by Defendants, the Termination Letter and Defendants' termination of the EAC program unlawfully denies educators, including NAACP members, the right to receive information free from viewpoint and content-based restrictions.

227.    As a result of Defendants' unlawful conduct, Plaintiff MAEC and Plaintiff NAACP have suffered and will continue to suffer irreparable harm.

### Third Cause of Action
### Fifth Amendment – Procedural Due Process
### (Plaintiff MAEC Against All Defendants)

228.    All preceding paragraphs are incorporated herein by reference.

229.    "A procedural due process violation under the Fifth Amendment occurs when a government official deprives a person of property without appropriate procedural protections— protections that include, at minimum, the basic requirements of notice and an opportunity to be heard." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1265 (D.C. Cir. 2020).

230.    Defendants funded the EAC Program for decades, from the 1960s through this year. Similarly, Defendants also funded Plaintiff MAEC's EAC grant from October 1, 2024, through September 30, 2025. Plaintiff MAEC therefore had a property interest in the grant funding through the end of the budget period. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 536 (N.D. Cal. 2017).

231.    Defendants then terminated the EAC Program and Plaintiff MAEC's EAC grant in the middle of the budget period without providing Plaintiff MAEC any notice or an opportunity to be heard.

232.    Accordingly, Defendants deprived Plaintiff MAEC of a property interest without providing the constitutionally guaranteed due process protections. *See Climate United Fund v. Citibank, N.A.*, No. 25-CV-698, -- F. Supp. 3d --, 2025 WL 842360, at *7 (D.D.C. Mar. 18, 2025).

233.    As a result of Defendants' unlawful conduct, Plaintiff MEAC has suffered and will continue to suffer irreparable harm.

**Fourth Cause of Action**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(B) – Contrary to Constitutional Rights under the First and Fifth Amendments**
**(All Plaintiffs Against All Defendants)**

234.    All preceding paragraphs are incorporated herein by reference.

235.    The APA provides that courts "shall . . . hold unlawful and set aside" agency action that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

236.    The Termination Letter constitutes a final agency action subject to judicial review because it marks the "consummation" of the Department's decision-making process, sets forth the Department's conclusions that Plaintiff MAEC is acting unlawfully, and proscribes new substantive obligations "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

237.    The Termination Letter violates Plaintiff MAEC and Plaintiff NAACP's Fifth Amendment right to due process and prohibition against vagueness and the First Amendment right to freedom of speech, as set forth above. *Supra* pp. 42–48.

238.    Defendants' conduct has and will continue to irreparably harm Plaintiff MAEC.

239.    Accordingly, the Termination Letter must be set aside under 5 U.S.C. § 706(2)(B).

**Fifth Cause of Action**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A) – Arbitrary and Capricious; Not in Accordance with Law**
**(All Plaintiffs Against All Defendants)**

240.    All preceding paragraphs are incorporated herein by reference.

241.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.SC. § 706(2)(A).

242.    The Termination Letter constitutes a final agency action subject to judicial review.

243.    That Plaintiff MAEC's Termination Letter is substantively identical to the termination letters received by over a hundred other Department of Education grantees further demonstrates the lack of reasoned decision-making. *See AACTE*, 2025 WL 833917, at *21 (describing the substantively identical termination letters that the Department sent to grantees and explaining that "the Department's use of a template or boilerplate letter issued to all Grant Recipients further strengthen[ed] Plaintiffs' argument that the Department did not consider individual, or any, data or information."). Defendants used the fiction of individual grant termination determinations, in the form of identical and unsupported Termination Letters and updated GANs, to undertake the undisclosed purpose of entirely terminating the Congressionally authorized EAC Program.

244.    The Termination Letter failed to provide reasoned decision-making for terminating Plaintiff MAEC's grant and the EAC Program. Indeed, the Termination Letter provides *no* reasoning specific to Plaintiff MAEC for terminating its grant.

245.    The Termination Letter also failed to consider the reliance interests of Plaintiff MAEC and the school districts it serves.

