**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MID-ATLANTIC EQUITY CONSORTIUM, *et al*., | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-1407-PLF |
| U.S. DEPARTMENT OF EDUCATION, *et al.*, | |
| *Defendants*. | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................. 2

  A.  Congress Created the Equity Assistance Center Program to Fund Technical Assistance and Training for Desegregation of Schools. ................................................................ 2

  B.  MAEC's 2022 EAC Grant ....................................................................................... 3

  C.  The 2022 EAC Grant Enabled MAEC to Provide Needed Technical Assistance to Justify Schools. ................................................................................................... 4

  D.  The NAACP Relies on Services Provided by MAEC and the Other EAC Grantees. ........ 5

  E.  ED Terminates the EAC Grants ............................................................................... 8

LEGAL STANDARD ........................................................................................................ 11

ARGUMENT .................................................................................................................. 12

  I.  This Court Has Jurisdiction Over Plaintiffs' Claims ..................................................... 12

    A.  Plaintiffs Have Standing ...................................................................................... 12

    B.  This Court Has Jurisdiction .................................................................................. 12

  II.  Plaintiffs Are Likely to Succeed on the Merits of Their Claims ..................................... 14

    A.  Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claims.. 14

      1.  The Termination Letter is Unconstitutionally Viewpoint Specific. .................. 15

      2.  The Termination Letter Imposes Unconstitutional Conditions. ....................... 15

      3.  The Termination of the EAC Program and the Termination Letter Violates Plaintiff NAACP Educator Members' Right to Receive Information and Ideas. ................................................................................................ 17

    B.  Plaintiffs Are Likely to Succeed on the Merits of Their Fifth Amendment Claims . 18

      1.  The Termination Letter is Impermissibly Vague. .............................................. 19

      2.  The Termination Letter Deprived Plaintiffs of a Property Interest Without Due Process of Law. ................................................................................... 20

    C.  Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims ...................... 24

      1.  Final Agency Action ...................................................................................... 24

        i.  The Termination of the EAC Grant Program Is Final Agency Action .......... 25

        ii.    The Department's Adoption of the New Grant Termination Appeals

              Procedures Is Final Agency Action..................................................... 28

        iii.   The Department's Adoption of Its New Priorities Is Final Agency Action. . 30

    2.    The Department's Termination of the EAC Grants Is Arbitrary

        and Capricious. ................................................................................ 31

    3.    The Department's Termination of the EAC Grants Is Contrary to

        Constitutional Rights. ...................................................................... 36

    4.    The Department Terminated the EAC Grants, Promulgated New Appeal

        Procedures, and Adopted New Priorities without Observance of the Procedures

        Required by Law. ............................................................................ 37

    5.    The Department's Termination of the EAC Grants is in Excess of Its

        Statutory Authority. ......................................................................... 39

III.   Plaintiffs Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction 39

  A.   MAEC Faces Irreparable Harm. .............................................................. 41

  B.   NAACP Educator and Student Members Face Irreparable Harm. .......................... 42

IV.   The Balance of Equities Tips in Plaintiffs' Favor Because Plaintiffs Face Irreparable

    Harm, the Injunction Would Not Harm Defendants, and the Public Interest Will Be

    Served by the Injunction ................................................................... 44

CONCLUSION.................................................................................... 45

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.B.A. v. U.S. Dep't of Just.*,
No. 25-CV-1263 (CRC), 2025 WL 1388891 (D.D.C. May 14, 2025) .............................13, 14

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013)..................................................................................................14, 15, 16

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*,
No. 1:25-CV-00702-JRR, 2025 WL 833917 (D. Md. Mar. 17, 2025) .....................................8

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) ..........................................................................................31

*Arce v. Douglas*,
793 F.3d 968 (9th Cir. 2015) ...............................................................................................20

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)...............................................................................................................15

*Bd. of Cnty. Comm'rs v. Wabaunsee Cnty.*,
518 U.S. 668 (1996).............................................................................................................16

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982) (plurality opinion) ..........................................................................17, 18

*Beacon Assocs., Inc. v. Apprio, Inc.*,
308 F. Supp. 3d 277 (D.D.C. 2018) ...............................................................................40, 41, 42

*Bellion Spirits, LLC v. United States*,
7 F.4th 1201 (D.C. Cir. 2021) .............................................................................................25

*Bennett v. Spear*,
520 U.S. 154 (1997).....................................................................................................24, 25, 30

*Blanton v. Office of the Comptroller of the Currency*,
909 F.3d 1162 (D.C. Cir. 2018) ..........................................................................................37

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962).............................................................................................................32

*Butte Cnty. v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010) ............................................................................................31

iii

*Chi. Women in Trades v. Trump*,
    -- F. Supp. 3d --, No. 25 C 2005, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025)...............14, 19

*Chi. Women in Trades v. Trump*,
    -- F. Supp. 3d --, No. 25 C 2005, 2025 WL 933871 (N.D. Ill. Mar. 27, 2025). ....................20

*Ciba-Geigy Corp. v. EPA*,
    801 F.2d 430 (D.C. Cir. 1986) .................................................................................................29

*Climate United Fund v. Citibank, N.A.*,
    No. 25-cv-698, 2025 WL 842360 (D.D.C. Mar. 18, 2025) ...........................................21, 42

*Cmty. for Creative Non-Violence v. Turner*,
    893 F.2d 1387 (D.C. Cir. 1990) .............................................................................................19

*Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
    No. 25-2808, 2025 WL 1393876 (9th Cir. May 14, 2025)....................................................14

*Davis v. District of Columbia*,
    158 F.3d 1342 (D.C. Cir. 1998) .............................................................................................40

*Dep't of Com. v. New York*,
    588 U.S. 752 .........................................................................................................................31

*Department of Education v. California*,
    145 S. Ct. 966 (2025) .............................................................................................................13

*DHS v. Regents of the Univ. of Calif.*,
    591 U.S. 1 (2020).............................................................................................................35, 36

*District of Columbia v. USDA*,
    444 F. Supp. 3d 1 (D.D.C. 2020) .....................................................................................40, 42

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016)....................................................................................................31, 34, 35

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239, 253-54 (2012) .................................................................................................19

*FEC v. Cruz*,
    596 U.S. 289 (2022)...............................................................................................................39

*Feinerman v. Bernardi*,
    558 F. Supp. 2d 36 (D.D.C. 2008) .........................................................................................40

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)...............................................................................................................26

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013) ....................................................................40, 44

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ...................................................................................19

*Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) ....................................................................41, 43

*Her Majesty the Queen in Right of Ontario v. EPA*,
   912 F.2d 1525 (D.C. Cir. 1990) ..................................................................29

*Hood v. United*
   States, 659 F. App'x 655 (Fed. Cir. 2016) ..................................................13

*Ipsen Biopharmaceuticals, Inc. v. Azar*,
   943 F.3d 953 (D.C. Cir. 2019) ....................................................................29

*Karem v. Trump*,
   960 F.3d 656 (D.C. Cir. 2020) ....................................................................41, 43

*Kingman Park Civic Ass'n v. Bowser*,
   815 F.3d 36 (D.C. Cir. 2016) ......................................................................12

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ........................................................................39, 44

*Legal Servs. Corp. v. Velazquez*,
   531 U.S. 533 (2001) ...................................................................................16

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ...................................................................................12

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ...................................................................20, 21, 22, 24

*MediNatura, Inc. v. FDA*,
   998 F.3d 931 (D.C. Cir. 2021) ....................................................................11

*Mills v. District of Columbia*,
   571 F.3d 1304 (D.C. Cir. 2009) ..................................................................40, 41

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)...................................................................31, 32, 34

*N. Mariana Island v. United States*,
   686 F. Supp. 2d 7 (D.D.C. 2009) ...............................................................45

*NAACP v. Trump*,
    298 F. Supp. 3d 209 (D.D.C.) ..................................................................................12

*NAACP v. U.S. Dep't of Educ.*,
    No. 25-CV-1120 (DLF), 2025 WL 1196212 (D.D.C. Apr. 24, 2025)........................12, 20, 44

*Nat'l Env't Dev. Ass'n's Clean Air Proj. v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014) ..............................................................................30

*Nat'l Mining Ass'n v. Jackson*,
    768 F. Supp. 2d 34 (D.D.C. 2011) .........................................................................40

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024)............................................................................................15

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................................................44

*Ohio v. EPA*,
    603 U.S. 279 (2024)............................................................................................31

*Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*,
    963 F. Supp. 1 (D.D.C. 1997) ..........................................................................41, 42

*NB ex rel. Peacock v. District of Columbia*,
    794 F.3d 31 (D.C. Cir. 2015) ................................................................................21

*People for the Ethical Treatment of Animals, Inc. v. Gittens*,
    215 F. Supp. 2d 120 (D.D.C. 2002) ......................................................................44

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*,
    613 F.3d 220 (D.C. Cir. 2010) ..............................................................................36

*Perry v. Sindermann*,
    408 U.S. 593 (1972)............................................................................................15

*Peter Kiewit Sons' Co. v. U.S. Army Corps of Engineers*,
    714 F.2d 163 (D.C. Cir. 1983) ..............................................................................27

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)............................................................................................14

*Rhea Lana, Inc. v. Dep't of Lab.*,
    824 F.3d 1023 (D.C. Cir. 2016) ............................................................................27

*Rosenberger v. Rector v. Rector and Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)............................................................................................15

*S. Educ. Found. v. U.S. Dep't of Educ.*,
   No. 25-cv-1079-PLF, ECF No. 11 (Apr. 23, 2025) ............................................................7, 36

*S. Educ. Found. v. U.S. Dep't of Educ.*,
   No. 25-cv-1079-PLF, ECF No. 28 (May 21, 2025) ...............................................................31

*Sackett v. EPA*,
   566 U.S. 120 (2012) ......................................................................................................27, 28

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
   508 F. Supp. 3d 521 (N.D. Cal. 2020) ..................................................................................14

*Sierra Club v. EPA*,
   955 F.3d 56 (D.C. Cir. 2020) .........................................................................................24, 25

*Soundboard Ass'n v. FTC*,
   888 F.3d 1261 (D.C. Cir. 2018) .............................................................................................25

*Sw. Airlines Co. v. United States Dep't of Transp.*,
   832 F.3d 270 (D.C. Cir. 2016) .......................................................................................25, 30

*Taylor v. Cohen*,
   405 F.2d 277 (4th Cir. 1968) .................................................................................................23

*Tootle v. Sec'y of Navy*,
   446 F.3d 167 (D.C. Cir. 2006) ...............................................................................................13

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016) ......................................................................................................24, 27

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,
   No. 1:25-CV-00465, 2025 WL 763738 (D.D.C. Mar. 11, 2025) ..........................................13

*United States v. James Daniel Good Real Prop.*,
   510 U.S. 43 (1993) ........................................................................................................20, 24

*United States v. Williams*,
   553 U.S. 285 (2008) ...............................................................................................................19

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
   455 U.S. 489 (1982) ...............................................................................................................19

*Wash. Legal Found. v. Alexander*,
   984 F.2d 483 (D.C. Cir. 1993) ...............................................................................................23

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .....................................................................................................11, 44

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ............................................................... 40, 42

**Statutes**

5 U.S.C. § 553(b), (c) ............................................................................... 33, 38

5 U.S.C. § 556(d) ........................................................................................... 22

5 U.S.C. § 706(2)(A) ..................................................................................... 31

5 U.S.C. § 706(2)(B) ..................................................................................... 36

5 U.S.C. § 706(2)(C) ..................................................................................... 39

5 U.S.C. § 706(2)(D) ..................................................................................... 37

20 U.S.C. § 1221-1 ........................................................................................ 45

20 U.S.C. § 1232(a) ....................................................................................... 28

20 U.S.C. § 1232(d) ................................................................................. *passim*

20 U.S.C. § 1234 ...................................................................................... 13, 21

20 U.S.C. § 1234(a) ....................................................................................... 22

20 U.S.C. § 1234(f)(1) ................................................................................... 22

20 U.S.C. §1234a ........................................................................................... 21

20 U.S.C. §1234b ........................................................................................... 21

20 U.S.C. §1234c .................................................................................. 21, 22, 32

20 U.S.C. §1234d .................................................................................... *passim*

20 U.S.C. §1234e ........................................................................................... 21

20 U.S.C. §1234f ........................................................................................... 21

20 U.S.C. §1234g .................................................................................... *passim*

20 U.S.C. §1234h ........................................................................................... 21

20 U.S.C. §1234i ...................................................................................... 21, 22

28 U.S.C. 1331 ............................................................................................... 12

31 U.S.C. § 1101 *et seq.* ................................................................................. 5

42 U.S.C. § 2000c–2 ...................................................................................................2, 3

42 U.S.C. § 2000c–3 ......................................................................................................2

42 U.S.C. § 2000d ........................................................................................................23

42 U.S.C. § 2000d–1 ............................................................................................. *passim*

42 U.S.C. § 2000d–2 ....................................................................................................26

Administrative Procedure Act, 5 U.S.C. § 702 ...........................................................12

Tucker Act (28 U.S.C. § 1491) ...................................................................................13

**Other Authorities**

2 C.F.R. Part 180 .....................................................................................................3, 13

2 C.F.R. Part 485 ........................................................................................................13

2 C.F.R. Part 3474 ..................................................................................................3, 13

2 C.F.R. Part 3485 .......................................................................................................3

