UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                        )
                                                        )
MID-ATLANTIC EQUITY                                     )
CONSORTIUM, et al.,                                     )
                                                        )
                    Plaintiffs,                         )
                                                        )
          v.                                            )          Civil Action No. 25-1407 (PLF)
                                                        )
U.S. DEPARTMENT OF                                      )
EDUCATION, et al.,                                      )
                                                        )
                    Defendants.                         )
_____)


OPINION

        In 2022, the United States Department of Education ("the Department") awarded

the Mid-Atlantic Equity Consortium ("MAEC") a five-year Equity Assistance Center grant to

operate the Center for Education Equity ("CEE").[1]  See Am. Compl. [Dkt. No. 33] ¶¶ 31, 37.

CEE is a technical assistance center designed to confront federal school desegregation cases in

"Region I," which includes Connecticut, Delaware, Kentucky, Maine, Maryland, Massachusetts,

New Hampshire, New Jersey, New York, Pennsylvania, Puerto Rico, Rhode Island, Vermont,

_____

    [1]     The Court has reviewed the following documents and attachments thereto in
connection with the pending motion:  Complaint ("Compl.") [Dkt. No. 1]; Amended Complaint
("Am. Compl.") [Dkt. No. 33]; Plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 14];
Plaintiffs' ERRATA Motion for a Preliminary Injunction ("Pls. Mot.") [Dkt. No. 15];
Defendants' Opposition to the Motion for a Preliminary Injunction ("Defs. Opp.") [Dkt. No. 26];
Plaintiffs' Reply in Further Support of the Motion for a Preliminary Injunction ("Pls. Reply")
[Dkt. No. 30]; Plaintiffs' Supplemental Memorandum of Law in Support of the Motion for a
Preliminary Injunction ("Pls. Suppl.") [Dkt. No. 36]; Plaintiffs' Revised Proposed Order
("Pls. Revised Proposed Order") [Dkt. No. 36-2]; Defendants' Response to Plaintiffs' Revised
Proposed Order ("First Defs. Suppl.") [Dkt. No. 37]; Defendants' Response to Plaintiffs'
Supplemental Memorandum of Law ("Second Defs. Suppl.") [Dkt. No. 38]; and Plaintiffs' Reply
in Support of Plaintiffs' Supplemental Memorandum of Law ("Pls. Suppl. Reply") [Dkt. No. 40].

West Virginia, and the Virgin Islands.  See id. ¶ 31.  But CEE's programming grinded to a halt on February 13, 2025, when the Department terminated MAEC's grant.  See id. ¶¶ 86, 110.

On May 22, 2025, plaintiff MAEC, for itself, and plaintiffs National Association for the Advancement of Colored People ("NAACP"), Tennessee State Conference of the NAACP ("Tennessee NAACP"), and NAACP Fayette-Somerville Branch ("Fayette NAACP") (collectively, "the NAACP Plaintiffs"), for their members, moved for a preliminary injunction against the Department and Linda M. McMahon, in her official capacity as Secretary of Education.  See Plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 14], as corrected by Plaintiffs' ERRATA Motion for a Preliminary Injunction ("Pls. Mot.") [Dkt. No. 15].  Plaintiffs challenge defendants' decision to terminate several EAC grants—including MAEC's EAC grant—and they request immediate declaratory and injunctive relief.  See generally Pls. Mot.

The Court held oral argument on plaintiffs' motion on July 8, 2025.  Upon careful consideration of the parties' filings, the oral arguments, and the relevant legal authorities, the Court concludes that:  (i) MAEC has demonstrated organizational standing to sue on its own behalf, (ii) MAEC is likely to succeed on the merits of its APA claims, and (iii) MAEC has been irreparably harmed.  The Court therefore will grant MAEC's motion for a preliminary injunction.

## I.    BACKGROUND

### A.    The EAC Grant Program

To effectuate the Supreme Court's ruling in Brown v. Board of Education to desegregate schools "with all deliberate speed," Congress enacted Title IV of the Civil Rights Act of 1964 ("Title IV").  See Am. Compl. ¶ 24; see also 42 U.S.C. §§ 2000c et seq.  Title IV directs the Department to provide technical assistance to facilitate public school desegregation initiatives, see 42 U.S.C. § 2000c-2, and to "arrange, through grants or contracts, . . . institutes

for special training designed to improve the ability of [school personnel] to deal effectively with special educational problems occasioned by desegregation." 42 U.S.C. § 2000c-3.

Pursuant to Title IV, the Department established the Equity Assistance Center ("EAC") Program, through which the Department "operates a competitive grant process for organizations to seek funding to provide desegregation assistance to school districts and local educational agencies ('LEAs')." Pls. Mot. at 2 (citing 34 C.F.R. §§ 270.1-270.5, 270.7).[2] Since 2016, the Department has divided the United States and territories into four regions and has awarded EAC grants to four grantees, each of which provides technical assistance, upon request, to public schools within its assigned geographical region. See Am. Compl. ¶ 30. EAC Program grantees are called "Equity Assistance Centers" or "EACs,"[3] see Pls. Mot. at 2 (citing 34 C.F.R.§ 270.1), and these EACs help schools "develop[ ] effective strategies to ensure all students have a full opportunity to participate in educational programs." Applications for New Awards: Equity Assistance Centers, 87 Fed. Reg. 8564, 8564 (Feb. 15, 2022).

On February 15, 2022, following notice-and-comment rulemaking, the Department published a Notice Inviting Applications for the FY2022 EAC grant competition. See Am. Compl. ¶ 122; see also 87 Fed. Reg. 8564-70. The Notice stated that the Department

---

[2]     The "desegregation assistance" that EACs provide "may include, among other activities, (1) Dissemination of information regarding effective methods of coping with special educational problems occasioned by desegregation; (2) Assistance and advice in coping with these problems; and (3) Training designed to improve the ability of teachers, supervisors, counselors, parents, community members, community organizations, and other elementary or secondary school personnel to deal effectively with special educational problems occasioned by desegregation." Am. Compl. ¶ 33 (quoting 34 C.F.R. § 270.4(c) (2025)).

[3]     EACs were initially named "Desegregation Assistance Centers," but the Department changed the Centers' name in 2016 to reflect their broadened mission. See Southern Educ. Found. v. United States Dep't of Educ. ("Southern Educ."), Civil Action No. 25-1079 (PLF), 2025 WL 1453047, at *2 (D.D.C. May 21, 2025).

was "particularly interested" in applications addressing the following priority: "Promoting

Equity Through Diverse Partnerships." 87 Fed. Reg. 8566. The EAC Program's authorizing

statutes set forth application procedures for the grant competition. See 37 C.F.R. 270 (2025).

### B. Plaintiff MAEC

Plaintiff MAEC is a nonprofit, 501(c)(3) corporation. See Pls. Mot. at 3; see also

Declaration of Karmen Rouland ("Rouland Decl.") [Dkt. No. 15-4] ¶ 3. Since 1992, the

Department "has repeatedly awarded MAEC an EAC grant" to provide technical assistance to

school districts and LEAs upon request. Pls. Mot. at 3. And since 2016, MAEC has served as

the EAC for Region I. See id.; see also Declaration of Susan Shaffer ("Shaffer Decl.") [Dkt.

No. 15-3] ¶¶ 3, 7; Declaration of Daryl Williams ("Williams Decl.") [Dkt. No. 15-5] ¶ 17.

In 2022, MAEC submitted an application for the Department's FY2022 EAC

grant competition, requesting a grant to operate the CEE program for Region I. See MAEC-CEE

Equity Consortium Application ("MAEC-CEE Appl.") [Dkt. No. 15-7]. As of February 2022,

"Region I had 177 open Title VI investigations at elementary and secondary schools," for

incidents "ranging from Racial Harassment, to Denial of Benefits, to Discipline." Id. at 6. In its

EAC grant application, MAEC proposed several projects aimed at resolving these open Title VI

cases, see id. at 6-7, as well as fulfilling the Department's competition priority of "Promoting

Equity Through Diverse Partnerships." See id. at 61-65; see also 87 Fed. Reg. 8566. For

example, MAEC proposed a partnership with Capital Community College, a minority-serving

institution, to support its dual enrollment programs during the 2024-2025 grant year. See

MAEC-CEE Appl. at 64; see also Am. Compl. ¶ 128; Williams Decl. ¶ 12.

Following a competitive selection process, the Department awarded MAEC a

five-year EAC grant under Title IV to operate the CEE in Region I. See Am. Compl. ¶ 39.

4

Under the grant agreement, MAEC was scheduled to receive $8,214,498 over five years to

operate the CEE in Region I from October 1, 2022 to September 30, 2027.  See Am. Compl.

¶ 41.  MAEC's most recent Grant Award Notification ("GAN") letter awarded

MAEC $1,686,452 for the period of October 1, 2024 to September 30, 2025.  See id. ¶ 42.

        Since receiving its most recent grant award in 2022, MAEC, through the CEE, has

helped "states, districts, schools, and community-based organizations . . . address discrimination

and segregation on the basis of race, national origin, sex, or religion."  Pls. Mot. at 4; see also

Shaffer Decl. ¶¶ 8, 9.  In 2024, the CEE supplied technical assistance to three public schools in

Maine seeking to "reduce racial opportunity gaps" in the classroom, and ultimately "achiev[ed]

decreases in the racial opportunity gap as high as 10.6% in Math and 10.1% in English Language

Arts."  Pls. Mot. at 4.  CEE has also "helped 17 school districts in New York State significantly

reduce the racially disproportionate use of school discipline."  Id.; Williams Decl. ¶ 23.  The

Department regularly reviewed MAEC's work, and at its most recent annual review in

January 2025, MAEC received exceptional feedback.  See Pls. Mot. at 5; Williams Decl. ¶ 21.