246.    The Termination Letter alleges new priorities and deviates from ED's longstanding positions and guidance on Title VI and Title IX without explanation. *See supra* Section V; *see also Encino Motorcars, LLC*, 579 U.S. at 221–22; *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020).

247.    The Department based its decision to terminate the EAC Program and Plaintiff MAEC's grant on factors that Congress did not authorize the Department to consider. The Department's stated "priorities" in the Termination Letter—including opposition to organizations that promote or take part in diversity, equity, and inclusion initiatives—are not the priorities that the Department has established through notice-and-comment rulemaking.

248.    To the contrary, Plaintiff MAEC's conduct is fully consistent with the priorities that the Department has established through notice-and-comment rulemaking. *See supra* pp. 27–29. By terminating Plaintiff MAEC's grant based on agency "priorities" not established through rulemaking, the Department considered factors beyond what Congress intended the Department to consider.

249.    Further, the Termination Letter is not in accordance with the GEPA, which only allows the Department to withhold funds from a grantee if the grantee fails to "comply substantially" with any law applicable to such funds. 20 U.S.C. § 1234c(a); *see supra* Section VIII. The Department also violated GEPA by (i) terminating Plaintiff MAEC's grant without notifying MAEC of the factual and legal basis for the Department's belief that MEAC failed to comply substantially with a requirement of law; and by (ii) failing to provide MAEC an opportunity to be heard after MAEC received the Termination Letter. *See supra* Section VIII.

250.    Defendants' conduct has and will continue to irreparably harm Plaintiff MAEC.

251.    In addition, Defendants' arbitrary and capricious termination of the EAC Program and grants, including Plaintiff MAEC's grant, harms Plaintiff NAACP's members. Defendants' conduct eliminates the provision of technical assistance from the EAC program and EAC grantees necessary to ensure NAACP members' equal educational access by furthering their schools' desegregation efforts and by improving their schools' compliance with civil rights laws. Defendants' conduct also denies educators who are NAACP members the ability to learn from and freely discuss technical assistance programs and resources that promote desegregation and equity.

252.    Defendants deny NAACP members EAC programs and resources without justification, reasoned analysis, or consideration of Plaintiff NAACP's reliance interests. *See Encino Motorcars, LLC*, 579 U.S. at 222; *Dep't of Homeland Sec.*, 591 U.S. at 33.

253.    In sum, Defendants' termination of the EAC Program and Plaintiff MAEC's grant was both arbitrary and capricious in violation of all Plaintiff's rights and was not in accordance with federal law and must be set aside under 5 U.S.C. § 706(2)(A).

### Sixth Cause of Action
### Administrative Procedure Act, 5 U.S.C. § 706(2)(C) – In Excess of Statutory Authority Under Title VI and Title IX
### (All Plaintiffs Against All Defendants)

254.    All preceding paragraphs are incorporated herein by reference.

255.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.SC. § 706(2)(C).

256.    The Termination Letter constitutes a final agency action subject to judicial review.

257.    The Department's termination of the EAC Program and Plaintiff MAEC's grant exceeds Defendants' authority under Title VI and Title IX. 42 U.S.C. §§ 2000d–2000d-7; 20 U.S.C. § 1681.

258.    Title VI provides that no student "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefit[] of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

259.    In excess of the Department's authority under Title VI and contrary to longstanding Title VI precedent, including the Department's past guidance, the Department's termination of the EAC Program and Plaintiff MAEC's grant claims that lawful technical assistance to advance diversity, equity, and inclusion violates Title VI. *See supra* Section VIII.  This is unsupported by Title VI and disregards the Department's prior guidance requiring schools to implement similar measures to prevent and remedy Title VI violations.

260.    Title IX provides that no student "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

261.    In excess of the Department's authority under Title IX and contrary to longstanding Title IX precedent, including the Department's past guidance, the Department's termination of the EAC Program and Plaintiff MAEC's grant claims that lawful technical assistance to advance diversity, equity, and inclusion violates Title IX. *See supra* Section VII.