2 C.F.R. § 200.339 ..........................................................................................23, 37, 38

2 C.F.R. § 200.340(a)(4) ..........................................................................................9, 33

2 C.F.R. § 200.341(a) ....................................................................................24, 37, 38

2 C.F.R. § 200.342 ......................................................................................................38

2 C.F.R. § 3474.1(a) part 200 .....................................................................................21

34 C.F.R. Part 75 .....................................................................................................3, 13

34 C.F.R. Part 77 .....................................................................................................3, 13

34 C.F.R. Part 79 .....................................................................................................3, 13

34 C.F.R. Part 81 .................................................................................................3, 13, 22

34 C.F.R. Part 82 .....................................................................................................3, 13

34 C.F.R. Part 84 .....................................................................................................3, 13

34 C.F.R. Part 86 .....................................................................................................3, 13

34 C.F.R. Part 97 .....................................................................................................3, 13

34 C.F.R. Part 98 .......................................................................................................3, 13

34 C.F.R. Part 99 .......................................................................................................3, 13

34 C.F.R. pt. 100, App. A, pt. 1(18) ...........................................................................23

34 C.F.R. § 75.105(b)(2) ...............................................................................30, 33, 39

34 C.F.R. § 75.253 ....................................................................................................9, 21

34 C.F.R. § 75.900(a) ....................................................................................................33

34 C.F.R. § 81.1 ............................................................................................................21

34 C.F.R. § 81.2 ............................................................................................................21

34 C.F.R. § 81.3 ......................................................................................................21, 22

34 C.F.R. § 81.4 ............................................................................................................21

34 C.F.R. § 81.5 ............................................................................................................21

34 C.F.R. § 81.6 ......................................................................................................21, 22

34 C.F.R. § 81.7 ............................................................................................................21

34 C.F.R. § 81.8 ............................................................................................................21

34 C.F.R. § 81.9 ............................................................................................................21

34 C.F.R. § 81.10 ..........................................................................................................21

34 C.F.R. § 81.11 ..........................................................................................................21

34 C.F.R. § 81.12 ..........................................................................................................21

34 C.F.R. § 81.13 ..........................................................................................................21

34 C.F.R. § 81.14 ..........................................................................................................21

34 C.F.R. § 81.15 ..........................................................................................................21

34 C.F.R. § 81.16 ..........................................................................................................21

34 C.F.R. § 81.17 ..........................................................................................................21

34 C.F.R. § 81.18 ..........................................................................................................21

34 C.F.R. § 81.19 ..........................................................................................................21

34 C.F.R. § 81.20 ...................................................................................................................21

34 C.F.R. § 100.7 ..............................................................................................................23, 37

34 C.F.R. § 100.8 ..............................................................................................................21, 23

34 C.F.R. § 200.208(d) .........................................................................................................23

34 C.F.R. § 270.1 ...................................................................................................................2

34 C.F.R. § 270.2 ...................................................................................................................2

34 C.F.R. § 270.3 ...................................................................................................................2

34 C.F.R. § 270.4 ...................................................................................................................2

34 C.F.R. § 270.5 ...................................................................................................................2

34 C.F.R. § 270.6 .................................................................................................................22

34 C.F.R. § 270.7 ...................................................................................................................2

86 Fed. Reg. 70,636 (2021) .................................................................................................35

87 Fed. Reg. 8564 (2022) ....................................................................................................35

Alicia R. Jackson, *Inherently Unequal: The Effect of Structural Racism and Bias on K-12 School Discipline*, 88 Brook. L. Rev. 459, 495 (2023)................................7

Am. Psych. Ass'n Zero Tolerance Task Force, *Are Zero Tolerance Policies Effective in the Schools?*, 63 Am. Psych. 852, 852 (2008), https://www.apa.org/pubs/reports/zero-tolerance.pdf [https://perma.cc/6SSP-7RCT] ...............................................................................................................................7

Amity L. Noltemeyer et al., *Relationship Between School Suspension and Student Outcomes: A Meta-Analysis*, 44 Sch. Psych. Rev. 224-40 (2015), https://edsource.org/wpcontent/uploads/2018/09/Noltemeyer_Ward_2015_Meta-Analysis.pdf ........................................................................................................7

Anne Gregory & Katherine Evans, *The Starts and Stumbles of Restorative Justice in Education: Where Do We Go from Here?* https://nepc.colorado.edu/sites/default/files/publications/Revised%20PB%20Gregory 0.pdf [https://perma.cc/C6LEQBS6]................................................5

Blessing Ngozi Iwueno et al., *Impact of Racial Representation in Curriculum Content on Student Identity and Performance*, 23 World J. Advanced Rsch. & Revs. 2913, 2914-15 (2024), https://doi.org/10.30574/wjarr.2024.23.1.2280 ......................43

DeLeon L. Gray et al., *Black and Belonging at School: A Case for Interpersonal, Instructional, and Institutional Opportunity Structures* Educ. Psych. 97, 102 (2018), https://doi.org/10.1080/00461520.2017.1421466 ..................................................6, 43

Dr. Gillian Scott-Ward, *Moving Past Racist Grooming Standards Terrorizing our Children*, Medium (Jan. 10, 2019), https://medium.com/@gillianscottward/moving-past-racist-grooming-standards-terrorizing-our-children-40df73b9ecb3 ....................................................................6

Emily Peterson, *Racial Inequality in Public School Discipline for Black Students in the United States*, Ballard Brief (Sept. 2021), https://ballardbrief.byu.edu/issue-briefs/racial-inequality-in-public-school-discipline-for-black-students-in-the-united-states ....................................................7

Erica L. Green & Zach Montague, *Trump Cracks Down on Diversity Initiatives Celebrated in His First Term*, N.Y. Times (Feb. 14, 2025) ......................................34

Erin Hinrichs, *Minnesota Educators Weigh in on Student Discipline Debate Unfolding in D.C.*, MinnPost (Dec. 5, 2017), https://www.minnpost.com/education/2017/12/minnesota-educators-weigh-student-discipline-debate-unfolding-dc/ [https://perma.cc/S25S-SM54] .................................6

Gregory M. Walton & Geoffrey L. Cohen, *A Brief Social-Belonging Intervention Improves Academic and Health Outcomes of Minority Students*, *Minority Students*, 331 Sci., 1447, 1447 (Mar. 18, 2011), https://doi.org/10.1126/science.1198364 ..............................................................43

*Hearings and Appeals*, U.S. Dep't of Educ., Off. of Commc'ns & Outreach, https://web.archive.org/web/20250521224238/https://www.ed.gov/laws-and-policy /hearings-and-appeals (last reviewed Apr. 14, 2025) ....................................26

Joint "Dear Colleague" Letter from the U.S. Dep't of Educ. & U.S. Dep't of Just. (Jan. 8, 2014), https://web.archive.org/web/20250409163856/https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-201401-title-vi.pdf .........................................................................................................6

MAEC-CEE, Mid Atlantic Equity Consortium Application - S004D22002 4 (Oct. 2022), https://web.archive.org/web/20250421211134/https://www.ed.gov/sites/ed/files/2022/10/Region_I_Project_Narrative-MAEC.pdf (attached as Exhibit 5) ...........................4

Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/withhold (last visited May 21, 2025) .................................22

Nat'l Educ. Pol'y Ctr. 3 (2020), https://nepc.colorado.edu/sites/default/files/publications/Revised%20PB%20Gregory 0.pdf ................................................................................................5

Nora Gordon, *Disproportionality in Student Discipline: Connecting Policy to Research*, Brookings Inst. (Jan. 18, 2018), https://www.brookings.edu/articles/disproportionality-in-student-discipline-connecting-policy-to-research/ ................................................................................6

Off. for C.R., U.S. Dep't of Educ., *2024 Fiscal Year Annual Report* 8 (2024), https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf ..........................................................................6

Oxford English Dictionary, https://www.oed.com/search/dictionary/?scope=Entries&q=withhold (last visited May 21, 2025) ...................................................................................22

Press Release, U.S. Dep't of Educ. Release Secretary McMahon's Supplemental Grant Priorities, U.S. Dep't of Educ. (May 20, 2025), https://web.archive.org/web/20250521213038/ https://www.ed.gov/about/news/press-release/us-department-of-education-releases-secretary-mcmahons-supplemental-grant-priorities (attached as Exhibit 11) .............................................................................................33

Press Release, U.S. Dep't of Educ., U.S. Department of Education Cancels Additional $350 Million in Woke Spending: Contracts and grants terminated at several Regional Educational Laboratories and Equity Assistance Centers (Feb. 13, 2025), https://web.archive.org/web/20250422213426/https://www.ed.gov/about/news /press-release/us-department-of-education-cancels-additional-350-million-woke-spending ...............................................................................................9

Regional Educational Laboratories and Equity Assistance Centers (Feb. 13, 2025), https://web.archive.org/web/20250422213426/https://www.ed.gov/about/news /press-release/us-department-of-education-cancels-additional-350-million-woke-spending .............................................................................................9, 10

*School to Prison Pipeline*, Wis. Coal. Against Sexual Assault, Inc., https://www.wcasa.org/resources/areas-of-interest/topics/school-to-prison-pipeline/ (last visited May 6, 2025) ...........................................................7

Sellers et al., *Racial Identity Matters: The Relationship between Racial Discrimination and Psychological Functioning in African American Adolescents*, 16 J. Res. Adolescence 187, 188 (2006), https://doi.org/10.1111/j.1532-7795.2006.00128.x ..............................................6

*Training and Advisory Services – Equity Assistance Centers: Home*, U.S. Dep't of Educ., https://web.archive.org/web/20250421210554/https://www.ed.gov/grants-and-programs/grants-birth-grade12/training-and-advisory-services--equity-assistance-centers (last reviewed Feb. 28, 2025) (attached as Exhibit 4)................................3

U.S. Const. amend. V ...................................................................................................20

U.S. Dep't of Educ., Off. for C. R., *Ensuring Educational Opportunities for All Students on Equal Terms 70 Years After Brown v. Board of Education* 4 (May 2024), https://web.archive.org/web/20250422230223/https://drive.google.com/file/d/ 1l671DtgWsgs_zlMyn269k_Gmatvgdx7A/view ....................................................34

U.S. Dep't of Educ., Off. for C. R., *Fact Sheet: Diversity & Inclusion Activities Under Title VI* 2 (Jan. 2023), https://web.archive.org/web/20250423014506/https://drive.google.com/file/d/ 1WzUGtPntZa3RlhPp2q69thKhqUctPakF/view....................................................34

Administrative Appeals Process for Department Grants. U.S. Dep't of Educ., https://web.archive.org/web/20250502144446/https://www.ed.gov/grants-and- programs/administrative-appeals-process-department-grants (attached as Exhibit 10) (showing that the earliest identifiable version of this webpage was last reviewed on April 23, 2025)............................................................................28

11A Wright & Miller, Federal Practice and Procedure: Civil 3d § 2948.1 ..................................41

## **INTRODUCTION**

Plaintiff Mid-Atlantic Equity Consortium ("MAEC"), for itself, and Plaintiffs NAACP, NAACP Tennessee State Conference, and Somerville-Fayette NAACP, on behalf of their members, move for a preliminary injunction barring Defendants from enforcing their February 13, 2025 Termination Letter to Plaintiff MAEC and other Equity Assistance Center ("EAC") grantees, evaluating Plaintiff MAEC and other EAC grantees pursuant to criteria other than properly promulgated agency priorities, and implementing the February 2025 Grant Appeals Procedure described in their Termination Letter.

Defendants' wrongful termination of the EAC grants, including Plaintiff MAEC's EAC grant, plainly violates Plaintiff MAEC's First and Fifth Amendment rights to engage in speech free of unconstitutional grant conditions and Plaintiffs NAACP, NAACP Tennessee State Conference, and Somerville-Fayette NAACP's First Amendment right to receive information and training. Under the guise of prohibiting discrimination, Defendants' Termination Letters to Plaintiff MAEC and the other EAC grantees target "equity-related grants" and impose vague and viewpoint discriminatory prohibitions against diversity, equity, and inclusion activities. In further violation of Plaintiffs' rights under the Fifth Amendment and Administrative Procedure Act, Defendants inflict this harm without reasoned analysis or justification, observance of required procedures, or even bare compliance with minimum procedural due process requirements afforded by the Constitution.

Defendants' conduct has irreparably harmed and will continue to irreparably harm Plaintiff MAEC and NAACP members, by depriving Black students and educators the benefit of technical assistance to redress discriminatory practices and hostile environments in their schools and inflicting irreparable economic loss and reputational harm on Plaintiff MAEC.

**FACTUAL BACKGROUND**

**A. Congress Created the Equity Assistance Center Program to Fund Technical Assistance and Training for Desegregation of Schools.**

The EAC Program was established in Title IV of the Civil Rights Act of 1964 to "render technical assistance . . . in the preparation, adoption, and implementation of plans for the desegregation of public schools," 42 U.S.C. § 2000c–2, and to "arrange, through grants or contracts, . . . institutes for special training designed to improve the ability of . . .school personnel to deal effectively with special educational problems occasioned by desegregation," 42 U.S.C. § 2000c–3. The program operates a competitive grant process for organizations to seek funding to provide desegregation assistance to school districts and local educational agencies ("LEAs") in an assigned region. 34 C.F.R. §§ 270.1–270.5, 270.7. Since 2016, the Department of Education ("The Department" or "ED") has divided the United States and territories into four regions, and awarded one EAC grant per region. Shaffer Decl. ¶ 5, Pls. Ex. 1 (hereinafter "Shaffer Decl.").