### C.  The NAACP Plaintiffs

        Plaintiffs NAACP, Tennessee NAACP, and Fayette NAACP are not-for-profit

organizations.  See Pls. Mot. at 5.  The NAACP has over 2,200 local branches, 371 college

chapters, and 23 high school chapters across the country.  Pls. Mot. at 5; see also Declaration of

Derrick Lewis ("Lewis Decl.") [Dkt. No. 15-8] ¶ 7.  The Tennessee NAACP is a "state

conference of the NAACP," while the Fayette NAACP is a "local unit" of the NAACP and the

Tennessee NAACP.  Am. Compl. ¶ 16.  "Members of the Tennessee NAACP are also members

of the national NAACP, [and] [m]embers of the Fayette NAACP are also members of" the

NAACP and the Tennessee NAACP.  Am. Compl. ¶ 16; see also Declaration of Benard Simelton

("Simelton Decl.") [Dkt. No. 15-10] ¶ 4; Declaration of Elton Holmes ("Holmes Decl.")

[Dkt. No. 15-9] ¶ 3.  Put another way, the NAACP Plaintiffs' membership is fully captured by

Plaintiff NAACP's membership, which consists of "educators and families in every state,

including Black students who attend PK-12 schools throughout the country and Black educators

who teach in PK-12 schools throughout the country."  Am. Compl. ¶ 15; see also Pls. Mot at 5-6.

       The NAACP Plaintiffs allege that their members' equal access to education

depends upon the development of "practices that prevent and redress discrimination" in school

settings, "including through the technical assistance services made available by the EAC

Program." Am. Compl. ¶ 15.  Specifically, "[t]echnical assistance from EACs . . . help[ ] K-12

schools better respond to discrimination and ensure equal educational opportunities for Black

students and equal professional opportunities for Black educators."  Pls. Mot. at 7.

### D.  Change of Administration and Executive Orders

       On January 20, 2025, President Trump was sworn in as President of the United

States.  That same day, he signed Executive Order 14151, titled "Ending Radical and Wasteful

Government DEI Programs and Preferencing."  See Exec. Order No. 14151, Ending Radical and

Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg. 8339 (Jan. 20, 2025) (In

order to "mak[e] America great," all DEI programs "end[] today.").  Executive Order 14151

directs "[e]ach agency, department, or commission head" to "terminate, to the maximum extent

allowed by law . . .  all 'equity action plans,' 'equity' actions, initiatives, or programs, [and]

'equity-related' grants or contracts . . . .'"  Id. at § 2(b)(i), Implementation (emphasis added).

       The next day, on January 21, 2025, President Trump signed Executive

Order 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity."

See Exec. Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based

Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025). Ostensibly in order to enforce "longstanding civil-rights laws and to combat illegal private-sector DEI preferences," id. at § 2, Executive Order 14173 directs "all executive departments and agencies" to "terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements." Id.

### E. February 2025 Termination of MAEC's Grant

On February 13, 2025, MAEC received a letter from the Department, which read:

This letter provides notice that the United States Department of Education is terminating your federal award, S004D220002. See 2 C.F.R. § 200.340-43; see also 34 C.F.R. § 75.253.

It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R.

> § 200.340(a)(4); see also 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. S004D220002 in its entirety effective 2/13/25.

Shaffer Decl. App., Ex. A ("Termination Letter") [Dkt. No. 15-3] at 1.

Plaintiffs allege that the three other EAC grantees also received identical termination letters from the Department on February 13, 2025. See Am. Compl. ¶ 37. The other EAC grantees are: the Southern Education Foundation, which serves "Region II" (Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, Texas, Virginia, and the District of Columbia); the Midwest and Plains Equity Assistance Center, which serves "Region III" (Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, Oklahoma, South Dakota, and Wisconsin); and the Western Educational Equity Assistance Center, which serves "Region IV" (Alaska, Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, Wyoming, American Samoa, the Commonwealth of the Northern Mariana Islands, and Guam). See id. ¶ 31; see also Declaration of Susan Mundry ("Mundry Decl.") [Dkt. No. 30-1] ¶¶ 2-3; Declaration of Seena Skelton ("Skelton Decl.") [Dkt. No. 30-2] ¶¶ 2-3.

The Termination Letter set forth an informal appeal process for MAEC to follow if it "wish[ed] to object to or challenge" the termination of the grant. See Shaffer Decl. App., Ex. A at 2. The Letter directed MAEC to "submit information and documentation supporting [its] position in writing within 30 calendar days of the date of this termination notice." Id. MAEC's appeal had to contain the following: "1. a copy of the written notice of termination; 2. the date [MAEC] received written notice of termination; 3. a brief statement of [MAEC's] argument and the disputed factual, legal, or other issues; 4. the amount of funds or costs in dispute, if any; and 5. any other relevant documents." Id. Lastly, the Letter provided the name

8

and contact information of the Department official to whom appeals should be forwarded.

See id.  In addition to the Termination Letter, MAEC also received a new GAN letter stating that

MAEC's grant was terminated because it was deemed "inconsistent with, and no longer

effectuates, Department priorities."  Am. Compl. at 94; see also Williams Decl. ¶ 32.

     MAEC submitted a timely appeal to the Department on March 12, 2025,

challenging the termination of its grant.  See Am. Compl. ¶ 112.  The Department did not

respond, see id. ¶ 113, and MAEC withdrew its appeal on July 2, 2025.  Id. ¶ 114.

### F.  Procedural History

     On May 8, 2025, plaintiffs filed this lawsuit against defendants.  See Am. Compl.

¶¶ 14-18.  Plaintiffs allege that "[d]efendants' termination of the EAC program," including

MAEC's EAC grant, violates plaintiffs' Fifth Amendment rights, see id. ¶¶ 202-12 (Count One),

constitutes viewpoint discrimination under the First Amendment, see id. ¶¶ 213-28 (Count Two),

violates the Administrative Procedure Act ("APA"), see id. ¶¶ 235-80 (Counts Four, Five, Six,

and Seven), and violates separation of powers principles under Article I, §§ 1, 8 of the

Constitution.  See id. ¶¶ 281-89 (Count Eight).  MAEC independently alleges that defendants'

termination of its EAC grant violates MAEC's Fifth Amendment procedural due process rights.

See id. ¶¶ 229-34 (Count Three).  Plaintiffs move for preliminary relief on all counts except

Count Eight—their separation of powers claim.  See Pls. Reply at 9 n.2.

     As noted, plaintiffs filed a motion for a preliminary injunction on May 23, 2025.

See Pls. Mot.  Plaintiffs seek declaratory and injunctive relief.  See Am. Compl. at 56-57; see

also Proposed Order Granting Preliminary Injunction [Dkt. No. 15-14].  On July 2, 2025,

plaintiffs filed a motion to supplement the record and amend their complaint pursuant to

Rule 15(d) of the Federal Rules of Civil Procedure.  See Plaintiffs' Motion to Supplement the

Record [Dkt. No. 31].  To their motion, plaintiffs attached a letter that MAEC sent to the

Department on July 2, 2025, formally withdrawing MAEC's administrative appeal challenging

the Department's grant termination decision.  See id. at Ex. 1 [Dkt. No. 31-1].  The Court

granted plaintiffs' motion by minute order, and gave plaintiffs leave to serve a supplemental

pleading.  See Minute Order of July 3, 2025.  On July 7, 2025, plaintiffs filed an amended

complaint alleging that MAEC had withdrawn its administrative appeal.  See Am. Compl. ¶ 114.

      The Court heard oral argument on plaintiffs' motion on July 8, 2025.  See Minute

Entry of July 8, 2025.  That same day, the Court directed plaintiffs to file a revised proposed

order and a supplemental brief "providing the basis for the relief requested in the revised

proposed order," and gave defendants an opportunity to respond.  See Order of July 8, 2025

[Dkt. No. 35].  Plaintiff filed a revised proposed order and a supplemental brief on July 11, 2025.

See Pls. Revised Proposed Order; Pls. Suppl.  Defendants responded to plaintiffs' filings on

July 14, 2025 and July 16, 2025.  See First Defs. Suppl.; Second Defs. Suppl.  Plaintiffs filed a

reply in support of their supplemental brief on July 24, 2025.  See Pls. Suppl. Reply.

## II.     JURISDICTION

      Defendants advance three threshold jurisdictional arguments.  First, they contend

that because plaintiffs seek reinstatement of grant agreements between the Department and the

EAC grantees, their claims sound in contract and therefore belong in the Court of Federal

Claims—and not this Court—under the Tucker Act.  See Defs. Opp. at 6-10.  Second, defendants

argue that because MAEC administratively appealed the Department's termination decision,

plaintiffs' claims are not ripe.  Id. at 10-11.  And third, defendants argue that the NAACP

Plaintiffs lack associational standing to sue on behalf of their members because "[a]ll of the

harms referenced by Plaintiffs are far too attenuated—and in most cases, entirely separate from

the specific termination of the MAEC grant—to give rise to standing."  Second Defs. Suppl. at 3;
see also Defs. Opp. at 13.  As such, defendants argue, plaintiffs have no standing to "seek relief
broader than a restoration of the MAEC grant," and "this Court has no jurisdiction . . . to issue
relief to any other EAC grantee other than MAEC."  Second Defs. Suppl. at 3.

       The Court finds that defendants' first and second arguments are foreclosed by this
Court's recent opinion in Southern Educ. Found. v. United States Dep't of Educ. ("Southern
Educ."), Civil Action No. 25-1079 (PLF), 2025 WL 1453047, at *5-12 (D.D.C. May 21, 2025).
But the Court agrees that the NAACP plaintiffs have failed at this stage to establish associational
standing to sue on behalf of their members.  See Defs. Opp. at 13; Second Defs. Suppl. at 3.  The
Court therefore likely lacks subject matter jurisdiction over the NAACP Plaintiffs' claims.