262.    The Department's termination of Plaintiff MAEC's grant also disregards the terms of the grant, which require Plaintiff MAEC to provide technical assistance in furtherance of Title VI, Title IX, and other federal civil rights laws.

263.    The Department has provided no justification for its abandonment of its longstanding positions on Title VI and Title IX, but instead "depart[s] from . . . prior policy *sub*

*silentio.*" *See Encino Motorcars, LLC*, 579 U.S. at 221–22; *Dep't of Homeland Sec.*, 591 U.S. at 33.

264.    Further, Defendants failed to comply with the procedural requirements of Title VI and its implementing regulations before terminating the EAC Program and Plaintiff MAEC's grant. *See* 42 U.S.C. § 2000d-1.

265.    Defendants have no statutory authorization to terminate a grant for alleged Title VI violations without following these procedural requirements.

266.    Defendants' conduct has and will continue to irreparably harm Plaintiff MAEC.

267.    In addition, Defendants' conduct harms Plaintiff NAACP members by terminating technical assistance programs necessary to protect NAACP student members' equal educational access and by denying NAACP educator members the ability to learn from and freely discuss technical assistance programs and resources that promote desegregation and equity.

268.    Defendants' termination of the EAC Program and Plaintiff MAEC's grant should be set aside as "not in accordance with law," and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §§ 706(2)(A)–(C).

### Seventh Cause of Action
### Administrative Procedure Act, 5 U.S.C. § 706(2)(D) – Without Observance of Procedure Required by Law
### (All Plaintiffs Against All Defendants)

269.    All preceding paragraphs are incorporated herein by reference.

270.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

271.    The Termination Letter constitutes a final agency action subject to judicial review.

272.    Defendants are not permitted to waive the requirements of any regulation that applies to EAC grants "unless the regulation specifically provides that it may be waived." 34 C.F.R. § 75.900(a).

273.    Defendants did not follow any of the termination procedures required by Title VI and its implementing regulations. 42 U.S.C. § 2000d-1; 34 C.F.R. § 100.8.

274.    Defendants did not follow any of the termination procedures required by GEPA before terminating Plaintiff MAEC's grant. *See* 20 U.S.C. §§ 1234, 1234c(a), 1234d(b), (c).

275.    Defendants did not follow any of the termination procedures required by the OMB Uniform Guidance. 2 C.F.R. §§ 200.339, 200.341(a).

276.    Defendants claimed that they were terminating Plaintiff MAEC's grant—and the EAC Program—because it was inconsistent with agency priorities. Defendants did not enact these new purported "priorities" through notice-and-comment rulemaking as required by GEPA. *See* 20 U.S.C. § 1232(d). *See AACTE*, 2025 WL 833917, at *21 (explaining the Department's requirement to go through the notice-and-comment rulemaking process unless one of three narrow exceptions applies). Therefore, Defendants are not authorized by the applicable statutes and regulations to terminate the grant on the grounds asserted.

277.    Defendants' conduct has and will continue to irreparably harm Plaintiff MAEC.

278.    Defendants' conduct harms Plaintiff NAACP members by terminating technical assistance programs necessary to protect NAACP student members' equal educational access and by denying NAACP educator members the ability to learn from and freely discuss technical assistance programs and resources that promote desegregation and equity.

279.    Accordingly, the Department's termination of the EAC Program and Plaintiff MAEC's grant must be set aside for failure to observe the procedures required by law.

**Eighth Cause of Action**
**U.S. Const. art. I, §§ 1, 8 – Violation of Separation of Powers**
**(All Plaintiffs Against All Defendants)**

280.    All preceding paragraphs are incorporated herein by reference.

281.    This Court is authorized "to enjoin unconstitutional actions by state and federal officers," including actions that contravene our Constitution's separation of powers principle. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

282.    The Spending Clause vests "the power of the purse" exclusively in the legislative branch. *See* U.S. Const., art. I, § 8. Accordingly, "Congress has broad power . . . to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022).