An entity that receives funds through the EAC Program is called an Equity Assistance Center or EAC. 34 C.F.R.§ 270.1. Each EAC is mandated to provide assistance—upon the request of a school board or other responsible governmental agency in the EAC's assigned region, *id*. § 270.3; 42 U.S.C. § 2000c–2—in the areas of race, sex, national origin, and religion desegregation. *Id*. §§ 270.4(b), 270.7. Such assistance "may include, among other activities, (1) Dissemination of information regarding effective methods of coping with special educational problems occasioned by desegregation; (2) Assistance and advice in coping with these problems; and (3) Training designed to improve the ability of . . . parents, community members, community organizations, and . . . school personnel to deal effectively with special educational problems occasioned by desegregation." *Id*. § 270.4(c). More recently, "the EACs have also focused on how to create and maintain environments that meet the needs of all children once schools and classrooms are

desegregated."[1] Shaffer Decl. ¶ 6. EACs "play[] a vital role in ensuring that all students have equitable access to learning opportunities, regardless of their . . . race, sex, national origin, or religion."[2]

### B. MAEC's 2022 EAC Grant

MAEC is a nonprofit, 501(c)(3) corporation. Rouland Decl. ¶ 3, Pls. Ex. 2 (hereinafter "Rouland Decl."). Since MAEC's founding in 1992, ED has repeatedly awarded MAEC an EAC grant to provide free or low-cost technical assistance, planning, and training as requested by LEAs. Since 2016, MAEC has served as the EAC for "Region I," which serves Connecticut, Delaware, Kentucky, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Puerto Rico, Rhode Island, Vermont, West Virginia, and the Virgin Islands. *See* Shaffer Decl. ¶¶ 3, 7; Williams Decl. ¶ 17, Pls. Ex. 3, (hereinafter "Williams Decl."). In 2022, ED awarded its most recent round of EAC grants pursuant to its authority under 42 U.S.C. § 2000c–2 and the Department's General Administrative Regulations, including 34 C.F.R. Parts 75, 77, 79, 81, 82, 84, 86, 97–99 and 2 C.F.R. Parts 180, 3485, 3474.[3] MAEC was competitively selected for a five-year EAC grant, under which it was scheduled to receive annual disbursements totaling $8,214,498 to provide technical assistance and training in Region I from October 1, 2022 to September 30, 2027. Williams Decl. ¶ 18. MAEC's most recent Grant Award Notification ("GAN"), dated August 22, 2024, awarded $1,686,452 for the period October 1, 2024 to September 30, 2025. *Id*.

---

[1] *Training and Advisory Services – Equity Assistance Centers: Home*, U.S. Dep't of Educ., https://web.archive.org/web/20250421210554/https://www.ed.gov/grants-and-programs/grants-birth-grade12/training-and-advisory-services--equity-assistance-centers (last reviewed Feb. 28, 2025) (attached as Exhibit 4).
[2] *Id.*
[3] *Id*.

**C.  The 2022 EAC Grant Enabled MAEC to Provide Needed Technical Assistance to Justify Schools.**

Dozens of districts in Region I remain subject to school desegregation orders; many more struggle to comply with federal civil rights laws. As of February 2022, Region I had 177 open Title VI investigations at elementary and secondary schools, for matters involving racial harassment, denial of equal access to education, or discipline.[4]

Under the terms of its current EAC grant, MAEC's Center for Education Equity ("CEE") has assisted states, districts, schools, and community-based organizations since October 2022. *See* Shaffer Decl. ¶¶ 8–9; Williams Decl. ¶ 22. In Fiscal Year 2024 alone, CEE served 109 LEAs and engaged in thirty-four projects to address discrimination and segregation on the basis of race, national origin, sex, or religion. Shaffer Decl. App. 1, at 7–8. CEE's technical assistance is consistent with ED's grant priorities, its overriding mission to ensure equal access to education, and Federal civil rights laws. Williams Decl. ¶¶ 12–15.

For example, in 2024, CEE used a technical assistance tool that it developed, *A Data Inquiry Guide for Identifying and Addressing Equity Gaps*, to reduce the racial opportunity gaps in three public schools in Maine, achieving decreases in the racial opportunity gap as high as 10.6% in Math and 10.1% in English Language Arts. Exhibit 5 at 6–7. In addition, CEE helped 17 school districts in New York State significantly reduce the racially disproportionate use of school discipline. As a result, the NYS Education Department asked MAEC to provide trainings to prevent discrimination in school discipline throughout the state. Exhibit 5, at 9–10; *see also* Williams Decl. ¶ 23. This assistance is critical. Black students are less likely to be excluded and

---

[4] MAEC-CEE, Mid Atlantic Equity Consortium Application - S004D22002 4 (Oct. 2022), https://web.archive.org/web/20250421211134/https://www.ed.gov/sites/ed/files/2022/10/Region_I_Project_Narrative-MAEC.pdf (attached as Exhibit 5).

more likely to benefit from their educational environment when schools adopt restorative justice practices, regularly analyze and respond to racial disparities in discipline, and take other steps to reduce racial discrimination in discipline.[5] Before the February 13 grant termination, MAEC was planning to assist six districts with similar projects. Shaffer Decl. App. 1, at 11–13; *see also* Williams Decl. ¶¶ 24–29.

ED regularly approved MAEC's work. It reviewed MAEC's annual reports and its compliance with Government Performance and Results Act measures, 31 U.S.C. § 1101 *et seq.*, and it determined that MAEC merited each continuation GAN. Williams Decl. ¶ 20; *see also* Shaffer Decl. ¶ 11. Daryl Williams, who led the CEE, met monthly with ED's program officers and received monthly and annual feedback from ED to evaluate the CEE's progress and effectiveness. Williams Decl. ¶¶ 19–21. ED's most recent annual review was in January 2025, and as at every prior review, MAEC received exceptional feedback. Williams Decl. ¶ 21. ED also conducted yearly client surveys, submitting them to Congress to support budget appropriations. Compl. ¶ 56.

**D. The NAACP Relies on Services Provided by MAEC and the Other EAC Grantees.**

The NAACP is a not-for-profit organization founded in 1909. It has more than 2,200 local branches across the United States, 371 college chapters, 567 Youth Councils, and 23 high school chapters. Lewis Decl. ¶ 7, Pls. Ex. 6 (hereinafter "Lewis Decl."). Its members include public school teachers, parents of Black schoolchildren who attend public schools throughout the country, and Black students in public high schools who are members of its Youth Councils and high school

---

[5] Anne Gregory & Katherine Evans, *The Starts and Stumbles of Restorative Justice in Education: Where Do We Go from Here?*, Nat'l Educ. Pol'y Ctr. 3 (2020), https://nepc.colorado.edu/sites/default/files/publications/Revised%20PB%20Gregory 0.pdf [https://perma.cc/C6LEQBS6] (discussing, among other benefits, that schools that adopt these practices saw a drop in suspension rates).

chapters. Lewis Decl. ¶ 4; *see also* Holmes Decl. ¶ 7, Pls. Ex. 7 (hereinafter, "Holmes Decl.").

Black students, including the children of NAACP members and student members of NAACP Youth Councils, experience higher rates of school-based discrimination than their non-Black peers. *See* Lewis Decl. ¶ 9. They must expend cognitive energy processing discrimination and have less of it to spend on learning and development.[6] During Fiscal Year 2024, 19% (4,307) of the nearly 23,000 complaints that ED's Office for Civil Rights received alleged discrimination on the basis of race, color, or national origin.[7] Racially discriminatory acts, including school-based discrimination, are "detrimental to students' motivation, engagement, development, learning, performance, and psychological well-being."[8] ED has recognized, moreover, that students of color—and particularly Black students, including NAACP members—are subject to harsher and more frequent school discipline.[9] Racially discriminatory discipline adversely affects students'

---

[6] Sellers et al., *Racial Identity Matters: The Relationship between Racial Discrimination and Psychological Functioning in African American Adolescents*, 16 J. Res. Adolescence 187, 188 (2006), https://doi.org/10.1111/j.1532-7795.2006.00128.x; Dr. Gillian Scott-Ward, *Moving Past Racist Grooming Standards Terrorizing our Children*, Medium (Jan. 10, 2019), https://medium.com/@gillianscottward/moving-past-racist-grooming-standards-terrorizing-our-children-40df73b9ecb3.

[7] Off. for C.R., U.S. Dep't of Educ., *2024 Fiscal Year Annual Report* 8 (2024), https://www.ed.gov/media/document/ocr-report-president-and-secretary-of-education-2024-109012.pdf.

[8] DeLeon L. Gray et al., *Black and Belonging at School: A Case for Interpersonal, Instructional, and Institutional Opportunity Structures*, 53 Educ. Psych. 97, 102 (2018), https://doi.org/10.1080/00461520.2017.1421466.

[9] Joint "Dear Colleague" Letter from the U.S. Dep't of Educ. & U.S. Dep't of Just. (Jan. 8, 2014), https://web.archive.org/web/20250409163856/https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-201401-title-vi.pdf; Nora Gordon, *Disproportionality in Student Discipline: Connecting Policy to Research*, Brookings Inst. (Jan. 18, 2018), https://www.brookings.edu/articles/disproportionality-in-student-discipline-connecting-policy-to-research/; *see, e.g.*, Kirsten Weir, *Inequality at School: What's Behind the Racial Disparity in Our Education System?*, 47 Am. Psych. Ass'n 42 (2016), https://www.apa.org/monitor/2016/11/cover-inequality-school; *see* Erin Hinrichs, *Minnesota Educators Weigh in on Student Discipline Debate Unfolding in D.C.*, MinnPost (Dec. 5, 2017), https://www.minnpost.com/education/2017/12/minnesota-educators-weigh-student-discipline-debate-unfolding-dc/ [https://perma.cc/S25S-SM54].

academic performance, attendance, and behavior; may contribute to lower enrollment in higher education; and may push students into the criminal justice system.[10]

Schools often fail to appropriately respond to school-based discrimination. Technical assistance from EACs can help K-12 schools better respond to discrimination and ensure equal educational opportunities for Black students and equal professional opportunities for Black educators. For example, children of NAACP members attend the schools in Anniston, Alabama, where the Southern Education Foundation's EAC-South ("EAC-South") has provided intensive technical assistance to address disparities in graduation rates and access to college readiness programs.[11] Simelton Decl. ¶ 8, Pls. Ex. 8 (hereinafter "Simelton Decl."). In addition, children of NAACP members attend Fayette County (Tennessee) Public Schools ("FCPS"), a district currently subject to a federal court desegregation order that requires FCPS to contract with the EAC-South for technical assistance and other support. *See* Holmes Decl. ¶¶ 14–16. The vestiges of discrimination against Black students and educators have not been eliminated, and the federal court order remains in effect, but FCPS, its students and teachers, have suddenly been deprived of EAC services.

---

[10] *E.g.*, Alicia R. Jackson, *Inherently Unequal: The Effect of Structural Racism and Bias on K-12 School Discipline*, 88 Brook. L. Rev. 459, 495 (2023), https://brooklynworks.brooklaw.edu/blr/vol88/iss2/2; Am. Psych. Ass'n Zero Tolerance Task Force, *Are Zero Tolerance Policies Effective in the Schools?*, 63 Am. Psych. 852, 852 (2008), https://www.apa.org/pubs/reports/zero-tolerance.pdf [https://perma.cc/6SSP-7RCT]; Amity L. Noltemeyer et al., *Relationship Between School Suspension and Student Outcomes: A Meta-Analysis*, 44 Sch. Psych. Rev. 224–40 (2015), https://edsource.org/wpcontent/uploads/2018/09/Noltemeyer_Ward_2015_Meta-Analysis.pdf; Emily Peterson, *Racial Inequality in Public School Discipline for Black Students in the United States*, Ballard Brief (Sept. 2021), https://ballardbrief.byu.edu/issue-briefs/racial-inequality-in-public-school-discipline-for-black-students-in-the-united-states; *School to Prison Pipeline*, Wis. Coal. Against Sexual Assault, Inc., https://www.wcasa.org/resources/areas-of-interest/topics/school-to-prison-pipeline/ (last visited May 6, 2025).
[11] Declaration of Eshé P. Collins at 3, *S. Educ. Found. v. U.S. Dep't of Educ.*, No. 25-cv-1079-PLF, ECF No. 11-4 (Apr. 23, 2025).

7

Educators, including NAACP members served by Plaintiff MAEC and other EACs, similarly receive and rely on technical assistance from MAEC and other EACs to respond appropriately to school-based discrimination, to facilitate equal education access for all students, and to foster a more supportive environment for educators, including Black educators. *See* Holmes Decl. ¶¶ 20, 23.