## A.  The Tucker Act and the Essence of Plaintiffs' Claims

       Because the "United States is immune from suit unless it unequivocally
consents," Maine Cmty. Health Options v. United States, 590 U.S. 296, 322 (2020), plaintiffs
requesting emergency relief against the government must "identify an unequivocal waiver of
sovereign immunity."  Franklin-Mason v. Mabus, 742 F.3d 1051, 1054 (D.C. Cir. 2014); see also
Southern Educ., 2025 WL 1453047, at *5.  Here, plaintiffs point to Section 702 of the APA as
such a waiver that applies to their claims.  See Pls. Mot. at 12-13 (citing 5 U.S.C. § 702).

       As this Court explained in Southern Educ., the APA provides "a limited waiver of
sovereign immunity" for persons "adversely affected or aggrieved by agency action."  Southern
Educ., 2025 WL 1453047, at *5 (quoting Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.
("Crowley"), 38 F.4th 1099, 1105-06 (D.C. Cir. 2022)).  But Section 702's waiver is not without
limits:  For one, it only applies to claimants "seeking relief other than money damages."  5
U.S.C. § 702.  For another, "Section 702's sovereign immunity waiver does not apply [ ] 'if any

11

other statute that grants consent to suit expressly or impliedly forbids the relief which is

sought.'" Crowley, 38 F.4th at 1106 (quoting Perry Cap. LLC v. Mnuchin, 864 F.3d 591, 618

(D.C. Cir. 2017) and 5 U.S.C. § 702); see also Southern Educ., 2025 WL 1453047, at *5.

        Defendants contend that the Tucker Act "impliedly forbids" the APA's waiver of

sovereign immunity here. See Defs. Opp. at 6. As explained in Southern Educ., the Tucker Act

> waives the government's sovereign immunity from actions
> "founded . . . upon any express or implied contract with the United
> States." 28 U.S.C. § 1491(a)(1). The D.C. Circuit has explained
> that the Tucker Act grants the Court of Federal Claims "exclusive
> jurisdiction over breach of contract claims against the United States
> seeking more than $10,000 in damages." Crowley, 38 F.4th at 1106
> (quoting Hammer v. United States, 989 F.3d 1, 2 (D.C. Cir. 2021))
> (emphasis added). So if [plaintiffs'] claims are "'at [their] essence'
> contractual," then they fall within the scope of the Tucker Act and
> this Court has no power to resolve them. Crowley, 38 F.4th at 1106
> (quoting Megapulse, Inc. v. Lewis ("Megapulse"), 672
> F.2d 959, 967 (D.C. Cir. 1982)); see also 5 U.S.C. § 702 (providing
> that the APA's waiver of sovereign immunity is inapplicable where
> "any other statute . . . impliedly forbids the relief which is sought.").
>
> The Supreme Court has cautioned, however, that "[n]ot every claim
> invoking the Constitution, a federal statute, or a regulation is
> cognizable under the Tucker Act." United States v. Mitchell, 463
> U.S. 206, 216 (1983). For example, the Court of Federal Claims
> generally is not the appropriate forum to consider requests for
> injunctive relief because it "has no power to grant equitable relief."
> Bowen v. Massachusetts ("Bowen"), 487 U.S. 879, 905 (1988)
> (quoting Richardson v. Morris, 409 U.S. 464, 465 (1973) (per
> curiam)). The D.C. Circuit has also made clear that the Tucker Act
> should not be interpreted "so broad[ly] as to deny a court jurisdiction
> to consider a claim that is validly based on grounds other than a
> contractual relationship with the government." Megapulse, 672
> F.2d at 968. "[T]he mere fact that a court may have to rule on a
> contract issue does not, by triggering some mystical metamorphosis,
> automatically transform an action . . . into one on the contract and
> deprive the court of jurisdiction it might otherwise have." 
> Megapulse, 672 F.2d at 968 (emphasis added). Further, "[t]he fact
> that a judicial remedy may require one party to pay money to another
> is not a sufficient reason to characterize the relief as 'money
> damages'" such that Section 702 of the APA's waiver of sovereign
> immunity is inapplicable. Bowen, 487 U.S. at 893.

12

Southern Educ., 2025 WL 1453047, at *5.  Defendants argue that the Court lacks subject matter

jurisdiction over plaintiffs' claims because "[p]laintiffs' APA and non-APA claims are all based

expressly on MAEC's grant and cooperative agreement," and plaintiffs request "a contractual

remedy in the form of an order to essentially pay money due under the grant and Cooperative

Agreement."  Defs. Opp. at 7.  According to defendants, the contractual nature of plaintiffs'

claims and the relief sought "indicate [that] the contemplated relief" falls under the exclusive

jurisdiction of the Court of Federal Claims under the Tucker Act, not this Court.  See id. at 10.

        The Court rejected these same Tucker Act arguments in Southern Educ., 2025

WL 1453047, at *5-11.  There, plaintiff Southern Education Foundation ("SEF") brought several

APA and non-APA claims against the Department, challenging the sudden termination of its

EAC grant.  See id. at *2-5.  Defendants argued that because SEF sought reinstatement of the

grant agreement, its claims sounded in contract and therefore belonged in the Court of Federal

Claims under the Tucker Act.  See id. at *5.  After applying the "rights and remedies" test

articulated by the D.C. Circuit in Megapulse, 672 F.2d at 967, the Court concluded that SEF's

claims were not in essence contractual such that jurisdiction lay exclusively in the Court of

Federal Claims.  See Southern Educ., 2025 WL 1453047, at *6.  Rather, SEF's claims "turn[ed]

entirely on examining the federal statutes and regulations governing SEF's grant award[, and] the

Court need not look to the terms of the grant agreement at all to adjudicate SEF's claims."

Id. at *7 (citing AIDS Vaccine Advoc. Coal., Civil Action No. 25-1079 (PLF), 2025

WL 752378, at *9 (D.D.C. May 21, 2025) ("[I]t would be quite extraordinary to consider

Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the

terms of particular awards were breached—they instead challenge whether the agency action

here was unlawful, irrespective of any breach.").

In the instant case, plaintiffs bring several APA and non-APA claims against the Department, challenging the sudden termination of several EAC grants, including MAEC's EAC grant. See Am. Compl. ¶¶ 202-89. Defendants make no attempt to differentiate the Tucker Act arguments they advance here from the arguments this Court rejected in Southern Educ.—in fact, defendants do not even cite Southern Educ. in their briefs. See Pls. Reply at 2. So for the same reasons this Court articulated in Southern Educ., the Court finds that plaintiffs' claims do not sound in contract. See 2025 WL 1453047, at *6-11. Therefore "this Court—not the Court of Federal Claims—is the appropriate forum to adjudicate [plaintiffs'] suit." Id. at *7.[4]

This Court is far from the first in this Circuit to consider the Tucker Act's applicability to federal grant terminations. Indeed, as Judge Mehta noted in a recent opinion,

---

[4]    There is one important difference between SEF's requested relief and plaintiffs' requested relief: Plaintiffs here ask the Court to extend the performance period of MAEC's EAC continuation grant agreement for 320 days from the date of the reinstatement of the grant. See Pls. Reply at 24. According to plaintiffs, this extension would account for the 230 days left in the 2024-2025 grant year, plus the 90 days that MAEC alleges it will need to restart its EAC projects and rehire staff. See id. Plaintiffs also ask the Court to extend the performance period of the grant agreements between the three other EACs and the Department. See id. Following oral argument, the Court ordered plaintiffs to file a revised proposed order and a supplemental brief "providing the basis for . . . the Court's authority to direct defendants to extend the term for [MAEC's EAC] continuation grant." Order of July 8, 2025.

        Upon consideration of plaintiffs' supplemental brief, defendants' responses, and plaintiffs' reply, the Court declines plaintiffs' request to modify the performance period of the grant agreements. First, as defendants note, "[t]he performance period of the EAC grant contract is a substantive term of [each] cooperative agreement." Second Defs. Suppl. at 2. Though the Department may voluntarily modify the performance period of a grant agreement, see Pls. Suppl. at 5, plaintiffs have failed to demonstrate that this Court has the authority to do so unilaterally, over the Department's objection. See First Defs. Suppl. at 1-2; see also Second Defs. Suppl. at 1-3. Moreover, as this Court explained in Southern Educ., SEF's claims were not contractual in nature—and therefore the Court had jurisdiction over them—in part because the Court could adjudicate SEF's claims without looking to the terms of the grant agreement. See Southern Educ., 2025 WL 1453047, at *7. The same cannot be said of plaintiffs' request for the Court to modify a substantive term of the grant agreements between the EACs and the Department, which implicates the same jurisdictional concerns.

there is an "ongoing controversy" in the D.C. Circuit—and in courts all over the country—"over whether federal grant termination cases belong in federal district courts or in the Court of Federal Claims." Vera Institute of Justice v. U.S. Dep't of Justice ("Vera Inst. v. DOJ"), Civil Action No. 25-1643 (APM), 2025 WL 1865160, at *6 (D.D.C. July 7, 2025) (collecting cases).