283.    By enacting GEPA, Congress set specific terms for the disbursement of federal funds by limiting Defendants' authority to withhold funding granted through Department programs, including the EAC Program. *See* 20 U.S.C. §§ 1221(b), (c).

284.    Defendants terminated the EAC Program and Plaintiff MAEC's grant without following any of the procedures required by Congress under GEPA. *See id.* §§ 1234, 1234c, 1234d(b), (c); 34 C.F.R. § 81.3.

285.    Defendants purported to terminate the EAC Program Plaintiff MAEC's grant because of inconsistencies with agency priorities, but Defendants did not promulgate these purported new "priorities" through notice-and-comment rulemaking as required by Congress under GEPA. *See* 20 U.S.C. § 1232(d).

286.    By taking actions in contravention of Congress's "expression" of its "exclusive power over spending . . . through statutes that constrain [Defendants'] authority" to withhold

funding granted through Department of Education programs, Defendants have acted in violation of the separation of powers. *Aids Vaccine Advoc. Coal. v. United States Dep't of State*, -- F. Supp. 3d --, 2025 WL 752378, at *14 (D.D.C. 2025).

287.    Defendants' conduct has and will continue to irreparably harm Plaintiff MAEC.

288.    Defendants' conduct harms Plaintiff NAACP members by terminating technical assistance programs necessary to protect NAACP student members' equal educational access and by denying NAACP educator members the ability to learn from and freely discuss technical assistance programs and resources that promote desegregation and equity.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully request the Court:

a.    Declare Defendants' termination of the Equity Assistance Center grant unlawful;

b.    Vacate and set aside the Termination Letter;

c.    Preliminarily and permanently enjoin Defendants from ending the EAC Program and otherwise implementing or enforcing the Termination Letter in a manner that hinders the EAC Program;

d.    Preliminarily and permanently enjoin Defendants from evaluating the EAC Program, including Plaintiff MAEC's grant award performance and continuation, pursuant to any criteria other than properly promulgated agency priorities, published as final rulemakings in the Federal Register pursuant to GEPA;

e.    Preliminarily and permanently enjoin Defendants from implementing their February 2025 Grant Appeals Procedure; require Defendants, before terminating the EAC grant, to provide Plaintiff MAEC with a detailed statement of the factual allegations of Plaintiff MAEC's failure to perform its duties under the grant award and/or the cooperative agreement and an

opportunity to cure the alleged noncompliance; and require Defendants to allow Plaintiff MAEC

the time and opportunity to exercise its due process rights granted by Title VI, GEPA, the OMB

Uniform Guidance, and the other applicable authorities cited herein, and to pursue its appeal

pursuant to the procedures set forth in GEPA;

      f.     Award the Plaintiffs costs and reasonable attorney fees; and

      g.     Grant such other injunctive and forward-looking relief as Plaintiffs may request and

as this Court may deem just and proper.

Dated: May 8, 2025                  Respectfully submitted,

                                      */s/Charles McLaurin*
                                      Charles McLaurin
                                      DC Bar No. 1000107
                                      Joseph Wong
                                      DC Bar No. 1017589
                                      NAACP Legal Defense and
                                      Educational Fund, Inc.
                                      700 14th Street NW, Suite 600
                                      Washington, DC 20005
                                      Phone: (202) 682-1300
                                      Fax: (202) 682-1312
                                      cmclaurin@naacpldf.org
                                      jwong@naacpldf.org

                                      Katrina Feldkamp*
                                      Tiffani Burgess*
                                      Maia Cole*
                                      Victor Genecin*
                                      NAACP Legal Defense and
                                      Educational Fund, Inc.
                                      40 Rector Street, 5th Floor
                                      New York, NY 10006
                                      Phone: (212) 965-2200
                                      Fax: (212) 226-7592
                                      kfeldkamp@naacpldf.org
                                      tburgess@naacpldf.org
                                      mcole@naacpldf.org

vgenecin@naacpldf.org

* *Pro hac vice* admission forthcoming

*Counsel for Plaintiffs*