### E.  ED Terminates the EAC Grants

Without warning, on February 13, 2025, Defendants sent MAEC a form letter announcing the immediate termination of its EAC grant and the immediate suspension of EAC grant funds. Shaffer Decl. App. 1, at 14. That same day, ED sent each of the other three EAC grant recipients and more than one hundred other program grantees letters identical to the Termination Letter except for differences in the addressees, termination dates, and grant-award numbers.[12] These terminations effectively ended the EAC Program nationwide. Terminating the EAC grants has caused immediate and irreparable harm to MAEC, to the NAACP, to the other three regional EACs, and to the students, families, school districts, and municipalities they serve. MAEC and its partner school districts have been forced shutter ongoing projects in multiple school districts. Shaffer Decl. App. 1, at 11–13; Rouland Decl. ¶¶ 14–27. On their own, these districts lack the resources to ensure compliance with federal law and support students' well-being. Rouland Decl. ¶ 27. NAACP members who attend or are employed by public schools have been deprived of the benefits of the support provided to their school districts by EACs. *See* Holmes Decl. ¶¶ 15, 17, 20, 22. ED's elimination of the EACs has inflicted disproportionate harm on the most vulnerable students and parents, including NAACP members, by removing technical assistance that redresses disparities

---

[12] *See* Mem Op., *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, No. 1:25-CV-00702-JRR, 2025 WL 833917, at *5 (D. Md. Mar. 17, 2025); Shaffer Decl. ¶ 12; Williams Decl. ¶ 37.

on the basis of race, sex, and religion. *See, e.g.*, Holmes Decl. ¶¶ 20, 22; Simelton Decl. ¶¶ 14–16.

None of the boilerplate Termination Letters include findings specific to individual recipients' actual conduct. They state ED's reasons for the grant termination as follows:

> The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. S004D220002 in its entirety effective 2/13/25.

*E.g.*, Shaffer Decl. App. 1, at 14. The Termination Letters further assert that

> [i]t is a priority of the Department to eliminate discrimination in all forms of education throughout the United States. . . . [T]his priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic.

*See id.*

Also on February 13, 2025, Defendants sent MAEC an updated GAN listing the budget period as October 1, 2024, through February 13, 2025, and stating that the grant was terminated because it was deemed "inconsistent with, and no longer effectuates, Department priorities." *See* Williams Decl. ¶ 32. In addition, ED issued a press release (the "February 13 Press Release") announcing that it had cancelled over $350 million in contracts and grants, including $33 million in grants to MAEC and the other three EACs.[13]

---

[13] Press Release, U.S. Dep't of Educ., U.S. Department of Education Cancels Additional $350 Million in Woke Spending: Contracts and grants terminated at several Regional Educational Laboratories and Equity Assistance Centers (Feb. 13, 2025),

The February 13 Press Release suggests that the grant termination was effectuated pursuant to Executive Order 14151, requiring ED to terminate "equity-related" grants or contracts.[14] The press release states, without basis or explanation, that MAEC and other Equity Assistance Centers "support[] divisive training in DEI, Critical Race Theory, and gender identity for state and local education agencies."[15] Like the Termination Letter, the February 13 Press Release does not define the terms "divisive training," "DEI," "Critical Race Theory," and "gender identity."

MAEC was in the middle of the Fiscal Year 2024 continuation grant award budget period when it received the Termination Letter. *See* Williams Decl. ¶¶ 18, 32. The applicable statutes and regulations require ED to comply with robust due process procedures as a condition precedent for terminating a grant award mid-budget period, including an investigation, notice of finding, a remediation plan, and administrative law adjudication. *See infra* § II.A.2.ii. The Termination Letter cited to some, but conspicuously not all, of the requirements for termination. But it did not comply with any of these required due process procedures. Instead, the Termination Letter briefly mentions an "objection" process and imposes a thirty-day timeline to challenge the termination, *see* Shaffer Decl. App. 1, at 15, without describing any procedures to address objections or challenges or the timeframe in which ED will process such objections.

Prior to the Termination Letter, ED did not send MAEC any pretermination notice, provide MAEC any opportunity to be heard, or offer MAEC an opportunity to cure any alleged noncompliance. *See* Shaffer Decl. ¶ 14; Williams Decl. ¶ 38. Nor did Defendants consider the reliance interests of MAEC and the school districts MAEC serves before terminating the EAC

---

https://web.archive.org/web/20250422213426/https://www.ed.gov/about/news/press-release/us-department-of-education-cancels-additional-350-million-woke-spending.
[14] *Id*.
[15] *Id*.

grant. The grant termination cost MAEC over forty percent of its expected FY2025 revenue, devastating its operations. Rouland Decl. ¶ 36. As a result, MAEC was forced to close its Equity Assistance Center; terminate intensive technical assistance requested by six school districts and the other universal and targeted projects it was due to conduct; and lay off four staff members, including its highly experienced CEE Project Director, and reduce the workload and compensation of remaining staff. *See* Shaffer Decl. ¶¶ 19, 21–22; Rouland Decl. ¶¶ 41–45; Williams Decl. ¶ 40. MAEC has attempted to secure other funding, but the school districts it serves are unable to pay full fees for its services, and MAEC is unlikely to secure enough funding to replace the EAC grant. Shaffer Decl. ¶ 19; Rouland Decl. ¶¶ 39–40. As a result of the boilerplate letters sent to them, the other EAC grantees immediately ceased their EAC operations.[16] At least one EAC has been forced to shutter its operations entirely. Rouland Decl. ¶ 46.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must show that (1) it "is likely to succeed on the merits" of its claims, (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the government is the party opposing a motion for a preliminary injunction, the balance of equities and public-interest factors merge. *E.g.*, *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

---

[16] Compl. ¶ 111.

## ARGUMENT

I. **This Court Has Jurisdiction Over Plaintiffs' Claims**

A. Plaintiffs Have Standing

Plaintiffs have standing to bring this suit. The violation of MAEC's First and Fifth Amendment Rights and the economic loss inflicted on MAEC are injuries directly traceable to ED's unlawful termination of the EAC grant which will be redressed by a favorable decision in this case. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

As to the remaining Plaintiffs, NAACP, Tennessee NAACP, and Somerville-Fayette NAACP can demonstrate associational standing—"a cognizable injury to one or more . . . members,'" *Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 39 (D.C. Cir. 2016). Plaintiffs meet all requirements for associational standing: (1) they have alleged injuries to members, Lewis Decl. ¶ 14; Simelton Decl. ¶¶ 14–16; (2) preserving access to desegregation and antidiscrimination services is germane to their purpose of providing equal educational opportunities for Black students, Lewis Decl. ¶ 6; and (3) members' individual participation is not necessary. *See NAACP v. Trump,* 298 F. Supp. 3d 209, 225 (D.D.C.) (finding associational standing for NAACP to challenge rescission of immigration policy where injury of at least one member was alleged and policy had a disproportionate effect on people of color); *NAACP v. U.S. Dep't of Educ.,* No. 25-CV-1120 (DLF), 2025 WL 1196212, at *5–6 (D.D.C. Apr. 24, 2025) (finding associational standing for NAACP where government conduct sought to be enjoined "force[d] schools and teachers . . . to steer clear of offering courses and teaching topics that touch on undefined concepts such as diversity, equity and inclusion" (citations omitted)).

B. This Court Has Jurisdiction

This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 because this action arises under the Constitution and the laws of the United States, including the Administrative

Procedure Act ("APA"), 5 U.S.C. § 702, and the General Education Provisions Act ("GEPA"), 20 U.S.C. § 1234, and ED's General Administrative Regulations, including 34 C.F.R. Parts 75, 77, 79, 81, 82, 84, 86, 97–99 and 2 C.F.R. Parts 180, 485, 3474.

This Court's jurisdiction over Plaintiffs' claims is not precluded by the Tucker Act (28 U.S.C. § 1491) nor the Supreme Court's recent opinion in *Department of Education v. California*, 145 S. Ct. 966 (2025). Unlike the plaintiffs in *California*, NAACP and Tennessee NAACP are not parties to the cooperative agreements between ED and the EAC program grantees nor to any contractual agreement with ED. As such, their claims against ED cannot be construed as contractual. *See U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 1:25-CV-00465, 2025 WL 763738, at *6 (D.D.C. Mar. 11, 2025) (that plaintiff has no contractual relationship with Defendants is "critical[]" to a finding that jurisdiction lies in the District Court rather than the Court of Claims). Moreover, unlike in *California*, Plaintiffs allege violations of their constitutional rights. These claims cannot be required to be heard in the Court of Claims, as the Federal Court of Claims lacks jurisdiction to hear First and Fifth Amendment claims. *See Hood v. United* States, 659 F. App'x 655, 661–62 (Fed. Cir. 2016) (Court of Federal Claims is without jurisdiction to consider free speech and due process claims under the First and Fifth Amendment); *Tootle v. Sec'y of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006) ("We categorically reject the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims."); *A.B.A. v. U.S. Dep't of Just.*, No. 25-CV-1263 (CRC), 2025 WL 1388891, at *6 (D.D.C. May 14, 2025) (finding *California* did not entail jurisdiction in the Federal Claims Court where constitutional claims were raised).

In addition, Plaintiffs in the instant case do not seek specific performance or restoration of funds, but rather seek vacatur of the Termination Letter or, in the alternative, for the Court to enjoin

ED from terminating the EAC grants without observing the procedures required by law. Pl.'s Compl., ECF No. 1, at 56–57; *see generally infra* § II.B.1 (discussing the three final agency actions Plaintiffs challenge). Numerous courts have held that, notwithstanding the *California* decision, claims challenging the termination of federal grants belong in the appropriate district court and not the Federal Court of Claims. *See, e.g.*, *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, No. 25-2808, 2025 WL 1393876, at *3–4 (9th Cir. May 14, 2025) (finding no Tucker Act jurisdiction where statutory claims were brought by subcontractors with no contractual relationship with the government); *A.B.A.*, 2025 WL 1388891, at *6 (no Tucker Act jurisdiction in challenge to grant terminations where First Amendment claim brought); *Chi. Women in Trades v. Trump*, -- F.Supp.3d --, No. 25 C 2005, 2025 WL 1114466, at *10 (N.D. Ill. Apr. 14, 2025) (same). The Court should reach the same result in the instant case.

## II.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims

### A.    Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claims.

When the government restricts the right to speak based on viewpoint, that restriction is presumptively unconstitutional, and the government must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 171 (2015) (citations omitted). The government cannot condition funding on a speech restriction that is outside the confines of the government program. *See, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 218 (2013) ("*AOSI*") (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)); *see also Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 542 (N.D. Cal. 2020). Plaintiff MAEC is likely to succeed on its First Amendment claim because threatening to withhold federal funding to ensure preferred viewpoints is antithetical to the First Amendment.

14

*1. The Termination Letter is Unconstitutionally Viewpoint Specific.*

"In the realm of private speech or expression, government regulation may not favor one speaker over another." *Rosenberger v. Rector v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). A speech regulation is viewpoint-specific when it goes beyond general discrimination against speech about a specific topic and instead regulates one perspective of speech. *Rosenberger*, 515 U.S. at 829–31 (1995). Viewpoint-specific regulations are considered especially pernicious because "[a]t the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024); *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (a government entity's "threat of invoking legal sanctions and other means of coercion" "to achieve the suppression" of disfavored speech violates the First Amendment).

Here, the Termination Letter unquestionably discriminates based on viewpoint by imposing unconstitutional conditions on MAEC's and other EAC grantees' speech. Defendants prohibit grantees from promoting diversity, equity, or inclusion, including in speech outside the scope of their grants, but impose no similar prohibitions about programs opposing "DEI." That is an unconstitutional viewpoint-based restriction. Because the Termination Letter seeks to suppress the viewpoints in favor of diversity, equity, and inclusion, Plaintiffs are likely to prevail on their First Amendment claim in Count II of the complaint.

*2. The Termination Letter Imposes Unconstitutional Conditions.*

Under the "unconstitutional conditions" doctrine, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech" even if he has no entitlement to that benefit." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). The Termination Letter unlawfully serves as "conditions that seek to leverage funding to regulate speech outside the contours of the program" funded by the government. *AOSI*, 570 U.S. at 214–

15

15. The government may "define the limits of [a] government spending program," but cannot use funding to dictate grantee speech outside of those programs. *See id*.

The Termination Letter does precisely this. The Termination Letter targets "equity-related" grants and states that ED is targeting grants that fund "*organizations* [that] promote or take part in diversity, equity, and inclusion . . . initiatives," [emphasis added] without any definition of diversity, equity and inclusion and regardless of whether the *grant* is funding such initiatives. This is "an unconstitutional burden on First Amendment rights." *Id.* at 214; *see also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548 (2001). That is, not speaking about DEI—in whatever way ED defines it—is a precondition to MAEC's grant. ED can choose to fund one activity to the exclusion of another; it may not, however, make this decision because it disagrees with a grantee's viewpoint. *See AOSI*, 570 U.S. at 218–19.

In addition, ED's stated justifications reveal an intent to suppress certain viewpoints on matters of public concern, which the First Amendment squarely forbids. Defendants cannot cut off funding "because of the[] [contractors' or grantees'] speech on matters of public concern" in a manner unjustified by the government's interests. *Bd. of Cnty. Comm'rs v. Wabaunsee Cnty.*, 518 U.S. 668, 675 (1996). MAEC promotes and takes part in programs that remedy discrimination and prevent future discrimination and produces equity-related resources and tools unrelated to the EAC grant. *See* Rouland Decl. ¶¶ 28–29. In targeting "diversity, equity, and inclusion," Defendants' Termination Letter targets these efforts and other speech and activities through which MAEC expresses its viewpoints regarding discrimination, among other issues, as well as MAEC's view of the Civil Rights Act, the Fourteenth Amendment, and other federal laws. MAEC has already been forced to alter its speech in its non-EAC work by, for example, removing language that ED may perceive to be advocating for "diversity, equity, and inclusion" initiatives, and by cancelling

an event to commemorate the Civil Rights Act for fear that it would run afoul of ED's new "priorities." Rouland Decl. ¶¶ 31–35. The Termination Letter, issued in conjunction with related Executive Orders, therefore targets and punishes MAEC for espousing viewpoints with which the Administration disagrees. This is exactly the type of viewpoint-based discrimination that the First Amendment prohibits.