The D.C. Circuit recently had occasion to consider the Tucker Act's applicability in federal grant termination cases. In Widakuswara v. Lake ("Widakuswara II"), No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025), a motions panel concluded that the district court likely lacked jurisdiction under the Tucker Act to restore plaintiffs' federal grants. The Court summarized Widakuswara II in Southern Educ. as follows:

> In Widakuswara v. Lake, the United States Agency for Global Media ("USAGM") terminated two of its affiliates' grant agreements for the 2025 fiscal year. See Widakuswara II, 2025 WL 1288817, at *1. The grantees filed suit in this Court, challenging the USAGM's termination of their grants, bringing claims under the APA, the United States Constitution, various congressional appropriations acts, "and numerous other statutory provisions." Widakuswara v. Lake (Widakuswara I"), Civil Action No. 25-1015 (RCL), 2025 WL 1166400, at *5 (D.D.C. Apr. 22, 2025). Judge Lamberth granted plaintiffs' motion for a preliminary injunction, and ordered the government to "restore the FY 2025 grants" and "disburse[ ] to [the grantees] the funds Congress appropriated." Id. at *18. The government appealed to the D.C. Circuit and filed a motion to stay this Court's order to restore the grantees' fiscal year 2025 grants. See Widakuswara II, 2025 WL 1288817, at *2.
>
> A motions panel of the D.C. Circuit granted the government's motion for a stay, finding that this Court likely lacked jurisdiction to restore the grants. See Widakuswara II, 2025 WL 1288817, at *1, 3. Relying on the Supreme Court's opinion in Department of Education, [145 S. Ct. 966 (2025),] the panel majority found that the government, through its grant agreement with the plaintiffs, "promised to pay the appropriated funds" and "[i]n return, [plaintiffs] promised to use the funds to advance statutory objectives and to comply with all program requirements." Id. at *3. "These exchanges of promises—reflecting offer, acceptance, consideration, mutuality of intent, and action by an official with authority to bind the government—constitute government contracts for Tucker Act

> purposes." Id. (citing Columbus Reg'l Hosp. v. United States, 990 F.3d [1330, 1338-39 (Fed. Cir. 2021)]). The panel majority held that "[w]hether phrased as a declaration that [the grant] agreements remain in force, or an order to pay the money committed by those agreements," this Court's injunction "in substance order[ed] specific performance of the grant agreements— a quintessentially contractual remedy." Id. at *4. The panel majority concluded that the "inherently contractual nature" of the district court's relief "makes the [Court of Federal Claims] the exclusive forum for this suit." Id.

Southern Educ., 2025 WL 1453047, at *9-10. In Southern Educ., this Court respectfully

declined to follow the panel majority's holding in Widakuswara II, largely for the reasons

articulated in Judge Pillard's dissent. See Widakuswara II, 2025 WL 1288817, at *12

(Pillard, J., dissenting) ("[w]hat matters is what the court must examine to resolve the case: If a

plaintiff's claim depends on interpretations of statutes and regulations rather than the terms of an

agreement negotiated by the parties, the claim is not in essence contractual."); Southern

Educ., 2025 WL 1453047, at *10 (adopting Judge Pillard's reasoning).

      The plaintiffs in Widakuswara II quickly filed petitions for rehearing en banc.

See Widakuswara Plaintiffs-Appellees' Pet. for Rehearing En Banc, Dkt. Nos. 25-5144, 25-5145

(D.C. Cir. May 5, 2025); Plaintiffs' Emergency Pet. for Rehearing En Banc, Dkt.

Nos. 25-5150, 25-5151 (D.C. Cir. May 5, 2025). The D.C. Circuit, en banc, administratively

stayed the motion panel's stay order "pending further order of the court," with four judges

dissenting. See Middle East Broad. Networks, Inc. v. United States, No. 25-5150, 2025

WL 1378735, at *1 (D.C. Cir. May 7, 2025). Then, on May 28, 2025, the en banc court denied

in part and granted in part plaintiffs' petitions for reconsideration; the same four judges again

dissented. See Widakuswara v. Lake ("Widakuswara En Banc Order"), No. 25-5144, 2025

WL 1521355, at *1 (D.C. Cir. May 28, 2025). Relevant here is the Circuit's decision to

reconsider the portion of the panel's decision which found that the district court likely lacked

jurisdiction under the Tucker Act to order the reinstatement of plaintiffs' federal grants.
See Widakuswara En Banc Order, 2025 WL 1521355, at *1.  The majority stated that,
"substantially for the reasons explained by Judge Pillard" in her Widakuswara II dissent, the
government "ha[d] not made the requisite 'strong showing' of a likelihood of success on the
merits" of its claims, including its Tucker Act jurisdictional arguments.  See id.

       To date, the D.C. Circuit has not yet reheard the Widakuswara cases en banc on
the merits.  Absent an intervening change in controlling law, the Court sees no reason to deviate
from its analysis in its Southern Educ. opinion regarding the Tucker Act jurisdictional question.

### B. Ripeness

       Defendants' second jurisdictional argument is that plaintiffs' claims are not ripe
because MAEC filed an administrative appeal challenging the grant termination.  See Defs.
Opp. at 10-11.  But as the Court said in Southern Educ., the withdrawal of an administrative
appeal and the filing of an amended complaint reflecting that withdrawal—especially when, as
here, the plaintiff is not statutorily required to exhaust all available administrative remedies—
resolves "any risk of a concurrent administrative process that might preclude judicial
review."  2025 WL 1453047, at *11; see also Scahill v. D.C., 909 F.3d 1177, 1184
(D.C. Cir. 2018) (holding that a plaintiff may cure jurisdictional defects by filing an amended
pleading, thereby avoiding "the unnecessary hassle and expense of filing a new lawsuit when
events subsequent to filing the original complaint have fixed the jurisdictional problem.").

       MAEC withdrew its administrative appeal on July 2, 2025.  Am. Compl. ¶ 114.
Then, on July 7, 2025, plaintiffs filed an amended complaint reflecting the withdrawal of
MAEC's administrative appeal.  See id.  The Court therefore finds that these developments

resolve any risk of a concurrent administrative process that might preclude judicial review, and render defendants' ripeness argument moot. See Southern Educ., 2025 WL 1453047, at *11.

### C. Article III Standing

Defendants' third and final jurisdictional argument relates only to the NAACP Plaintiffs. Defendants argue that they lack associational standing to sue on behalf of their members because their members' alleged harms are "far too attenuated" to give rise to standing. Second Defs. Suppl. at 3; see also Defs. Opp. at 13. On the current record, the Court agrees, and therefore will not now consider the NAACP Plaintiffs' claims. It need not do so because the other plaintiff in this case, MAEC, likely does have standing to sue. See infra at 19-20.

Federal courts are courts of limited jurisdiction. See Murthy v. Missouri, 603 U.S. 43, 56-57 (2024); U.S. Const. art. III, § 2, cl. 1. For a plaintiff's claims to come within this Court's limited subject matter jurisdiction, the plaintiff must have standing to advance their claims. See Attias v. Carefirst, Inc., 865 F.3d 620, 624 (D.C. Cir. 2017). To establish standing, a plaintiff must demonstrate that they have suffered an "injury in fact" that is "concrete and particularized," "actual or imminent," "fairly . . . trace[able] to the challenged action of the defendant," and which "likely" will be "redressed by a favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (alterations in original) (first quoting Allen v. Wright, 468 U.S. 737, 756 (1984); then quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990); and then quoting Simon v. Eastern Ky. Welfare Rts. Org., 426 U.S. 26, 41-42 (1976)).

A plaintiff must have standing "for each claim that [it] press[es] and for each form of relief that [it] seek[s]." TransUnion LLC v. Ramirez, 594 U.S. 413, 431 (2021). And for a plaintiff to have standing to pursue "forward-looking" relief—such as an injunction—the plaintiff must "face 'a real and immediate threat of repeated injury.'" Murthy v. Missouri, 603

U.S. at 58 (quoting O'Shea v. Littleton, 414 U.S. 488, 496 (1974)).  At the preliminary injunction stage, the movant bears the burden of demonstrating a "substantial likelihood" of standing.  Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015).

Here, all plaintiffs are organizational plaintiffs.  See Am. Compl. ¶¶ 14-16.  "An organizational plaintiff can demonstrate standing either by organizational standing, showing injury to itself, or by associational standing, showing 'a cognizable injury to one or more of its members.'"  Nat'l Ass'n of Consumer Advocs. v. RentGrow, Inc. ("NACA v. RentGrow"), Civil Action No. 24-3218 (PLF), 2025 WL 1429172, at *2 (D.D.C. May 16, 2025) (quoting Kingman v. Park Civic Ass'n v. Bowser, 815 F.3d 36, 39 (D.C. Cir. 2016)).  MAEC asserts organizational standing, and the NAACP Plaintiffs assert associational standing.  Pls. Mot. at 1.

1. Plaintiff MAEC's Organizational Standing

The Court finds—and the parties do not dispute—that MAEC has sufficiently demonstrated organizational standing to sue on its own behalf.  See Pls. Mot. at 1, 12.  To have standing to sue "in its own right," an organization must show that it has suffered "an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision."  League of United Latin Am. Citizens v. Exec. Off. of the President ("LULAC"), Civil Action No. 25-0946 (CKK), 2025 WL 1187730, at *22 (D.D.C. Apr. 24, 2025) (quoting Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric., 946 F.3d 615, 618 (D.C. Cir. 2020)).  MAEC alleges that the Department's decision to terminate its EAC grant violates its First Amendment and Fifth Amendment rights, as well as the APA.  See Am. Compl. ¶¶ 202-80.  MAEC also alleges economic and reputational harms as a result of the Department's termination decision.  See Pls. Mot. at 12.  The Court finds that MAEC's alleged injuries constitute injuries in fact that are fairly traceable to defendants' allegedly unlawful

termination decision, and that are likely to be redressed by a favorable decision from this Court, specifically, an order setting aside as unlawful the Department's termination of MAEC's grant.

### 2.  The NAACP Plaintiffs' Associational Standing

As for the NAACP Plaintiffs, the Court finds that they have not sufficiently demonstrated associational standing to sue on their members' behalf.  Accordingly, the Court will deny the NAACP Plaintiffs' motion for a preliminary injunction for lack of standing.