Defendants failed to explain in their Termination Letter and cannot demonstrate that MAEC promoted "diversity, equity and inclusion" practices or, even if it did, how such practices render it difficult for MAEC to effectuate the goals of the grant. Nor can Defendants demonstrate that these goals could only be effectuated by a grantee with antipathy toward "diversity, equity and inclusion." In fact, as discussed above—*see supra* Factual Background, Section C—MAEC's technical assistance and other work has yielded measurable results effectuating the goals of the grant.

3. *The Termination of the EAC Program and the Termination Letter Violates Plaintiff NAACP Educator Members' Right to Receive Information and Ideas.*

The First Amendment's right to receive information and ideas gives true meaning to the "recipient'*s* meaningful exercise of [their] own rights of speech, press, and political freedom." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion). The Termination Letters and Defendants' termination of the EAC program deny NAACP educator members the right to continue receiving training, instructional materials, and guidance (including on effective classroom management skills), and other technical assistance programming from MAEC and the other EACs simply because ED believes those trainings and instruction discuss diversity, equity, and inclusion. This violates Plaintiff NAACP educator members' First Amendment rights to receive information free from viewpoint and content-based restrictions.

For example, EAC-South provided technical assistance services to Fayette County Public

Schools ("FCPS"), including on student discipline and faculty recruitment.[17] Through EAC-South, FCPS intended to offer training on faculty recruitment and student discipline to FCPS faculty in 2025 and 2026. Holmes Decl. ¶ 17. Somerville-Fayette NAACP Member Civil Miller-Watkins, who teaches at FCPS schools, intended to attend these training sessions and looked forward to doing so. Holmes Decl. ¶ 20. She attended past training sessions FCPS provided in partnership with EAC-South and benefited from the information she learned in those sessions. *Id*. But the termination of the grant for EAC-South "has caused significant disruption" to FCPS' efforts.[18] Without the grant, EAC-South "will soon no longer be able to provide all of the services necessary" to ameliorate discriminatory patterns within FCPS. Holmes Decl. ¶ 17. As a result, Ms. Miller-Watkins will no longer be able to receive the training she intended to attend. Holmes Decl. ¶ 20.

Defendants' termination of EAC-South's grant, including technical assistance to FCPS, does not stem from pedagogical concerns, but rather from the fact that instruction includes viewpoints disfavored by Defendants: diversity, equity, and inclusion. Such censorship in the name of political orthodoxy is unconstitutional. *Pico*, 457 U.S. at 872 (the right to receive information may not be limited to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion").

B.  <u>Plaintiffs Are Likely to Succeed on the Merits of Their Fifth Amendment Claims</u>

Plaintiffs are likely to succeed on their Fifth Amendment claims because ED did not afford MAEC due process when depriving it of a benefit based on vague standards that infringe First Amendment freedoms. Because the Termination Letter used to deprive MAEC of its grant and the NAACP, Tennessee NAACP, and Somerville-Fayette NAACP's members of their right to receive

---

[17] Declaration of Dr. Tameka D. Lewis at ¶¶ 8–9, *S. Educ. Found. v. Dep't of Educ.*, No. 25-cv-01079 (Apr. 23, 2025), ECF No. 11-6 (hereinafter "Dr. Lewis Declaration").
[18] Dr. Lewis Declaration *supra* note 17, at ¶ 11.

information is unconstitutionally vague, and because Defendants denied MAEC appropriate notice and an opportunity to be heard, Defendants' termination of the EAC grants, including MAEC's grant, must be set aside.

      *1. The Termination Letter is Impermissibly Vague.*

Under the Fifth Amendment, due process requires that individuals receive fair notice of what conduct is prohibited. *See United States v. Williams*, 553 U.S. 285, 304 (2008); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Chi. Women in Trades*, 2025 WL 1114466, at *43. Moreover, "[a]n enactment can be void for vagueness if it contains 'terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its applications.'" *Id.* (citations omitted). Government enactments that "threaten[] to inhibit the exercise of constitutionally protected rights," including "the right of free speech," are subject to "a more stringent vagueness test." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982); *see also FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012). The prohibition against vagueness "applies with particular force in review of laws dealing with speech." *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1395 (D.C. Cir. 1990).

Here, the Termination Letter and the "priorities" it references fail to meet these basic constitutional requirements of clarity. The Termination Letter does not define key foundational terms (including "DEI") upon which it relies to terminate the EAC Program and MAEC's grant. This ambiguity leaves MAEC unable to meaningfully contest ED's determination that its programs conflict with ED's newfound "priorities." Further, it is impossible for MAEC to determine what conduct or speech is prohibited, creating an impermissibly vague standard subject to arbitrary enforcement. For example, the Termination Letter invokes undefined terms central to its decision to terminate the grants, such as "illegal DEI policies and practices" and states that such practices

19

can violate both the letter and purpose of Federal civil rights law without clarification of what constitutes "DEI" or "illegal DEI." *See NAACP*, 2025 WL 1196212, at *6; *Chi. Women in Trades v. Trump*, -- F. Supp. 3d --, No. 25 C 2005, 2025 WL 933871, at *8 (N.D. Ill. Mar. 27, 2025). Finally, the Termination Letter lacks any explanation or reasoning on how MAEC's grant is not aligned with "the Department's policy of prioritizing merit, fairness, and excellence in education." *Id.* Nor does the Termination Letter describe which of MAEC's programs purportedly conflict with ED's undefined priorities.

These vague prohibitions violate NAACP educator members' liberty interest in continuing to receive training, instructional materials, and other technical assistance programming. *NAACP*, 2025 WL 1196212, at *5, *7; *see also Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (finding a right-to-receive injury where a plaintiff challenged a vague statute alleged to have "a direct impact on plaintiffs' right to receive information."). Because of Defendants' termination, EAC-South no longer has the financial resources to continue providing this programming to FCPS. Holmes Decl. ¶ 17. This information will no longer be available to these educators NAACP members as a direct result of the vague prohibitions imposed on the EACs, including MAEC.

2. *The Termination Letter Deprived Plaintiffs of a Property Interest Without Due Process of Law.*

The Fifth Amendment provides that "[n]o person shall . . . be deprived of . . . property, without due process of law." U.S. Const. amend. V. The "fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in meaningful manner'" before being "finally deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation omitted). The guarantee of procedural due process almost always requires "*predeprivation* notice and hearing." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 52 (1993) (emphasis added). Applicable statutes set forth procedures requiring ED to provide certain notice, an

opportunity to cure alleged deficiencies, and an opportunity to be heard before the EAC grant may be terminated. Defendants failed to follow those procedures. And even beyond those requirements, Defendants' actions here were insufficient to satisfy the basic requirements established in *Mathews* and related cases.

MAEC has a protected property interest in the EAC grant and the funds awarded pursuant to that grant. *See Climate United Fund v. Citibank, N.A.*, No. 25-cv-698, 2025 WL 842360, at *7 (D.D.C. Mar. 18, 2025) (plaintiffs showed a likelihood of success on their claims that defendants' termination of their grant award violated their due process rights). But for the unlawful termination, and absent ED's denial of MAEC's future annual continuations during the remaining life of the grant, the grant and its funding would have continued through September 30, 2027.[19] Even for funds not yet obligated, "[i]f [a] statute or implementing regulations place substantive limitations on official discretion to withhold [the] award, there is a legitimate claim of entitlement, as to which the Due Process Clause affords protection." *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41–42 (D.C. Cir. 2015).

But Defendants did not comply with applicable laws and regulations limiting their discretion to terminate MAEC's grant, much less minimum requirements for procedural due process afforded by the Fifth Amendment. *See Mathews*, 424 U.S. at 333. ED cannot terminate MAEC's EAC grant during a budget period except through the processes provided by GEPA and its implementing regulations, Title VI and its implementing regulations, and the Office of Management and Budget's Uniform Guidance (the "Guidance"), as adopted by ED. *See* 20 U.S.C. §§ 1234–1234i; 34 C.F.R. §§ 81.1–81.20; 42 U.S.C. § 2000d–1, 34 C.F.R. § 100.8; 2 C.F.R. part

---

[19] ED can deny MAEC's future continuation awards for only a limited set of reasons. *See* 34 C.F.R. § 75.253(a), (f).

200, 2 C.F.R. § 3474.1(a). The boilerplate Termination Letter falls far short of these requirements and those established by *Mathews*. 424 U.S. at 333.

GEPA establishes the substantive standard and procedures that Defendants must follow before terminating a grant during the budget period, including MAEC's EAC grant. *See* 20 U.S.C. § 1234i (EAC grants are an "applicable program" for which ED has administrative responsibility as provided by law); *accord* 34 C.F.R. § 270.6; 34 C.F.R. pt. 81.[20] Under GEPA, ED may terminate MAEC's grant only if MAEC "is failing to comply substantially with any requirements of law applicable to [the EAC] funds." 20 U.S.C. § 1234c(a). Before terminating the grant, ED must notify MAEC in writing of its factual and legal basis for doing so and provide an opportunity for a hearing in front of an Administrative Law Judge. 20 U.S.C. §§ 1234d(b), 1234(a); *see* 20 U.S.C. § 1234(f)(1); 34 C.F.R. §§ 81.3(a), 81.6; 5 U.S.C. § 556(d). MAEC is entitled to 60 days to appeal an adverse hearing decision to the Secretary. 20 U.S.C. § 1234d(e), (f). Once that decision is final, MAEC is entitled seek judicial review, and "[t]he Secretary may not take any action . . . until judicial review is complete." *Id*. § 1234g(a).

Similarly, Title VI and its implementing regulations provide the required procedures for terminating federal funding based on failure to comply with Title VI. *See* 42 U.S.C. § 2000d–1.

---

[20] While GEPA does not define "withholding," the plain meaning of the term makes clear that it covers ED's mid-budget year termination of the EAC grants. To withhold means "to refrain from granting, giving, or allowing," or "to keep back; to keep in one's possession." *See* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/withhold (last visited May 21, 2025); Oxford English Dictionary, https://www.oed.com/search/dictionary/?scope=Entries&q=withhold (last visited May 21, 2025). GEPA describes this particular remedy for noncompliance as "withholding further payments." 20 U.S.C. § 1234c(a)(1). That is precisely what ED has done here. By terminating the grant mid-budget year, ED is keeping the grant funds that had been obligated to MAEC and the other EAC grantees in its possession. Put differently, ED is refraining from giving MAEC and the other EAC grantees the remainder of their annual grant funds. Thus, GEPA's procedures for withholding grant funds apply here.

These apply here, where Defendants allege that MAEC's services violate federal civil rights law.[21] *See* 34 C.F.R. pt. 100, App. A, pt. 1(18) (Title VI compliance procedures apply to EAC grants). Before ED can "terminat[e] . . . or refus[e] to grant or to continue assistance," it must advise MAEC of its alleged noncompliance with Title VI and provide a voluntary opportunity to cure. 42 U.S.C. § 2000d–1; 34 C.F.R. §§ 100.7, 100.8(a). "Title VI instructs agencies to ensure compliance by aid recipients first through a system of voluntary adherence, and then, if necessary, by initiating a process leading to the termination of federal funding." *Wash. Legal Found. v. Alexander*, 984 F.2d 483, 484 (D.C. Cir. 1993). If voluntary compliance is unsuccessful, then ED must give MAEC an opportunity for a hearing, and make "an express finding on the record . . . of a failure to comply with" Title VI. 42 U.S.C. § 2000d–1; *see* 34 C.F.R. § 100.8(c)–(d). ED must then file a report with the House and Senate. The termination only becomes effective thirty days *after* the agency files this report. 42 U.S.C. § 2000d–1; 34 C.F.R. § 100.8(c); *see Taylor v. Cohen*, 405 F.2d 277, 279 (4th Cir. 1968).

The OMB Guidance provides a procedural backstop to the more specific termination procedures required above. That Guidance permits ED to terminate MAEC's EAC grant only if it concludes that MAEC has failed "to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award," and if the agency "determines that noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 200.339. Prior to initiating grant termination, ED must notify MAEC of its alleged noncompliance, the nature of the specific conditions required to cure the noncompliance, and the time allowed to cure. *Id.* §

---

[21] ED stated that one potential basis for terminating the EAC grant was that MAEC's programs "violate either the letter or purpose of Federal civil rights law." Shaffer Decl. App. 1, at 14. While the termination letter does not name Title VI, it alleges discrimination on the basis of race and such discrimination is prohibited by Title VI. In addition, Title VI applies to recipients of federal funding. *See* 42 U.S.C. § 2000d.

200.208(d). ED must also provide written notice that includes "the reasons for termination." *Id*. §

200.341(a).

Defendants failed to follow any of these required procedures and, worse, failed to comply

with the basic requirements for procedural due process established by *Matthews* and related cases.