To establish associational standing, an organization must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  NACA v. RentGrow, 2025 WL 1429172, at *3 (quoting Hunt v. Wash. State Apple Advert. Comm'n ("Hunt"), 432 U.S. 333, 343 (1977)).  For an organization to satisfy the first prong of the associational standing test, it must show, for each of its claims, that at least one of its members suffered an "injury in fact" that is "concrete and particularized," "actual or imminent," "fairly . . . trace[able] to the challenged action of the defendant," and which "likely" will be "redressed by a favorable decision."  Lujan, 504 U.S. at 560-61.  When the plaintiff is not itself "the object of the government action or inaction [plaintiff] challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish."  Id. at 562 (internal quotations omitted); see also Arpaio v. Obama, 797 F.3d 11, 20 (D.C. Cir. 2015).  In such cases, plaintiff must proffer "substantial evidence of a causal relationship between the government [action] and the third-party conduct" to establish standing.  Arpaio v. Obama, 797 F.3d at 20 (quoting Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 941 (D.C. Cir. 2004)).

As discussed, the NAACP Plaintiffs allege that defendants' termination of the EAC program—that is, all four of the EAC grants—violates their members' First Amendment and Fifth Amendment rights, and violates the APA. See Am. Compl. ¶¶ 202-28, 235-89. The NAACP Plaintiffs' declarations establish the following facts: (i) NAACP members attend schools or have children who attend schools that were provided services through the EAC program prior to the Department's termination of the EAC grants, see Lewis Decl. ¶ 14; (ii) one NAACP member believes their child "would benefit from programs designed to help [the child's] school reduce disparities" in access to educational resources, see Simelton Decl. ¶ 16; (iii) one NAACP member believes their child would benefit from services designed to reduce racial disparities in access to advanced classes, see Leconte Decl. ¶ 11; (iv) one NAACP educator member, Ms. Civil Miller-Watkins, intended to attend future training sessions offered by her school district "through its partnership with EAC-South," but because EAC-South "significantly scale[d] back the services" it provided to Ms. Miller-Watkins's school district after its grant was terminated, Ms. Miller-Watkins "can no longer receive that training," see Holmes Decl. ¶ 20; and (v) two EACs— the Midwest and Plains Equity Assistance Center and the Western Educational Equity Assistance Center—discontinued ongoing projects with school districts and LEAs located in Region III and Region IV, respectively, after the Department terminated their EAC grants. See Mundry Decl. ¶¶ 7-18; Skelton Decl. ¶¶ 6-12.

The Court concludes that these declarations are not sufficient to demonstrate that at least one of the NAACP Plaintiffs' members "have standing to sue in their own right." See Hunt, 432 U.S. at 343. Because the NAACP Plaintiffs' members are not themselves "the object of the government action or inaction" that plaintiffs challenge—the Department's termination of the EAC grants—the NAACP Plaintiffs bore the burden of providing "substantial evidence of a

causal relationship" between defendants' termination of the EAC grants and their members' alleged harms.  See Arpaio v. Obama, 797 F.3d at 20; Lujan, 504 U.S. at 562.  But the proffered declarations merely establish that NAACP members have benefitted, see Lewis Decl. ¶ 14, might benefit, see Simelton Decl. ¶ 16; Leconte Decl. ¶ 11, or intended to benefit from the EAC program at some unspecified point in the future.  See Holmes Decl. ¶ 20.[5]  The "causal connection" between these alleged injuries and defendants' termination decision is far too attenuated to be "fairly . . . trace[able]" to defendants' conduct.  Lujan, 504 U.S. at 560.

Consider the "chain of contingencies" between the Department's termination decision and the harms alleged by the NAACP Plaintiffs' members.  Clapper v. Amnesty Int'l USA ("Clapper"), 568 U.S. 398, 410 (2013).  On February 13, 2025, the Department terminated all four EAC grants.  See Am. Compl. ¶¶ 1, 86.  The grant terminations allegedly led MAEC and the other EAC grantees to "abruptly end" some ongoing technical assistance projects with school districts and LEAs.  Pls. Mot. at 35-36; see also Mundry Decl. ¶¶ 7-18; Skelton Decl. ¶¶ 6-12.  This, in turn, left some school districts and LEAs without the EACs' technical assistance services.  See Lewis Decl. ¶ 14.  If those school districts and LEAs are unable to obtain comparable services from other sources, then their ability to "address patterns of discrimination and hostile environments" may eventually be negatively impacted.  Pls. Mot. at 36.  And if that happens, educators and students—including the NAACP Plaintiffs' members—may eventually be impacted by discrimination or other negative outcomes.  See Lewis Decl. ¶ 14; Simelton Decl. ¶ 16; Leconte Decl. ¶ 11; Holmes Decl. ¶ 20.  But this "theory of future injury is too speculative to satisfy the well-established requirement that threatened injury must be "certainly impending"

---

[5]     The Mundry and Skelton declarations do not allege harms to the NAACP Plaintiffs' members at all.  See Mundry Decl. ¶¶ 7-18; Skelton Decl. ¶¶ 6-12.

to constitute an injury in fact.  Clapper, 568 U.S. at 400 (citing Whitmore v. Arkansas, 495 U.S. at 158); see also Summers v. Earth Island Inst., 555 U.S. 488, 496 (2009) (rejecting a standing theory premised on a speculative chain of possibilities); Arpaio v. Obama, 797 F.3d at 20-21.

       The NAACP Plaintiffs' theory of standing suffers from another defect:  it requires too much "guesswork as to how independent decisionmakers"—specifically, the EACs, school districts, and LEAs—"will exercise their judgment."  Murthy v. Missouri, 603 U.S. at 57-58. Recall that EACs do not supply technical assistance services directly to students or educators. See Williams Decl. ¶ 3.  Rather, the EACs' services "are available only upon request by eligible public-school institutions" in an assigned region, who in turn distribute the benefits of the EACs' services to students and educators in that region.  Id.  Thus, there are two degrees of separation— and two independent decisionmakers—between defendants and the NAACP Plaintiffs' members. The Court cannot engage in "guesswork as to how [those] independent decisionmakers" will exercise their judgment in the wake of defendants' termination decisions.  See NAACP v. U.S. Dep't of Educ., Civil Action No. 25-1120 (DLF), 2025 WL 1196212, at *3 (D.D.C. Apr. 24, 2025) (finding that the NAACP's theory of associational standing "relie[d] too much on guesswork" where its members' alleged injuries "stem[med] from the independent decisions of school boards and administrators to end certain programs implicating DEI."); see also ASARCO Inc. v. Kadish, 490 U.S. 605, 615 (1989) (explaining that plaintiff's theory of standing may not depend on "unfettered choices made by independent actors not before the courts and whose exercise of . . . discretion the courts cannot presume either to control or to predict.").

       The attenuated nature of the NAACP Plaintiffs' theory of standing applies equally to each of their claims.  See Pls. Mot. at 17-18 (basing associational standing to advance First Amendment claim on allegations that the Department's termination of SEF's EAC-South

grant led to a disruption in EAC-South's programming, which led to an NAACP member "no longer be[ing] able" to attend a not-yet-scheduled training that she "intended to attend."); id. at 20 (basing associational standing to advance Fifth Amendment claim on allegations that the Department's termination of SEF's EAC-South grant—using an allegedly vague termination letter—led to EAC-South "no longer ha[ving] the financial resources to continue providing" technical assistance trainings to a particular school district, which in turn deprived an NAACP member of the opportunity to attend future trainings); id. at 35-36 (basing associational standing to advance APA claims on allegations that defendants failed to consider the reliance interests of NAACP members whose children experience disparities in access to educational resources, and who would have benefitted from technical assistance that may have remedied those disparities).

Thus—at least at this stage of the litigation—the Court cannot conclude that the NAACP Plaintiffs have shown a "substantial likelihood" of demonstrating standing. See Food & Water Watch, Inc. v. Vilsack, 808 F.3d at 913. And even assuming, arguendo, that the NAACP Plaintiffs have demonstrated associational standing to sue on behalf of their members, they have not sufficiently demonstrated that their members' alleged harms constitute irreparable harm such that a preliminary injunction is warranted. See infra at Section III.C.1. Accordingly, the Court will deny the NAACP Plaintiffs' motion for a preliminary injunction for lack of standing.

By contrast, because MAEC has shown a "substantial likelihood" of demonstrating organizational standing, see supra at Section II.C.1, the Court will allow MAEC's motion for a preliminary injunction to proceed. But MAEC conceded at oral argument that it only has standing to challenge defendants' termination of MAEC's grant, not all four EAC grants. See Transcript of Record, Mid-Atlantic Equity Consortium v. U.S. Dep't of Education, Civil Action No. 25-1407 (July 8, 2025) at 6:19-22 ("What plaintiff MAEC is seeking is the

set[ting] aside and restoration of its EAC grant and not of the other [EAC grants], nor are we claiming that plaintiff MAEC has standing to challenge those terminations.").  The Court therefore will consider MAEC's claims only as they relate to the termination of MAEC's grant.

### III.    MAEC's REQUEST FOR A PRELIMINARY INJUNCTION

#### A.  Legal Standard

A movant seeking preliminary injunctive relief must make a "clear showing that four factors, taken together, warrant relief:  likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest."  Archdiocese of Washington v. Wash. Metro. Area Transit Auth. ("Archdiocese of Washington"), 897 F.3d 314, 321 (D.C. Cir. 2018) (quoting League of Women Voters v. Newby 838 F.3d 1, 6 (D.C. Cir. 2016)); see also Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (noting that a preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." (quoting Winter v. Nat. Res. Def. Council, Inc. ("Winter"), 555 U.S. 7, 22 (2008))).  Of these, the most important factor is whether the movant has established a likelihood of success on the merits.  See Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014); see also Bailey v. Fed. Bureau of Prisons, Civil Action No. 24-1219 (PLF), 2024 WL 3219207, at *3 (D.D.C. June 28, 2024).