424 U.S. at 333. Because Defendants' Termination Letters immediately terminated MAEC's EAC

grant and the other EAC grants, MAEC received no notice whatsoever before it was "finally

deprived of [its] property interest. *Id*; *see also James Daniel Good Real Prop*., 510 U.S. at 52. In

addition, although procedural due process requires Defendants to give MAEC the opportunity for

a pre-deprivation hearing "at a meaningful time and in a meaningful manner," *Matthews*, 424 U.S.

at 333; *James Daniel Good Real Prop*., 510 U.S. at 52, Defendants provided no such opportunity

in their Termination Letter or through any other means. Shaffer Decl. ¶ 16. These deficiencies

render Defendants' termination of MAEC's grant unlawful and in violation of the Fifth

Amendment's guarantee of procedural due process.

Defendants' termination of MAEC's EAC grant failed to adhere to basic constitutional

requirements. Accordingly, MAEC is likely to succeed on its procedural due process claims.

C.  Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims

1. *Final Agency Action*

An agency action is "final" for purposes of the APA if it meets two conditions. "First, the

action must mark the 'consummation' of the agency's decisionmaking process—it must not be of

a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or

obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v.

Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). Courts take a "pragmatic" approach to

finality. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016). They consider "the

unique constellation of statutes and regulations that govern the action at issue," *Sierra Club v. EPA*,

955 F.3d 56, 61 (D.C. Cir. 2020), and how "the agency subsequently treats the challenged action," *Sw. Airlines Co. v. United States Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016). Plaintiffs challenge three final agency actions: ED's termination of the EAC program, including MAEC's grant; the unlawful adoption of new grant appeals procedures; and the unlawful adoption of new agency priorities. Each action marks the conclusion of ED's decisionmaking process, imposes legal consequences on MAEC, and determines the rights and obligations of both MAEC and ED.

i.    The Termination of the EAC Grant Program Is Final Agency Action

The abrupt termination of the EAC program, and MAEC's EAC grant in particular, satisfies the *Bennett* requirements. First, the termination marks the "consummation" of ED's decisionmaking process. 520 U.S. at 177. The termination letter sets forth ED's "official position" as to the status of the EAC grant, *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1208 (D.C. Cir. 2021)—that it "no longer effectuates[] Department priorities" and that it is therefore terminated immediately. *See* Shaffer Decl. App. 1, at 14; *see also* February 13 Press Release (showing that the termination of the EAC grant program is part of ED's broader policy opposing funding for disfavored topics such as diversity, equity, and inclusion, and critical race theory). Particularly because it is effective immediately, the termination letter gives no indication that it reflects merely an "informal" or tentative conclusion. *See Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1268 (D.C. Cir. 2018).

The applicable statutes and regulations confirm that the Termination Letter is the consummation of the Department's decisionmaking process. *See Sierra Club*, 955 F.3d at 61. Under GEPA, which governs ED's ability to terminate its grants, *see supra* § II.B.2, ED's determination to withhold grant funds comes at the conclusion of its decisionmaking process (with one exception). "*Before* withholding payments," GEPA requires that ED notify the grantee of, among other things, the "opportunity for a hearing." 20 U.S.C. § 1234d(b) (emphasis added). It

25

then requires that ED's Office of Administrative Law Judges hold a hearing, *id.* § 1234d(c), and issue a decision, *id.* § 1234d(e). That decision becomes "final agency action" 60 days after the grantee receives written notice of it, *id.* § 12343d(f), giving the grantee an opportunity to appeal to the Secretary. *id.*; *see also Hearings and Appeals*, U.S. Dep't of Educ., Off. of Commc'ns & Outreach, https://web.archive.org/web/20250521224238/https://www.ed.gov/laws-and-policy /hearings-and-appeals (last reviewed Apr. 14, 2025) (attached as Exhibit 9). ED can act on the hearing decision—i.e., withhold grant funds—only after that 60-day period is up—and only after any subsequent judicial review of the hearing decision. 20 U.S.C. § 1234g(a). In other words, withholding grant funds is the last step in the process that can only occur once ED has taken final agency action.[22] Necessarily, then, ED's decision to withhold grant funds here must be final agency action.

Similarly, under Title VI, which governs ED's ability to terminate grants based on noncompliance with Title VI, expressly states that an "agency action taken pursuant to" Title VI— such as the termination of federal funding—"*shall* be subject to such judicial review as may otherwise be provided by law." 42 U.S.C. § 2000d–2 (emphasis added). Thus, the termination of federal funding marks the finality of the agency's action under Title VI.

Second, the EAC grant termination immediately produced legal consequences for MAEC and the other EAC grantees—they can no longer access their grant funds or provide services as an EAC. It is therefore self-evident the grant termination "directly affects" MAEC. *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). The Supreme Court has found final agency action where

---

[22] GEPA does provide that ED may "suspend" payments to a grantee before the outcome of the hearing, but only "*after* [the grantee] has been given reasonable notice and an opportunity to show cause why" the payments should not be suspended, 20 U.S.C. § 1234d(d) (emphasis added). ED did not follow these procedures to suspend payment pre-hearing, so subsection d cannot render the termination nonfinal.

the legal consequences are far more attenuated than here. *See, e.g.*, *Sackett v. EPA*, 566 U.S. 120, 126 (2012) ("legal consequences flow[ed] from the issuance of an order that the petitioners' use of their property violated the Clean Water Act because it exposed petitioners to higher penalties in future, separate enforcement proceedings and limited their ability to get future permits (cleaned up)); *Hawkes Co.*, 578 U.S. at 598–99 (challenged agency action has "legal consequences" because it denied petitioners a safe harbor in potential future litigation).

As an independent basis for the second *Bennett* requirement, the EAC grant termination also determines the rights and obligations of MAEC and ED. *See Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1027 (D.C. Cir. 2016) (for final agency action purposes, either "determin[ing] rights or obligations *or* creat[ing] legal consequences . . . would suffice"). ED's termination of the EAC grant has ended the legal relationship between MAEC and ED.  Put simply, no further rights or obligations between MAEC and ED exist, other than the obligation MAEC now has to close out its grant-related activities, on penalty of further enforcement actions. *See* Shaffer Decl. App. 1, at 15; *Sackett*, 566 U.S. at 126 (order requiring petitioners to "restore" their property determined rights and obligations of the petitioners).

That MAEC filed an administrative objection to ED's Termination Letter does not render the grant termination non-final. *Cf. Peter Kiewit Sons' Co. v. U.S. Army Corps of Engineers*, 714 F.2d 163, 168 (D.C. Cir. 1983) (noting that agency's de facto debarment of government contractor was final agency action even though formal debarment proceedings were ongoing). First, as explained above, ED is legally permitted to withhold funds only after the grantee has notice, an opportunity to be heard, and a chance to appeal the hearing decision to the Secretary of Education. *See supra* § II.B.2. ED's controlling statutes and regulations do not provide any avenue for further review once the grant has been terminated. *Cf., e.g.*, 20 U.S.C. § 1234g(a) ("The Secretary may not

take any action on the basis of a final agency action until judicial review is completed."). While the Termination Letter purports to create an avenue for post-termination review, as explained below, these new grant termination appeal procedures are not lawfully adopted and cannot supersede the binding statutes and regulations that control how ED may terminate grants. *See infra* § II.B.2. Indeed, the "Administrative Appeals Process for Department Grants" appears to be newly created as of late April 2025—two months *after* ED terminated the EAC grants.[23] At most, therefore, ED's notice to MAEC that it could object to the termination decision, *see* Shaffer Decl. App. 1, at 16, amounts to an invitation "to engage in informal discussion of the terms and requirements of the order," which cannot render "an otherwise final agency action nonfinal." *Sackett*, 566 U.S. at 127 (internal quotation marks omitted). MAEC submitted its objection not because it believed ED was providing a lawful and meaningful appeals process, but simply out of an abundance of caution to preserve its rights. *See* Shaffer Decl. ¶¶ 16, 18; Williams Decl. ¶ 39.

Accordingly, the EAC grant termination is final agency action subject to judicial review.

ii.    The Department's Adoption of the New Grant Termination Appeals Procedures Is Final Agency Action.

ED's adoption of its new appeal procedures is likewise final agency action. Grant termination appeals procedures are "regulations" as defined by GEPA. 20 U.S.C. § 1232(a) ("'[R]egulation' means any generally applicable rule, regulation, guideline, interpretation, or other requirement that—(1) is prescribed by the Secretary or the Department; and (2) has legally binding effect in connection with, or affecting, the provision of financial assistance under any applicable program."). ED is required to promulgate regulations through notice-and-comment rulemaking

---

[23] *See* Administrative Appeals Process for Department Grants. U.S. Dep't of Educ., https://web.archive.org/web/20250502144446/https://www.ed.gov/grants-and-programs/administrative-appeals-process-department-grants (attached as Exhibit 10) (showing that the earliest identifiable version of this webpage was last reviewed on April 23, 2025).

and to publish them in the Federal Register. 20 U.S.C. § 1232(d). ED's adoption of the new appeal procedures meet the requirements of *Bennett*.

First, the appeal procedures reflect the consummation of ED's decisionmaking process. The procedures state that ED "*is publishing* this Guidance[24] to establish written procedures for objecting to adverse actions, including termination." *See* Shaffer Decl. App. 1, at 16 (emphasis added). They further state that "the Department *sets forth* the following procedures." *Id.* (emphasis added). Finally, they state these procedures "supersede[] any procedures previously established by the Department for appealing or objecting to adverse actions related to grants." *Id.* The language is definitive. The procedures are not tentative, interim, or subject to revision. *See Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 437 (D.C. Cir. 1986) ("Having definitively stated its position that [the petitioner] has no statutory right to a cancellation hearing, EPA has provided its final word on the matter."); *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1532 (D.C. Cir. 1990) (agency interpretation of law that is "unambiguous and devoid of any suggestion that it might be subject to subsequent revision" is final agency action).

Second, legal consequences have already flowed from ED's unlawful adoption of new appeals procedures. Under the new procedures, instead of having the opportunity to contest ED's termination decision—before losing its grant—through the procedures guaranteed by GEPA, Title VI, and the regulations promulgated under those statutes, MAEC lost its grant before it had any opportunity to object. Moreover, the new appeal procedures have altered MAEC's rights. MAEC now has no opportunity for a hearing, no entitlement to a written, reasoned decision, no timeframe

---

[24] That ED refers to the procedures as "Guidance" is irrelevant to the final agency action analysis. *See Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 955, 959 (D.C. Cir. 2019) (rejecting the agency's own characterization of the challenged action as not "a final agency action").

in which ED must issue that decision, and indeed no guarantee of a meaningful review at all. Shaffer Decl. ¶ 16. In other words, the new appeal procedures "alter the legal regime to which agency action"—here, the grant terminations—"is subject." *Bennett*, 520 U.S. at 178.

Accordingly, the adoption of the new grant termination appeal procedures is final agency action subject to judicial review.

### iii. The Department's Adoption of Its New Priorities Is Final Agency Action.

The Termination Letter reveals that ED has adopted new priorities with which the EAC grants purportedly conflict. ED is required to adopt new priorities through notice-and-comment rulemaking and to publish its priorities in the Federal Register. 34 C.F.R. § 75.105(b)(2); 20 U.S.C. § 1232(d).[25] The adoption of new priorities meets both requirements of *Bennett*.

First, the new priorities reflect the consummation of ED's decisionmaking: the Termination Letter states unequivocally that ED's priority "includes ensuring that [its] grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion . . . initiatives." *See* Shaffer Decl. App. 1, at 14. The Termination Letter's announcement of ED's new priorities is a "binding change . . . which immediately affects the rights and obligations" of grantees. *Nat'l Env't Dev. Ass'n's Clean Air Proj. v. EPA*, 752 F.3d 999, 1007 (D.C. Cir. 2014). ED has given no indication that this priority is tentative, interim, or subject to revision. *See* Shaffer Decl. App. 1, at 14. *See Bennett*, 520 U.S. at 177. Indeed, ED itself treats the adoption of the new priorities as final agency action by using it to justify terminating over one hundred grants. *See supra* Factual Background, Section D; *Sw. Airlines Co.*, 832 F.3d at 275. Second, legal

---

[25] The exceptions to this are (1) if the regulations "govern the first grant competition under a new or substantially revised program authority as determined by the Secretary; or (2) where the Secretary determines that the [rulemaking requirements] will cause extreme hardship to the intended beneficiaries of the program affected by such regulations." 20 U.S.C. § 1232(d). Neither of these exceptions are applicable here.

consequences have already flowed from the adoption of the priority—namely, the termination of MAEC's EAC grant and the cancellation of the EAC program.

Accordingly, the adoption of the new Department priorities is final agency action subject to judicial review.

### 2. The Department's Termination of the EAC Grants Is Arbitrary and Capricious.

The APA authorizes the Court to "hold unlawful and set aside final agency action . . . found to be[] arbitrary[ and] capricious." 5 U.S.C. § 706(2)(A). "An agency action qualifies as arbitrary or capricious if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (internal quotation marks omitted). To pass muster, an agency must give "adequate reasons" for its actions. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983). It must "examine[] the relevant data and articulate[] a satisfactory explanation for [its] decision, including a rational connection between the facts found and the choice made." *Dep't of Com. v. New York*, 588 U.S. 752, 773 (internal quotation marks omitted). And if the agency action amounts to a change in policy, it "must at least display awareness that it is changing position and show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (internal quotation marks omitted).