Before the Supreme Court's decision in Winter, courts in this Circuit weighed these four factors on a "sliding scale," under which the movant need not "make as strong a showing" on one factor if they "make[ ] an unusually strong showing" on another.  Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (quoting Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 361 (D.C. Cir. 1999)); accord Damus v. Nielsen, 313 F. Supp. 3d 317, 326 (D.D.C. 2018).  This Circuit has suggested, however, that "a likelihood of

success" and "a likelihood of irreparable harm" are "independent, free-standing requirement[s] for a preliminary injunction." Sherley v. Sebelius, 644 F.3d at 392-93 (quoting Davis v. Pension Benefit Guar. Corp., 571 F.3d at 1296 (Kavanaugh, J., concurring)); see Archdiocese of Washington, 897 F.3d at 334 (declining to resolve whether the "sliding scale" approach is still valid after Winter); Nat'l Treasury Emps. Union v. Vought, Civil Action No. 25-0381 (ABJ), 2025 WL 942772, at *19 (D.D.C. Mar. 28, 2025). Regardless, "a failure to show a likelihood of success on the merits alone is sufficient to defeat a preliminary-injunction motion." Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (citing Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric., 573 F.3d 815, 832 (D.C. Cir. 2009)); see also M.G.U. v. Nielsen, 325 F. Supp. 3d 111, 117-18 (D.D.C. 2018).

For each of its claims, MAEC bears the burden of persuasion. Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006). MAEC also "bears the burden of producing credible evidence sufficient to demonstrate [its] entitlement to injunctive relief." Workman v. Bissessar, 275 F. Supp. 3d 263, 267 (D.D.C. 2017).

### B. Likelihood of Success on the Merits

MAEC contends that it is likely to succeed on the merits of all of its claims: its Fifth Amendment claims (Counts One and Three), its First Amendment claims (Count Two), and its APA claims (Counts Four, Five, Six, and Seven). The Court finds that MAEC is likely to succeed on the merits of Count Five—that the Department's termination of MAEC's EAC grant

was arbitrary and capricious under the APA.  The Court therefore will grant plaintiffs' motion

for a preliminary injunction only as it relates to MAEC.[6]

### 1.  Finality

The APA limits judicial review to "final agency action."  5 U.S.C. § 704.  Agency

action is "final" when two conditions are met: (1) "the action must mark the 'consummation' of

the agency's decision making process—it must not be of a merely tentative or interlocutory

nature," and (2) "the action must be one by which 'rights or obligations have been determined,'

or from which 'legal consequences will flow.'"  Bennett v. Spear, 520 U.S. 154, 177-78 (1997)

(quoting Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948), and

Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatl., 400 U.S. 62, 71 (1970)).

Here, MAEC challenges three "final" agency actions:  (i) the Department's

"termination of . . . MAEC's grant," (ii) "the unlawful adoption of new grant appeals

procedures," and (iii) "the unlawful adoption of new agency priorities."  Pls. Mot. at 25.

The Court concludes that the Department's termination of MAEC's EAC grant is

a final agency action such that it is subject to judicial review under the APA.  MAEC received a

form termination letter from the Department that was identical to the letter SEF received in

Southern Educ.  Compare Southern Educ., 2025 WL 1453047, at *3-4, with Termination Letter.

In Southern Educ., this Court found that the termination letter SEF received from the Department

represented that the Department had concluded its review of the EAC-South grant.  See Southern

---

[6]        Although the parties briefed multiple issues, the Court need only find that MAEC
is likely to succeed on one of its claims for this factor to weigh in its favor.  The Court therefore
does not address all of the parties' arguments at this preliminary stage.  See Media Matters for
Am. v. Paxton, 732 F. Supp. 3d 1, 27 (D.D.C. 2024), affirmed, No. 24-7059, 2025 WL 492257
(D.C. Cir. Feb. 13, 2025).

Educ., 2025 WL 1453047, at *15.  The termination of the EAC-South grant "was immediate, without prior notice of deficiencies or opportunity to respond, [and] immediately produced legal consequences for SEF because SEF could no longer access previously awarded funds."  Id.  And though SEF administratively appealed the Department's termination decision, SEF withdrew its administrative appeal and filed an amended complaint to reflect that it had withdrawn its appeal.  See id.  The Court found that "[those] factual developments resolve[d] any risk of a concurrent administrative process altering the Court's analysis or obviating judicial review."  Id. (citing Vanda Pharms. Inc. v. Food & Drug Admin., Civil Action No. 23-2812 (CRC), 2024 WL 4133623, at *8 (D.D.C. Sept. 10, 2024) (emphasizing that what "matters" when determining whether a claim is incurably premature is if a "separate, still pending [administrative] proceeding . . . might alter the court's analysis or entirely vitiate the need for judicial review.")).

For the reasons it articulated in Southern Educ., the Court finds that the Department's termination of MAEC's EAC grant constituted final agency action.

## 2.  Arbitrary and Capricious

For the same reasons that SEF prevailed in showing that the Department's termination of the EAC-South grant was arbitrary and capricious in Southern Educ., the Court concludes that MAEC likely will prevail in showing that the Department's termination of MAEC's EAC grant was arbitrary and capricious in this case.  See Southern Educ., 2025 WL 1453047, at *16-17.

The APA instructs reviewing courts to hold unlawful and set aside final agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  When assessing whether a final agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," courts consider

"only whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'"  Dep't of Commerce v. New York, 588 U.S. 752, 773 (2019) (quoting Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co. ("Motor Vehicle Mfrs. Assn."), 463 U.S. 29, 43 (1983)); see also FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021) (explaining that an agency action is "arbitrary" and "capricious" if it is not "reasonable and reasonably explained."); Nat'l Tel. Coop. Ass'n v. FCC, 563 F.3d 536, 540 (D.C. Cir. 2009) ("The APA's arbitrary-and-capricious standard requires that agency rules be reasonable and reasonably explained.").  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Assn., 463 U.S. at 30.

In determining whether the Department's termination of MAEC's EAC grant was "reasonable and reasonably explained," the Court looks first to the "grounds that the [Department] invoked" when it terminated the grant.  Michigan v. EPA, 576 U.S. 743, 758 (2015)); see also Motor Vehicle Mfrs. Assn., 463 U.S. at 50 (". . . an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").  Recall that the Termination Letter that the Department sent to MAEC on February 13, 2025 reads as follows:

> This letter provides notice that the United States Department of Education is terminating your federal award, S004D220002.  See 2 C.F.R. § 200.340-43; see also 34 C.F.R. § 75.253.
>
> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States.  The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another

protected characteristic.  Illegal DEI policies and practices can
violate both the letter and purpose of Federal civil rights law and
conflict with the Department's policy of prioritizing merit, fairness,
and excellence in education.  In addition to complying with the civil
rights laws, it is vital that the Department assess whether all grant
payments are free from fraud, abuse, and duplication, as well as to
assess whether current grants are in the best interests of the
United States.

The grant specified above provides funding for programs that
promote or take part in DEI initiatives or other initiatives that
unlawfully discriminate on the basis of race, color, religion, sex,
national origin, or another protected characteristic; that violate
either the letter or purpose of Federal civil rights law; that conflict
with the Department's policy of prioritizing merit, fairness, and
excellence in education; that are not free from fraud, abuse, or
duplication; or that otherwise fail to serve the best interests of the
United States.  The grant is therefore inconsistent with, and no
longer effectuates, Department priorities.  See 2 C.F.R.
§ 200.340(a)(4); see also 34 C.F.R. § 75.253.  Therefore, pursuant
to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R.
§ 75.253, and the termination provisions in your grant award, the
Department hereby terminates grant No. S004D220002 in its
entirety effective 2/13/25.

Termination Letter at 1.  The Termination Letter lists five theoretical bases for the termination of

MAEC's grant.  See Shaffer Decl. App., Ex. A at 1.  The Termination Letter states that MAEC's

grant may have been terminated because it "promote[s] or take[s] part in DEI initiatives" that

"unlawfully discriminate on the basis of" protected characteristics, or "violate either the letter or

purpose of Federal civil rights law," or "conflict with" the Department's policies, or "are not free

from fraud, abuse, or duplication," or "otherwise fail to serve the best interests of the United

States."  See id.  The Termination Letter does not identify which of these bases was the reason

for the termination of MAEC's grant.  In fact, the Termination Letter was one of many

standardized termination letters that the Department sent to many federal grant recipients in early

February 2025.  See Southern Educ., 2025 WL 1453047, at *3-4; see also California v. U.S.

Dep't of Educ., Civil Action No. 25-10548 (MJJ), 2025 WL 760825, *2-3 (D. Mass.

Mar. 10, 2025); Am. Ass'n of Colleges for Tchr. Educ. v. McMahon, Civil Action No. 25-0702

(JRR), 2025 WL 833917, at *17 (D. Md. Mar. 17, 2025).

As noted, the Supreme Court has held that a reasonable explanation must consider

relevant data and articulate a satisfactory explanation for the agency's decision, "including a

rational connection between the facts found and the choice made." Dep't of Commerce v. New

York, 588 U.S. at 773 (quoting Motor Vehicle Mfrs. Assn., 463 U.S. at 43). "Here, '[t]he

Department has not provided a satisfactory explanation of the facts found or the choice made,

much less a rational connection between the two.'" Southern Educ., 2025 WL 1453047, at *16

(quoting Am. Ass'n of Colleges for Tchr. Educ. v. McMahon, 2025 WL 833917, at *21). There

is no evidence in the record that the Department engaged in any individualized assessment of

CEE's programming, or collected or considered any relevant data about MAEC or the CEE

before terminating the grant. "And the Department's use of a boilerplate letter that was issued to

several other grant recipients further strengthens [MAEC's] argument that there was no rational

connection between the facts the Department found, if any, and the termination decision that it

made." Southern Educ., 2025 WL 1453047, at *16; see also id. (finding that defendants'

termination of the EAC-South grant using a standardized termination letter was arbitrary and

capricious under the APA); Am. Ass'n of Colleges for Tchr. Educ. v. McMahon, 2025

WL 833917, at *21 (finding that an identical termination letter "fail[ed] to provide Grant

Recipients any workable, sensible, or meaningful reason or basis for the termination of their

awards."); Thakur v. Trump, Civil Action No. 25-04737 (RFL), 2025 WL 1734471, at *14 (N.D.