As this Court recently held, ED's termination of the EAC grant is likely arbitrary and capricious. *S. Educ. Found. v. U.S. Dep't of Educ.*, No. 25-cv-1079-PLF, ECF No. 28, at 32–34 (May 21, 2025) ("SEF Opinion"). ED's termination fails the arbitrary and capricious standard for three independent reasons. It offered no explanation or evidence to support its decision, it considered impermissible factors, and it made no attempt to explain its change in position.

First, the Termination Letter is "just a conclusion." *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) (internal quotation marks omitted). It "explains nothing about *why* the agency" terminated the grant. *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1351–52 (D.C. Cir. 2014). ED

stated that the EAC grant no longer effectuates Department priorities. *See* Williams Decl. ¶ 32. The Termination Letter provides several conclusory bases for this statement: that the grant funds programs that promote diversity, equity, and inclusion; that violate Federal civil rights laws; that conflict with ED's policy of prioritizing merit; or that are not free from fraud, abuse or duplication. Shaffer Decl. App. 1, at 14.

But the Termination Letter provides no explanation for how ED concluded that MAEC engages in one or more of these disfavored activities. The Termination Letter does not point to any factual evidence about MAEC's conduct, its programs, or its grant-related activities. In fact, ED does not even explain which of these bases for termination apply to MAEC. ED had not previously informed MAEC that its programming was deficient or unlawful in any way; to the contrary, as recently as January 2025, ED provided MAEC with exceptional feedback on its grant activities. Williams Decl. ¶ 21. Underscoring the arbitrary and capricious nature of the termination, ED sent substantively identical, boilerplate termination letters to all four EAC grantees and over one hundred other recipients of education-related grants. *See* SEF Opinion 33. None included reasoning specific to the grantee. An agency decision made without findings, analysis, or any "indication of the basis on which" the agency made its decision is the definition of arbitrary and capricious action. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962). ED's total lack of reasoning establishes that its termination of the EAC grant is arbitrary and capricious.

Second, the Termination Letter shows that ED "relied on factors which Congress had not intended it to consider." *State Farm*, 463 U.S. at 43. Under Title VI, Congress permits ED to terminate a grant for failing to comply with the requirements of Title VI. *See* 42 U.S.C. § 2000d–1. Under GEPA, Congress permits ED to withhold grant funds if the grantee fails to "comply substantially" with applicable laws. 20 U.S.C. § 1234c(a). But the Termination Letter posits

multiple bases for termination—that the EAC grant "conflict[s] with the Department's policy of prioritizing merit, fairness, and excellence in education"; and that the grantee promotes diversity, equity, and inclusion initiatives, Shaffer Decl. App. 1, at 14; February 13 Press Release—that are not authorized by Congress. Therefore, even if ED could provide evidence to support the termination of the EAC grant on those bases—which it did not—the termination would still be arbitrary and capricious.

In addition, the Termination Letter states that the EAC grant no longer effectuates ED priorities, which include "ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion . . . initiatives." Shaffer Decl. App. 1, at 14. But to adopt new priorities, ED must engage in notice-and-comment rulemaking and publish the priorities in the Federal Register. 20 U.S.C. § 1232(d); 34 C.F.R. § 75.105(b)(2); 5 U.S.C. § 553(b), (c); *see* 34 C.F.R. § 75.900(a) (ED's own regulations are binding on ED). ED's Termination Letter implicitly acknowledges this; it cites 2 C.F.R. § 200.340(a)(4), which provides that an agency may terminate a federal award "if the award no longer effectuates . . . agency priorities" but only "*to the extent authorized by law.*" (emphasis added). Using priorities that were not lawfully promulgated is not authorized by law. Indisputably, ED failed to comply with the notice-and-comment rulemaking requirements to adopt the "priorities" listed in the Termination Letter. Moreover, ED recently began the notice-and-comment rulemaking process to change its supplemental grant priorities,[26] showing that Defendants know they must do notice-and-comment rulemaking to change grant priorities but simply chose not to. ED has promulgated no

---

[26] Press Release, U.S. Dep't of Educ. Release Secretary McMahon's Supplemental Grant Priorities, U.S. Dep't of Educ. (May 20, 2025), https://web.archive.org/web/20250521213038/ https://www.ed.gov/about/news/press-release/us-department-of-education-releases-secretary-mcmahons-supplemental-grant-priorities (attached as Exhibit 11).

rule that codifies its new priorities to not support organizations that take part in diversity, equity, and inclusion initiatives. Accordingly, by relying on priorities that were not lawfully adopted to terminate the EAC grant, ED used impermissible considerations to make its determination. This renders the termination arbitrary and capricious. *See State Farm*, 463 U.S. at 43.

Third, the termination letter failed to explain ED's change in position, *Encino Motorcars*, 579 U.S. at 221, including its about-face as to its "priorities" and its conclusion that the decades-old EAC grants no longer effectuate its priorities. ED simply stated that its new priorities include ensuring it does not support programs that "promote or take part in diversity, equity, and inclusion . . . initiatives," without acknowledging that this is a sharp departure from its prior position.

Indeed, ED previously issued guidance stating that diversity, equity, and inclusion trainings "in most circumstances are consistent with Title VI" and have been used to redress discrimination.[27] Similarly, the Secretary of Education during the prior Trump administration emphasized the importance of "diversity and inclusion" for "high organizational performance," "building strong team," and "success."[28] ED provided *no* basis for its change in position, let alone "a reasoned explanation." *Encino Motorcars*, 579 U.S. at 221.

More fundamentally, Title VI and Title IX have long permitted exactly the kind of technical desegregation assistance that MAEC and the other EAC grantees provide. Indeed, ED has required

---

[27] *See* U.S. Dep't of Educ., Off. for C. R., *Ensuring Educational Opportunities for All Students on Equal Terms 70 Years After Brown v. Board of Education* 4 (May 2024), https://web.archive.org/web/20250422230223/https://drive.google.com/file/d/1l671DtgWsgs_zl Myn269k_Gmatvgdx7A/view; *see also* U.S. Dep't of Educ., Off. for C. R., *Fact Sheet: Diversity & Inclusion Activities Under Title VI* 2 (Jan. 2023), https://web.archive.org/web/20250423014506/https://drive.google.com/file/d/1WzUGtPntZa3Rl hPp2q69thKhqUctPakF/view.
[28] Erica L. Green & Zach Montague, *Trump Cracks Down on Diversity Initiatives Celebrated in His First Term*, N.Y. Times (Feb. 14, 2025), https://web.archive.org/web/20250521210400/https://www.nytimes.com/2025/02/14/us/politics/t rump-diversity-education-department.html.

school districts to, for example, identify and remedy racial disparities in school discipline, and to provide training on race- and sex-based harassments to remedy violations of Title VI and Title IX. Compl. ¶¶ 142, 145 & nn.26, 29. Along these lines, MAEC provides technical assistance to prevent and remedy violations of Title VI and Title IX. Compl. ¶¶ 134–38; *see also* Shaffer Decl. ¶ 3; Williams Decl. ¶¶ 8, 15. ED's conclusion that the services MAEC and the other EAC grantees provide violate of Federal civil rights laws is an unreasoned departure from its prior position and is therefore arbitrary and capricious.

By the same token, consider the "serious reliance interests" on the decades-old EAC program. *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020). When changing its position, ED must "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Encino Motorcars*, 579 U.S. at 221–22 (internal quotation marks omitted). MAEC and the other EAC grantees have relied on ED's duly promulgated priorities, and its longstanding interpretations of Title VI and Title IX, in applying for and structuring their grant activities. *See* Williams Decl. ¶ 15. These priorities include "promoting equity in student access to educational resources and opportunities," "supporting a diverse educator workforce," and "promoting equity through diverse partnerships." 86 Fed. Reg. 70612, 70,636–38; 87 Fed. Reg. 8564, 8566. But through the Termination Tetter, ED announced new "priorities" that conflicts with its lawfully established priorities and applied them to terminate the EAC grants, without considering the grantees' reliance interests. It is therefore arbitrary and capricious.

ED likewise failed to acknowledge, let alone consider, the reliance interests of the school district, local educational agencies, state educational agencies, students, and educators, including NAACP members whose are students and educators, that benefit from technical desegregation assistance. The grant termination required MAEC and the other EAC grantees to abruptly end their

ongoing technical assistance projects. This, in turn, left the school districts without the technical assistance they need to address patterns of discrimination and hostile environments that impact educators, students, and families, including NAACP members. For example, EAC-South previously provided technical assistance to Anniston City Schools in Alabama to "increase alignment with Alabama state policies aimed at increasing graduation rates" and "[to] promote sustainable practices in college readiness initiatives," including by supporting school leaders' and teachers capacity to support college readiness and access.[29] NAACP Member A's child, who attends Anniston City Schools, has experienced challenges accessing college readiness and graduation support resources. Simelton Decl.¶¶ 14–15. Member A believes that proper resources and training could help Anniston City Schools provide equal access to college readiness resources and better support her child. *Id*. ¶ 16. But Defendants' termination of the EAC grants deprives Member A's child of the technical assistance that could remedy these disparities, and does so without consideration of their reliance interests or the interests of any other NAACP members. By failing to consider the reliance interests of the beneficiaries of the EAC program, ED's termination decision is arbitrary and capricious. *See DHS*, 591 U.S. at 33.

Accordingly, Plaintiffs are likely to succeed on their claim that the termination of the EAC grant is arbitrary and capricious.

3.  *The Department's Termination of the EAC Grants Is Contrary to Constitutional Rights.*

The APA authorizes the Court to "hold unlawful and set aside final agency action . . . found to be[] contrary to constitutional right." 5 U.S.C. § 706(2)(B); *see People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613 F.3d 220, 222 (D.C. Cir. 2010) (setting aside agency action that did not

---

[29] Letter from Raymond Pierce et al, to Hon. Ruth Ryder et al, Ex. 1, at 18, *S. Educ. Found. v. U.S. Dep't of Educ.*, No. 25-cv-1079-PLF, ECF No. 11-4 (Apr. 23, 2025).

comply with due process). As explained above, *see supra* § II.A, ED's termination of the EAC grants violates the First and Fifth Amendments. Accordingly, Plaintiffs are likely to succeed on their claim that it must be set aside as contrary to constitutional rights.

> 4. *The Department Terminated the EAC Grants, Promulgated New Appeal Procedures, and Adopted New Priorities without Observance of the Procedures Required by Law.*

The APA authorizes the Court to "hold unlawful and set aside final agency action . . . found to be[] without observance of procedure required by law." 5 U.S.C. § 706(2)(D). These procedures include the statutory requirements and the agency's governing regulations. *See Blanton v. Office of the Comptroller of the Currency*, 909 F.3d 1162, 1176 (D.C. Cir. 2018) (setting aside agency determination because agency did not follow the procedures prescribed by regulation). GEPA, Title VI, their implementing regulations, and the OMB Uniform Guidance govern ED's termination of the EAC grants. *See supra* § II.B.2. ED complied with none of them.

Each imposes specific notice requirements and mandates that ED provide MAEC with an opportunity to cure any alleged noncompliance with the Constitution, federal law, or terms and conditions of the award. *See supra* § II.B.2; 42 U.S.C. § 2000d–1; 34 C.F.R. § 100.7(d); 2 C.F.R. §§ 200.339, 200.341(a). GEPA and Title VI, moreover, require pretermination hearings and express findings of noncompliance on the record. *See supra* § II.B.2; 20 U.S.C. § 1234d(b). Finally, GEPA requires ED to provide MAEC with an opportunity to appeal an adverse decision to the Secretary and to seek judicial review before withholding any grant funds. *See supra* § II.B.2; 20 U.S.C. §§ 1234d(e), (f), 1234g(a).

There can be no dispute that ED did not comply with *any* of the required procedures under Title VI, GEPA, and the OMB Guidance. That is for a simple reason: ED rushed to terminate the EAC grants without warning. MAEC received no written notice, had no opportunity to cure any alleged issues, had no opportunity for a hearing, could not present evidence to counter ED's

decision, could not seek review by the Secretary, and did not have the opportunity to seek judicial review before its grant was terminated. ED decided to skip *every* step. That is plainly unlawful.

In the Termination Letter, ED did not acknowledge the procedures required by Title VI and GEPA. Instead, it cited to the OMB Guidance. *See* Shaffer Decl. App. 1, at 14. Compliance with the Guidance cannot excuse ED's failure to follow the Title VI and GEPA procedures. The Guidance requires the agency to "comply with any requirements for hearings, appeals, or other administrative proceedings to which the recipient or subrecipient is entitled under any statute or regulation applicable to the action involved." 2 C.F.R. § 200.342. By declining to follow Title VI, GEPA, and their regulations, ED failed to comply with the OMB Guidance. In any event, ED could not even muster compliance with the independent requirements of the Guidance. It made no attempt to remedy any alleged noncompliance by imposing special conditions on MAEC, *see* 2 C.F.R. § 200.339, and the Termination Letter did not list the "reasons for terminat[ing]" MAEC's grant, *id.* § 200.341(a). The Termination Letter merely states possible reasons that ED claimed it could invoke for termination. *See* Shaffer Decl. App. 1, at 14. That is not adequate notice.