Cal. June 23, 2025) (finding that the "pace of the review" of plaintiffs' federal grants and "the

resulting large waves of [grant] terminations via form letters . . . further suggests a likelihood

that no APA-compliant individualized review occurred," raising "precisely the kinds of concerns that the APA's bar on arbitrary-and-capricious agency decisionmaking was meant to address.").

The Court concludes that the Department's Termination Letter provides no reasoned explanation for the grant termination.  "In fact, the Termination Letter's list of possible bases 'is so broad and vague as to be limitless; devoid of import, even.'"  Southern Educ., 2025 WL 1453047, at *17 (quoting Am. Ass'n of Colleges for Tchr. Educ. v. McMahon, 2025 WL 833917, at *21).  Moreover, the Termination Letter's reliance on undefined terms like "DEI" and "Illegal DEI" is also "arbitrary and capricious because it allows [defendants] to arrive at whatever conclusion [they] wish[ ] without adequately explaining the standard on which [their] decision is based."  Am. Pub. Health Ass'n v. Nat'l Institutes of Health, Civil Action No. 25-10787 (WGY), 2025 WL 1822487, at *17 (D. Mass. July 2, 2025) (quoting Firearms Regul. Accountability Coal., Inc. v. Garland, 112 F.4th 507, 525 (8th Cir. 2024).

For those reasons, the Court finds that MAEC has shown a substantial likelihood of success on the merits of Count Five—the APA arbitrary and capricious claim.

## C.  Irreparable Harm

Turning next to irreparable harm, plaintiffs assert that they will face "actual," "certain," and "imminent" injuries that "independently amount[ ] to irreparable harm."  Pls. Mot at 39-44.  To constitute irreparable harm, plaintiffs' alleged injuries must be "both certain and great," "actual and not theoretical," and "beyond remediation."  Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com., 498 F. Supp. 3d 87, 101 (D.D.C. 2020) (quoting Chaplaincy of Full Gospel Churches, 454 F.3d at 297).  While economic injuries are usually insufficient to justify injunctive relief, financial harm can "constitute irreparable harm . . . where the loss threatens the very existence of the movant's business."  Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C.

Cir. 1985).  And "obstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes . . . [of establishing] irreparable harm."  League of Women Voters v. Newby, 838 F.3d at 9.  Reputational injury can also suffice to establish irreparable harm.  See Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev., 963 F. Supp. 1, 5 (D.D.C. 1997) (finding plaintiffs' business reputation would be damaged by agency's characterization of them as "enticing" senior citizens into meetings, and "pressuring" them to obtain reverse mortgages "under the guise of sound estate planning.").

   The Court finds that the NAACP Plaintiffs have not sufficiently shown that their members will suffer irreparable harm in the absence of a preliminary injunction.  The Court finds, however, that MAEC has sufficiently made such a showing on its own behalf.

   1.  The NAACP Plaintiffs' Theories of Irreparable Harm

   The NAACP Plaintiffs advance two theories of irreparable harm:  (i) the deprivation of their members' First and Fifth Amendment rights, and (ii) the broader harms that will result "from the denial of technical assistance services to redress persistent racial discrimination in the schools" that NAACP members "attend and work in."  Pls. Mot. at 43. Specifically, the NAACP Plaintiffs assert that "[t]he loss of technical assistance to remedy racial discrimination in schools will occasion profound harms to the well-being of NAACP members and other Black students" because "[s]chool-based racial discrimination harms students' motivation, academic performance, graduation rates, and physical and mental health."  Id.

   Starting with the NAACP Plaintiffs' latter theory of irreparable harm, the Court does not question the harmful effects that discrimination can have on students of color, especially in the classroom.  But the issue before this Court is not the legitimacy of those harms—it is whether the NAACP Plaintiffs have provided substantial evidence of a "causal

connection" between defendants' conduct and the alleged harms facing their members.  See

Lujan, 504 U.S. at 560.  And as the Court has explained, the "causal connection" between the

defendants' decision to terminate the four EAC grants and the alleged injuries suffered by the

NAACP Plaintiffs' members is too attenuated to be "fairly . . . trace[able]" to defendants'

conduct.  Id.; see supra at Section II.C.2.  In its discussion of associational standing, the Court

found the NAACP Plaintiffs' "theory of future injury . . . too speculative to satisfy the

well-established requirement that threatened injury must be "certainly impending" to constitute

an injury in fact.  Clapper, 568 U.S. at 400; see supra at Section II.C.2.  And in order to

constitute irreparable harm, the alleged harms facing the NAACP Plaintiffs' members must clear

an even higher threshold.  See Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com., 498 F.

Supp. 3d at 101 (explaining that plaintiffs' alleged injuries must be "both certain and great,"

"actual and not theoretical," and "beyond remediation." (emphasis added)).  The Court concludes

that the NAACP Plaintiffs' second theory of irreparable harm—which amounts to concerns

about discrimination that may eventually occur as a result of defendants' decision to terminate

the EAC grants—is likely too attenuated to constitute irreparable harm.

      As for the NAACP Plaintiffs' first theory of irreparable harm, the Court finds that

their constitutional claims also do not support their request for preliminary injunctive relief.  The

NAACP Plaintiffs assert that "the Termination Letter and the termination of the EAC program

harms [their] members' First Amendment right to receive information, including by infringing

upon that right with vague conditions prohibited by the Fifth Amendment."  Pls. Mot. at 42.

While the D.C. Circuit has held that "the loss of constitutional freedoms, 'for even minimal

periods of time,'" constitutes per se irreparable harm, Mills v. District of Columbia, 571

F.3d 1304, 1312 (D.C. Cir. 2009) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)), the Court

34

concludes that the NAACP Plaintiffs have not sufficiently demonstrated that their members' First Amendment and Fifth Amendment rights have been infringed by defendants.

To start, the First Amendment protects both the right to speak and the "right to receive information and ideas." Stanley v. Georgia, 394 U.S. 557, 564 (1969); see also Murthy v. Missouri, 603 U.S. at 75. For example, in Martin v. City of Struthers, 319 U.S. 141 (1943), the Supreme Court struck down a city's prohibition on door-to-door distribution of "handbills, circulars[,] or other advertisements," holding that the law violated the First Amendment based on an individual's "right to distribute literature," and another's "right to receive it." Id. at 142-43; see also Thomas v. Collins, 323 U.S. 516, 538 (1945) (holding that a court could not bar a union organizer from delivering a speech to company employees); Lamont v. Postmaster Gen. of U.S., 381 U.S. 301, 306-07 (1965) (holding that the government could not burden someone's right to receive political literature through the mail); id. at 308 (Brennan, J., concurring) ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them."); Little v. Llano Cnty., 138 F.4th 834, 842-44 (5th Cir. 2025) (collecting cases). In other words, the government cannot "bar someone from receiving someone else's speech." Id. at 842. So "[t]o assert a First Amendment right-to-receive claim, a plaintiff must specifically identify information it is denied access to by reason of a government action." NAACP v. U.S. Dep't of Educ., Civil Action No. 25-1120 (DLF), 2025 WL 1196212, at *2 (D.D.C. Apr. 24, 2025) (emphasis added).

Here, the NAACP Plaintiffs allege that the Department's termination of the EAC-South grant forced EAC-South to halt its programming, depriving at least one NAACP educator member of the opportunity to attend a future training hosted by their school district in partnership with EAC-South. See Pls. Mot. at 17-18. But this argument stretches the First

Amendment right to receive too far:  defendants' decision to terminate the EAC-South grant has

not <u>prevented</u> the NAACP Plaintiffs' members from receiving information from EAC-South.

<u>See</u> <u>Little v. Llano Cnty.</u>, 138 F.4th at 843.  Rather, defendants have simply chosen not to

continue <u>paying</u> EAC-South to disseminate information.  <u>See</u> <u>Rust v. Sullivan</u>, 500 U.S. 173, 200

(1991) ("[T]he Government may choose not to subsidize speech"); <u>see also</u> <u>Rosenberger v.</u>

<u>Rector & Visitors of Univ. of Virginia</u>, 515 U.S. 819, 833 (1995); <u>Regan v. Taxation With</u>

<u>Representation of Washington</u>, 461 U.S. 540, 546 (1983) ("We again reject the notion that First

Amendment rights are somehow not fully realized unless they are subsidized by the State.").

The NAACP Plaintiffs' First Amendment claim therefore is not likely to succeed on the merits.

          This conclusion also is fatal to the NAACP Plaintiffs' Fifth Amendment due

process void-for-vagueness claim.  Void-for-vagueness challenges under the Fifth Amendment

are essentially due process claims, which means that the NAACP Plaintiffs must establish the

deprivation of a protected interest in liberty or property to succeed on their Fifth Amendment

claim.  <u>See</u> <u>NB ex rel. Peacock v. District of Columbia</u>, 794 F.3d 31, 41 (D.C. Cir. 2015) ("The

first inquiry in every due process challenge is whether the plaintiff has been deprived of a

protected interest in 'liberty' or 'property.'"); <u>see also</u> <u>Nat'l Urb. League v. Trump</u>, Civil Action

No. 25-471 (TJK), 2025 WL 1275613, at *17 (D.D.C. May 2, 2025) (observing that "[a] void for

vagueness challenge is, at bottom, a due-process claim, so Plaintiffs must show that they were

deprived of a constitutionally-protected property or liberty interest.").  The NAACP Plaintiffs

argue that "as a direct result of the vague prohibitions imposed on the EACs," through the

Department's grant termination letters, the EACs no longer have the financial resources to

continue providing instructional programming to participating school districts, depriving

NAACP educator members of that valuable information.  Pls. Mot. at 20.  These "vague

prohibitions," they assert, violate NAACP members' "liberty interest in continuing to receive training, instructional materials, and other technical assistance programming" from the EACs. See Pls. Mot. at 20.