In addition, ED failed to follow the required procedures when promulgating its new grant termination appeal procedures. GEPA requires that ED undertake notice-and-comment rulemaking and publish the final rules in the Federal Register in order to adopt new appeal procedures. 20 U.S.C. § 1232(d); *see also* 5 U.S.C. § 553(b), (c). ED failed to do so. Moreover, the new grant termination appeal procedures comply with none of GEPA's procedural requirements, including an opportunity for a hearing, a decision on the record, and an opportunity to seek review from the Secretary. *Compare* Shaffer Decl. App. 1, at 16 *with* 20 U.S.C. § 1234d. Thus, ED failed to observe the required procedures twice over when adopting the new grant termination appeal procedures.

Likewise, ED failed to follow the required procedures—namely, notice-and-comment

38

rulemaking and publication in the Federal Register—when adopting its new "priority." 20 U.S.C. § 1232(d); 34 C.F.R. § 75.105(b)(2); *see supra* p. 33. ED cannot change its priorities at will. Accordingly, ED failed to observe the procedures required by law when adopting its new priorities.

Accordingly, Plaintiffs are likely to succeed on their claim that the three final agency actions—termination of the EAC grant, promulgation of new grant termination appeal procedures, and adoption of new priorities—are unlawful because ED did not observe the procedures required by law.

   5.   *The Department's Termination of the EAC Grants is in Excess of Its Statutory Authority.*

The APA authorizes the Court to "hold unlawful and set aside final agency action . . . found to be[] in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Terminating the EAC grant program exceeds ED's statutory authority because ED did not follow the termination procedures required by Title VI and GEPA. *See supra* § II.B.2. Title VI and GEPA do not authorize ED to terminate EAC grants without following those procedures. *See FEC v. Cruz*, 596 U.S. 289, 301 (2022) (an agency "literally has no power to act . . . unless and until Congress authorizes it to do so by statute"). Without statutory authorization, ED's termination of the EAC grants exceeded its statutory authority.

## III.   Plaintiffs Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction

MAEC and NAACP members face "actual," "certain," and "imminent" irreparable harm that is "beyond remediation." *League of Women Voters v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (cleaned up). MAEC faces three types of irreparable harm: deprivation of its First and Fifth Amendment rights, existential economic injuries, and reputational harm. NAACP members also face the imminent deprivation of their First Amendment rights and of technical assistance services designed to redress patterns of discrimination and hostile environments in the schools they attend

and work in. Each of these imminent injuries independently amounts to irreparable harm.

"[L]oss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). The only proof of injury required for declaratory and injunctive relief against the threatened invasion of a constitutional right is "the threatened constitutional deprivation itself." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). "[T]here is a presumed availability of federal equitable relief against threatened invasions of constitutional interests." *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) (internal quotation marks omitted).

Economic loss also constitutes irreparable harm "where the loss threatens the very existence of the movant's business." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Moreover, economic losses that are unrecoverable strengthen the showing of irreparable harm. *See Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011) ("If a plaintiff has shown that financial losses are certain, imminent, and unrecoverable, then the imposition of a preliminary injunction is appropriate and necessary."). Because the APA does not waive sovereign immunity for money damages, courts have regularly found that imminent economic losses from APA claims are sufficient to establish irreparable harm. *See, e.g.*, *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 34 (D.D.C. 2020) (finding that economic loss from allegedly unlawful agency action established irreparable harm because monetary damages are "unrecoverable" under the APA); *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) ("[W]here . . . the plaintiff . . . cannot recover damages from the defendant due to the defendant's sovereign immunity, any loss of income suffered by a plaintiff is irreparable *per se*." (citation omitted)).

Finally, damage to the plaintiff's reputation may constitute irreparable harm. *See Beacon*

*Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018); *Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997); *accord* 11A Wright & Miller, Federal Practice and Procedure: Civil 3d § 2948.1. Concrete allegations that the challenged action will damage the plaintiff's ability to conduct its business or cause the plaintiff to lose future work opportunities establish irreparable reputational harm. *See Beacon*, 308 F. Supp. 3d at 288.

    A.  <u>MAEC Faces Irreparable Harm.</u>

    MAEC's constitutional injuries are *per se* irreparable. *Mills*, 571 F.3d at 1312. The unconstitutional viewpoint discrimination MAEC suffers is "unquestionably" irreparable. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Similarly, ED's denial of MAEC's due process rights—both because the Termination Letter is unconstitutionally vague and because ED terminated the EAC grant without any procedural protections—constitutes irreparable harm. *See Karem v. Trump*, 960 F.3d 656, 667–68 (D.C. Cir. 2020). Because MAEC has established that it is likely to succeed on the merits of its constitutional claims, it has necessarily established irreparable harm.

    In addition, MAEC will face irremediable economic harm if the termination of its EAC grant is not enjoined. The EAC grant represents over forty percent of MAEC's annual revenue. Rouland Decl. ¶ 36. The abrupt termination of the grant has devastated MAEC's operations. *Id.* ¶¶ 36–37, 43. MAEC has been forced to cancel every program and project run by its CEE. Williams Decl. ¶ 40. It has been forced to lay off four employees, reduce all remaining employees to 80% capacity, abandon its office space, and cut off its telephone and internet service. Shaffer Decl. ¶ 21; Rouland Decl. ¶¶ 41–45. These former employees are highly skilled professionals in the fields of educational equity and desegregation, with 93 years of combined experience with MAEC. Rouland Decl. ¶ 41. Darryl Williams, who ran the CEE, was laid off due to the grant termination. Rouland Decl. ¶ 41.

The nature and extent of MAEC's economic losses are irreparable. The loss of nearly half their funding threatens their very existence. *See Wis. Gas Co.*, 758 F.2d at 674. MAEC's inability to pay rent and staff are hallmarks of irreparable economic injury. *See Climate United*, 2025 WL 1131412, at *17–19. And, at least for MAEC's APA claims, monetary damages are unrecoverable because the APA's waiver of sovereign immunity does not extend to damages. *See USDA*, 444 F. Supp. 3d at 34. Moreover, MAEC faces the challenge of pursuing new clients to replace lost funding while also pulling back on activities that could be construed or labeled as "diversity, equity, or inclusion." *See* Rouland Decl. ¶¶ 28–35. MAEC's economic losses are immediate, concrete, and unrecoverable as after-the-fact monetary damages, and are therefore irreparable.

Finally, MAEC is facing, and will continue to face, irremediable reputational harm if the Termination Letter is not enjoined. The Termination Letter accuses MAEC of racial discrimination—the very problem that MAEC is dedicated to remedying. Shaffer Decl. ¶ 3; Williams Decl. ¶ 3. It further accuses MAEC of promoting "[i]llegal" diversity, equity, and inclusion initiatives. Shaffer Decl. App. 1, at 14. By impugning MAEC as a lawbreaker and discriminator, ED "has left a black mark on [MAEC's] reputation." *Beacon Assocs.*, 308 F. Supp. 3d at 287; *see also Patriot, Inc.*, 963 F. Supp. at 5. MAEC already faces increased difficulty in conducting its non-EAC work it is able to continue, *e.g.*, Rouland Decl. ¶ 28, 35, showing that is reputational damage is sufficiently concrete to establish irreparable harm.

B.  NAACP Educator and Student Members Face Irreparable Harm.

Like MAEC, NAACP members' First and Fifth Amendment injuries are *per se* irreparable. *See supra* § III.A. In addition to the injuries discussed above, the Termination Letter and the termination of the EAC program harms the NAACP, Tennessee NAACP, and Somerville-Fayette NAACP's educator members' First Amendment right to receive information, including by infringing upon that right with vague conditions prohibited by the Fifth Amendment. These

constitutional injuries are "unquestionably" irreparable. *Pursuing Am.'s Greatness*, 831 F.3d at 511; *see also Karem*, 960 F.3d at 667–68.

Moreover, NAACP educator members and the children of NAACP members are facing imminent, irreparable harm from the denial of technical assistance services to redress persistent racial discrimination in the schools they attend and work in. *See* Lewis Decl. ¶¶ 9–10; *see also supra* page 6 & note 7 (19% of the complaints ED's Office of Civil Rights received in FY 2024 alleged discrimination on the basis of race, color, or national origin). For example, NAACP student members will continue to experience racial achievement gaps or discriminatory discipline practices because their schools will be unable to access the technical assistance that MAEC and the other EACs provide to remedy such discrimination. *See* Holmes Decl. ¶¶ 21–24; Williams Decl. ¶ 42; *see also supra* page 7 & note 109999 (Black students are subject to harsher and more frequent school discipline). Similarly, if the termination of the EAC program is not enjoined, NAACP educator members will lose access to technical assistance that helps schools facilitate equal education access for all students. *See* Holmes Decl. ¶ 20. The loss of technical assistance to remedy racial discrimination in schools will occasion profound harms to the well-being of NAACP members and other Black students. School-based racial discrimination harms students' motivation, academic performance, graduation rates, and physical and mental health.[30] Racially discriminatory school discipline in particular affects students' academic performance and leads to higher dropout

---

[30] Gray et al., *supra* note 8, at 101; Blessing Ngozi Iweuno et al., *Impact of Racial Representation in Curriculum Content on Student Identity and Performance,* 23 World J. Advanced Rsch. & Revs. 2913, 2914–15 (2024), https://doi.org/10.30574/wjarr.2024.23.1.2280; Gregory M. Walton & Geoffrey L. Cohen, *A Brief Social-Belonging Intervention Improves Academic and Health Outcomes of Minority Students*, 331 Sci., 1447, 1447 (Mar. 18, 2011), https://doi.org/10.1126/science.1198364 ("Uncertainty about belonging, especially when chronic, can undermine minorities' performance and health.").

rates and an increased likelihood of criminal justice involvement.[31] The educational losses caused by the termination of the EAC program constitute irreparable harms to NAACP members.

## IV.    The Balance of Equities Tips in Plaintiffs' Favor Because Plaintiffs Face Irreparable Harm, the Injunction Would Not Harm Defendants, and the Public Interest Will Be Served by the Injunction

Neither the government nor the public will suffer a legitimate injury that outweighs MAEC and NAACP's interest in preliminary relief. When considering a preliminary injunction, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," while considering the public consequences of entering or withholding injunctive relief. *Winter*, 555 U.S. at 24 (citations omitted). Where, as here, the government is the defendant, those inquiries merge and the balancing turns on the public interest. *Nken*, 556 U.S. at 435–36.

When the government violates constitutional rights, the merged inquiry tips in Plaintiffs' favor. *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("enforcement of an unconstitutional law is always contrary to the public interest"). Indeed, the balance of equities tips in Plaintiffs' favor upon a showing that they are likely to succeed upon First or Fifth Amendment claims. *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 215 F. Supp. 2d 120, 134 (D.D.C. 2002) ("the public interest favors a preliminary injunction whenever First Amendment rights have been violated"); *NAACP*, 2025 WL 1196212, at *7 ("a likely meritorious Fifth Amendment claim . . . tips the balance of equities in [Plaintiff's] favor").

Similarly, "[t]here is generally no public interest in the perpetuation of unlawful agency action," *Newby*, 838 F.3d at 12, and "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (internal

---

[31] *See supra* p. 7 & n.10.

quotation marks omitted); *see also N. Mariana Island v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) (applying this to the Administrative Procedure Act). The Court need not, therefore, look any further than Defendants' brazen disregard for applicable termination procedures and notice-and-comment requirements, *see supra* § II.B.2, to conclude that the balance of equities and the public interest favor an injunction.

Should the Court wish to consider the public interest, the balance clearly weighs in favor of Plaintiffs. Defendants' termination of the EAC grants, including MAEC's grant, has and will continue to deny countless educators and students technical assistance services to address discriminatory practices and hostile environments in the schools in which they learn and work. *See supra* § III. The termination also harms the public interest in MAEC's work to advance "the Nation's goal of equal educational opportunity." 20 U.S.C. § 1221-1. In contrast, a preliminary injunction will not substantially injure Defendants. ED will not incur additional costs by allowing the current grant term to continue. To the extent that setting aside the Termination Letter incidentally requires Defendants to provide funds obligated to MAEC or other EAC grantees, those funds have already been appropriated and allocated to their grantees. Any harm the government might assert is outweighed by the protections of the APA and the Constitution.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' motion and issue a preliminary injunction against Defendants consistent with that requested in the Proposed Order.

Dated: May 22, 2025                                  Respectfully submitted,

                                                                    */s/Charles McLaurin*
                                                                    Charles McLaurin

45

DC Bar No. 1000107
Joseph Wong
DC Bar No. 1017589
NAACP Legal Defense and
Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, DC 20005
Phone: (202) 682-1300
Fax: (202) 682-1312
cmclaurin@naacpldf.org
jwong@naacpldf.org

Katrina Feldkamp*
Tiffani Burgess**
Maia Cole*
Victor Genecin*
NAACP Legal Defense and
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Phone: (212) 965-2200
Fax: (212) 226-7592
kfeldkamp@naacpldf.org
tburgess@naacpldf.org
mcole@naacpldf.org
vgenecin@naacpldf.org

\* *Pro hac vice* admission forthcoming
\*\* Admission for application pending

*Counsel for Plaintiffs*

46

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 21, 2025, the foregoing notice was filed electronically and will be sent electronically to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

<u>*/s/Charles McLaurin*</u>
Charles McLaurin
DC Bar No. 1000107