But as discussed, the NAACP Plaintiffs have failed to sufficiently demonstrate that defendants have infringed their members' First Amendment right to receive information from the EACs. The NAACP Plaintiffs therefore have not sufficiently demonstrated that their members were deprived of a constitutionally-protected property or liberty interest, as is required for Fifth Amendment due process claims. See e.g., Vera Inst. of Just. v. U.S. Dep't of Just., 2025 WL 1865160, at *16 (finding that plaintiffs had no "plausible property interest in . . . grant awards"); Nat'l Urb. League v. Trump, 2025 WL 1275613, at *19 (same).

For these reasons, the Court finds that the NAACP Plaintiffs have not sufficiently shown that their members will suffer irreparable harm in the absence of a preliminary injunction.

### 2.  Plaintiff MAEC's Theories of Irreparable Harm

The Court finds that MAEC has sufficiently demonstrated that it will suffer irreparable harm in the absence of a preliminary injunction. MAEC advances three theories of irreparable harm: "deprivation of its First and Fifth Amendment rights," "reputational harm," Pls. Mot. at 39, and "economic losses [that] are immediate, concrete, and unrecoverable as after-the-fact monetary damages" in the absence of a preliminary injunction. Id. at 41-42. MAEC alleges that its terminated EAC grant represents "over forty percent of MAEC's annual revenue," Pls. Mot. at 41; see also Rouland Decl. ¶ 36, and the loss of nearly half of its funding "threatens [MAEC's] very existence." Pls. Mot. at 42. MAEC also alleges that after the Department terminated MAEC's EAC grant, MAEC was "forced to close its Equity Assistance Center [the CEE]," Pls. Mot. at 11, "terminate intensive technical assistance requested by six

school districts," id., "cancel every program and project run by [the] CEE," id. at 41, "lay off

four [CEE] employees, reduce all remaining [CEE] employees to 80% capacity, abandon

[CEE's] office space, and cut off [CEE's] telephone and internet service."  Id.

        Defendants counter that MAEC has not provided any evidence that the loss of its

EAC grant is an unrecoverable economic loss.  See Defs. Opp. at 11-12 (citing Taylor v.

Resolution Trust Corp., 56 F.3d 1497, 1507 (D.C. Cir. 1995); see also Wis. Gas Co. v.

FERC, 758 F.2d at 674 ("economic loss does not, in and of itself, constitute irreparable harm.").

Defendants assert that "[p]laintiffs provide no evidence regarding the overall harm to MAEC as

an organization that operates several programs of which the [CEE] is just one."  Defs. Opp.

at 12.  And though MAEC asserts that it has had to lay off CEE employees, reduce all remaining

CEE employees to 80% capacity, abandon CEE's office space, and cut off CEE's telephone and

internet service, see Pls. Mot. at 41, defendants contend that these losses "say[ ] nothing about

the degree of harm to [MAEC], which is what is relevant."  Defs. Opp. at 12.

        The Court recently rejected very similar arguments in Southern Educ.  There, the

Court found that SEF had sufficiently demonstrated that it would suffer irreparable harm where

the termination of its EAC grant "deprived [SEF] of the sole source of funding for EAC-South,"

"result[ed] in an immediate cessation of program operations and services," and would eventually

"result in [a] $3,371,108 overall loss."  Southern Educ., 2025 WL 1453047, at *13.  In addition

to monetary losses, SEF also alleged that the termination of its EAC grant forced it to "shut

down EAC-South entirely," resulting in "the loss of experienced staff," "interrupt[ing] ongoing

technical assistance projects," and constituting an "existential threat to what [plaintiff] has

built."  Id.  The Court concluded that "because the defendants' actions threaten[ed] the

livelihoods of [SEF's] employees . . . and the very existence of its programs," SEF had

sufficiently demonstrated that it would suffer irreparable harm.  Id. at *15.

   Here, the termination of MAEC's grant "result[ed] in an immediate cessation of

[the CEE's] operations and services," "the loss of experienced staff," and the interruption of

"ongoing technical assistance projects."  Southern Educ., 2025 WL 1453047, at *13.  The grant

termination also "devastated MAEC's operations."  Pls. Mot. at 41.  The Court therefore finds

that MAEC has sufficiently demonstrated that it will suffer irreparable harm absent an

injunction.  See Am. Ass'n of Colleges for Tchr. Educ. v. McMahon, 2025 WL 833917, at *23

(finding that plaintiffs whose federal grants were terminated would suffer irreparable harm

absent an injunction); Climate United Fund v. Citibank, N.A., Civil Action No. 25-698

(TSC), 2025 WL 1131412, at *17 (D.D.C. Apr. 16, 2025) (same).

### D. Equities and the Public Interest

   The remaining preliminary injunction factors—the balance of the equities and

assessment of the public interest—weigh in MAEC's favor.  These factors "merge when, as here,

the Government is the opposing party.'"  Singh v. Berger, 56 F.4th 88, 107 (D.C. Cir. 2022)

(quoting Karem v. Trump, 960 F.3d 656, 668 (D.C. Cir. 2020)).  "[C]ourts must balance the

competing claims of injury and must consider the effect on each party of the granting or

withholding of the requested relief[,] . . . pay[ing] particular regard for the public consequences"

that would result in granting the relief sought.  Winter, 555 U.S. at 24 (quotation marks omitted).

   MAEC alleges economic and non-economic injuries that would occur absent a

preliminary injunction, and argues that "[n]either the government nor the public will suffer a

legitimate injury that outweighs [MAEC's] interest in preliminary relief," Pls. Mot. at 44,

because defendants have already "appropriated and allocated" funds for the EAC grant program.

Id. at 45.  Therefore, according to MAEC, defendants will incur no additional costs if ordered to disburse the grant funds.  See id.  MAEC further asserts that members of the public have an interest in allowing MAEC's work through the CEE—which "advance[s] 'the Nation's goal of equal educational opportunity'"—to continue.  Id. (quoting 20 U.S.C. § 1221-1).

Defendants counter that "there are several compelling reasons that weigh against an injunction."  Defs. Opp. at 21.  "First, the government and the public both have a compelling interest in eliminating racial discrimination."  Id. (citing Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 206 (2023)).  Defendants assert that the Department "should be allowed to end its support for programs that it views as inconsistent with its interpretation of 'the letter and purpose of' federal civil rights laws."  Id.  Defendants also argue that the Department "would be harmed by a preliminary order to release remaining funds under the terminated grant" because, if MAEC is given access to the grant funds during the pendency of the case, the Department "will bear all the risk if the Court enters a preliminary injunction."  Defs. Opp. at 21-22.  Lastly, defendants argue that granting plaintiffs' requested preliminary injunction would defeat "the primary purpose of a preliminary injunction, which 'is to preserve the object of the controversy in its then existing condition—to preserve the status quo.'"  Id. at 22 (quoting Aamer v. Obama, 742 F.3d at 1043).

The Court rejected similar arguments in Southern Educ., finding that defendants' arguments "miss[ed] the mark" for the following reasons:

> Under Winter, the Court must balance harms that may occur if an injunction is erroneously granted as opposed to denied. See Winter, 555 U.S. at 24. Defendants assert that they bear the risk of financial loss if the Court erroneously enters a preliminary injunction, but offer no evidence that SEF is unable to pay back grant monies released. As for defendants' public interest argument, any theoretical harms to members of the public who are opposed to EAC-South receiving grant funding do not outweigh the alleged

> concrete, irreparable harm in the form of programmatic closures and loss of funding that SEF has already experienced. And to the extent defendants assert an interest in ending financial support for programs that are "inconsistent" with their interpretation of federal civil rights laws, the Court finds that that they likely pursued an unlawful objective in an unlawful manner. See TikTok Inc. v. Trump, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) ("[T]he government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required.'") (quoting R.I.L-R v. Johnson, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)); see also League of Women Voters v. Newby, 838 F.3d at 12 (holding that while "[t]here is generally no public interest in the perpetuation of unlawful agency action," "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operation' ") (quoting Washington v. Reno, 35 F.3d 1093, 1103 (6th Cir. 1994)).

Southern Educ., 2025 WL 1453047, at *17.  Because defendants proffer no reason why the Court should deviate from its reasoning on this point in Southern Educ., the Court applies the same analysis here, and concludes that the balance of the equities and assessment of the public interest weighs in favor of granting a preliminary injunction.  Each of the preliminary injunction factors therefore weighs in favor of granting MAEC's motion.

## IV. SECURITY

Rule 65(c) of the Federal Rules of Civil Procedure provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the [C]ourt considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  FED. R. CIV. P. 65(c).  Here, defendants request that the Court require MAEC "to post security in the amount of any taxpayer funds anticipated to be distributed during the pendency of the Court's order."  Defs. Opp. at 22.

Courts have "broad discretion" in determining "the appropriate amount of an injunction bond, including the discretion to require no bond at all."  Simms v. D.C., 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (internal citation and quotation marks omitted).  As the Court

explained in Nat'l Treasury Emps. Union v. Trump, requiring a significant bond "would conflict with both the Court's findings that each of the preliminary injunction factors weigh heavily in [MAEC's] favor and the principles of the right to seek judicial review of unlawful government action." Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *21.

The Court, in its discretion, orders MAEC to post a bond in the amount of $100 pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 14], as corrected by Plaintiffs' ERRATA Motion for a Preliminary Injunction ("Pls. Mot.") [Dkt. No. 15] is hereby GRANTED IN PART and DENIED IN PART.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 7/30/25